UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Coosa River Basin Initiative; Raymond
J. Perkins, Jr.; J. Perkins Farms, LLC,

<div align="center"><em>Plaintiffs</em>,</div>

<div align="center">v.</div>

3M Company, <em>et al.</em>,

<div align="center"><em>Defendants</em>.</div>

Civil Action No. 4:25-cv-00075-AT

**OMNIBUS RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO STAY**

### INTRODUCTION

This case is not duplicative—it is one of a kind. It is the only action that seeks judicially enforceable remediation of Dalton Utilities' LAS, taking up the mantle from its predecessor, *Johnson v. 3M Company*. That case laid the groundwork but fell short on standing; Plaintiffs now fill that gap. Through both federal and common law, they seek a court-ordered end to the PFAS contamination and injunctive relief to address the source—relief no other case requests and no agency pursues.

And it is long overdue. Decades of unchecked discharges have left downstream properties contaminated, wildlife and ecosystems degraded, and tens

<div align="center">1</div>

of thousands exposed to toxic PFAS, including many who avoid the surrounding environment altogether as a result. With no historical or looming agency intervention to bring this to a halt, Plaintiffs continue this necessary work that began nearly six years ago.

Dalton Utilities now seeks to derail that effort, warning of "conflicting remediation orders" with its own case. But it does not even seek remediation, and it cannot do so under CERCLA. It seeks money and allocation—cost recovery for consultants and speculative future expenses, untethered to any agency involvement, identifiable plan, or enforceable obligation. That does not pose a conflict, but leaves a void that Plaintiffs seek to fill.

Dalton Utilities seeks *de facto* control over remediation—with no plan, no enforceable obligation, and no direct responsibility for the harm it has caused for decades. It is, albeit cliché, the fox asking to guard the henhouse. And it is not a close call. A stay would not preserve judicial resources; it would delay the only suit that can compel remediation. It would not avoid conflict but enable inaction. And it would not serve equity; it would protect the source of the harm and sideline those forced to live with it. That outcome defies both the letter and spirit of every environmental law at issue.

2

The path forward is not to halt this suit—but to let it proceed. This is the role citizen suits were designed to play: to step in when government fails to act, and to secure relief where no other mechanism is moving. Plaintiffs do not deny Dalton Utilities' role in any eventual remedy, and any injunctive relief will necessarily weigh all interests and engage regulators. And that is not even a potential conflict. It is the system working as the law intends.

## BACKGROUND

The path to this case was paved by nearly six years of litigation in this Court. It is the natural successor to *Johnson v. 3M Company*—a multi-year environmental class action brought on behalf of Rome, Georgia drinking water customers harmed by decades of upstream PFAS pollution originating from Dalton's carpet industry. Mr. Johnson pursued complex claims against most of the same Defendants here. The case demanded tens of thousands of hours of legal work, culminating in more than 100 depositions, producing millions of pages of documents, site inspections, testimony of over 40 experts, extensive motion practice and hearings, and a comprehensive remediation plan. Through these efforts, Johnson marshalled the scientific and factual record necessary to prove environmental fate, causation, and liability in a case that Defendants—including Dalton Utilities—vigorously contested at every stage.

*Johnson*'s most hotly contested issue was its request for injunctive relief: remediation of Dalton Utilities' 9,800-acre Riverbend Land Application System ("LAS")—the known epicenter of PFAS discharges into the Conasauga River. *See generally Johnson v. 3M Co.*, Order on Motions for Summary Judgment, Doc. 1616, No. 4:20-cv-8-AT (N.D. Ga. Dec. 10, 2024) ("*Johnson* MSJ Order"). This Court acknowledged that PFAS discharges from the LAS posed real harms. *Id.* at 39. But it held that Mr. Johnson, a Rome water ratepayer, lacked standing to seek injunctive relief after Rome announced that it would install reverse osmosis water treatment and rescinded PFAS-related water rates. *Id.*

As this Court emphasized, the issue was not whether harm downstream of Dalton existed, but who could redress it. "Standing is not dispensed in gross," and Mr. Johnson himself had "not suffered a concrete, particularized injury that would be redressable by comprehensive remediation of the Dalton LAS." *Id.*

That shortcoming is now resolved. Plaintiffs here include CRBI—the Rome-based riverkeeper for the Upper Coosa River Basin with members who use and enjoy the river directly—and Mr. Perkins, who owns farmland and a residence on the Conasauga riverbanks downstream from the LAS. Doc. 1, at ¶¶ 32-37. His property is contaminated with extraordinarily high PFAS levels, including over 1,000 ppt of PFOS in floodplain runoff and 27,000 ppt in soil samples. *Id.* at ¶ 37.

Together, Plaintiffs represent the exact kind of party this Court found to have standing to pursue remediation. *See Johnson* MSJ Order, No. 4:20-cv-8-AT, Doc. 1616, at 38-39. Their claims build directly on the extensive groundwork laid in *Johnson*. Indeed, the same counsel now prosecutes *CRBI*, drawing on nearly all of the factual and expert evidence already assembled.

Despite the scale and urgency of the contamination, neither state nor federal regulators have taken any enforcement action to remediate the LAS or address PFAS contamination in the Conasauga River—either before *Johnson* or since. In 2002, EPA objected to Georgia's failure to require a National Pollutant Discharge Elimination System ("NPDES") permit for the LAS, but never followed up. *Johnson* Doc. 1218-10, L. Rush Depo., at 1567:7-22. From 2009 to 2016, EPA helped assess the extent of PFAS contamination in the LAS and the Conasauga River, *see Johnson* Doc. 1403-1, Plaintiff's Statement of Facts, ¶ 131, yet it took no enforcement action, required no remediation, and never mandated NPDES permitting for the discharges. The Georgia Environmental Protection Division ("EPD") has likewise taken no action—neither to remediate the LAS nor to reduce PFAS levels in the river to meet drinking water standards. *See* Doc. 60-2, ¶ 163; *Johnson* Doc. 1218-10, L. Rush Depo., at 1570:8-1575:12.

Recently, EPA designated PFOA and PFOS as hazardous substances in April 2024, but that event has triggered no shift in agency posture. *See* U.S. EPA, *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctancesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39124 (May 8, 2024). And it doesn't require one according to Dalton Utilities: "That designation doesn't require EPA to take action. It doesn't require Dalton Utilities to take action." *Johnson* MSJ Hearing Transcript, No. 20-cv-8-AT, at 33:12-17 (Apr. 24, 2024). It further maintained: "As we stand here today, there is no regulatory obligation or mandate to undertake changes at the LAS." *Id.* at 32:18-21.

CERCLA gives EPA three primary tools for initiating a response action. It can (1) undertake the response itself and later pursue cost recovery from potentially responsible parties under Section 107, 42 U.S.C. § 9607; (2) issue a unilateral administrative or judicial order under Section 106(a), 42 U.S.C. § 9606, requiring a responsible party to abate an "imminent and substantial endangerment"; or (3) negotiate a settlement with responsible parties under Section 122, 42 U.S.C. § 9622. EPA may only fund a comprehensive response if the site is listed on the National Priorities List ("NPL")—a designation reached through a formal, multi-step assessment process. *See, e.g.,* U.S. EPA, *Superfund: CERCLA*

*Overview* (Oct. 8, 2024)[1]. EPA has taken none of these steps with respect to the Dalton Utilities LAS.

In the absence of any federal or state action under any statute or common law, there is no other action that seeks judicially-enforceable remediation of the LAS. This case does: Through its public nuisance and Clean Water Act claims, Plaintiffs seek court-ordered abatement and injunctive relief to halt unlawful discharges and compel remediation. Doc. 1, ¶¶ 166-221, 247-265.

Months before this case commenced, Dalton Utilities filed its own naming many of the Defendants named here. *See City of Dalton, Georga v. 3M Co.*, No. 4:24-cv-293WMR, Doc. 1. That action asserts claims for cost recovery and a declaratory judgment under CERCLA, in addition to common-law claims based on PFAS contamination of Dalton Utilities' POTW. *See CRBI* Doc. 60-2 (First Amended Complaint). Notably, Dalton Utilities does ***not*** seek injunctive relief or court-ordered remediation of the LAS or any other portion of its POTW. *See id.* at ¶¶ 174-281, Prayer for Relief ¶¶ a-i. Instead, it alleges incurring consulting costs and that it will incur remediation costs that it might voluntarily undertake in the future. *See id.* at ¶¶ 170-173, 178, 185, 214, 228-229, 248, Prayer for Relief ¶¶ a-c.

---

[1] *available at* https://www.epa.gov/superfund/superfund-cercla-overview (last visited June 25, 2025).

Its complaint outlines no cleanup plan, proposes no performance standards, and identifies no oversight mechanism. *See generally id.* Nor does it allege EPA involvement in any way. *See generally id.*; *see also id.* at ¶ 163 ("Neither EPA nor EPD took any action with respect to PFAS at the LAS.").

Nonetheless, Dalton Utilities now seeks to stay *CRBI* on grounds that it risks "duplicative litigation" and "conflicting remediation orders" with its own "more comprehensive" CERCLA action. Doc. 60-1, 1-2. It further insists that it has a superior interest in LAS remediation—despite decades of contamination affecting the environment and tens of thousands living downstream. *See id.* Other Defendants have filed their own motions echoing Dalton Utilities' arguments. *See generally* Docs. 76, 104.

## ARGUMENT

### A.    Dalton Utilities' suit seeks no "remediation order" and no "disposition of property."

Dalton Utilities' motion primarily invokes *Colorado River* abstention but applies it to a fictional problem. It warns of "duplicative litigation" and "conflicting remediation orders," Doc. 60-1, at 9-11, but it cites no fact or law that substantiates these risks. While *Colorado River* abstention permits a range of considerations, *see Colo. River Water Conservation District v. U.S.* 424 U.S. 800,

818-19 (1976), Dalton Utilities leans on contingencies that do not—and on this record, cannot—exist.

Start with the CERCLA relief Dalton Utilities seeks—and what the law allows. It asserts two such claims: (1) recovery under 42 U.S.C. § 9706(a)(4)(B),[2] for costs that it "has incurred and will incur" in response to alleged hazardous substance disposal; and (2) declaratory relief under § 9613(g)(2),[3] assigning future cost liability to Defendants. Doc. 60-2, ¶¶ 174-188.

Missing from both is any request for a remediation order, disposition of property, or any other mechanism that would authorize judicially-enforceable action. *See* Doc. 60-1, at 88-91. And that is no accident: Only the federal government can wield CERCLA to compel remediation or seek injunctive relief. *See* 42 U.S.C. §§ 9604, 9606(a). States and private parties do not have this authority. *State of Colo. v. Idarado Min. Co.*, 916 F.2d 1486, 1489 (10th Cir. 1990) ("Courts have adhered to the view that injunctions are not available to states and other non-federal plaintiffs under CERCLA, even after the 1986 SARA amendments") (compiling cases), *cert. denied*, 499 U.S. 960; *Smith v. City of Conyers, GA*, 2007 WL 313467, at *6 (N.D. Ga. Jan. 30, 2007) ("[T]here is no

---

[2] Also referenced as CERCLA Section 107(a).
[3] Also referenced as CERCLA Section 113(g)(2).

private right of action for injunctive relief under CERCLA") (citing *Idarado*, 916 F.2d at 1492-93). Dalton Utilities' complaint reflects that limit because it cannot ask for more. *See* Doc. 60-2

While Dalton Utilities may recover response costs that it proves necessary and consistent with the National Contingency Plan (NCP), that remedy does not reach as far as its allegations. The complaint seeks costs that it "has incurred or will incur" under Section 107(a). Doc. 60-2, ¶ 180 ; Prayer for Relief, ¶ a) (same). But by the statute's plain terms, only "incurred" costs are within reach. 42 U.S.C. § 9607(a)(4)(B); *see also Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F. 4th 458, 483 (9th Cir. 2024) ("Future response costs, not yet incurred, are not recoverable under CERCLA."); *Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 608 (W.D. Mich. 2009) ("CERCLA does not authorize the recovery of costs to be incurred in the future.") (citations omitted). According to its own complaint, the only costs incurred are for technical consultants. Doc. 60-2, ¶¶ 170-71. Even if it prevails on the merits, Dalton Utilities' only recovery is those costs—not remediation, not cleanup, and nothing that compels Dalton Utilities to take any action at the LAS.[4]

---

[4] This would remain true even if Dalton Utilities had incurred costs beyond preliminary investigation. CERCLA Section 107(a) authorizes reimbursement of necessary and NCP-consistent response costs—not judicial oversight or

The Carpet Companies argue otherwise, conflating Dalton Utilities' request for future cost recovery with Plaintiff's request for injunctive relief—calling them "identical" simply because both reference remediation. Doc. 104-1, at 2-3 (comparing Dalton Utilities' request for "all necessary response costs incurred ***and to be incurred*** and Plaintiff's request for injunctive relief) (emphasis in original). Response costs and injunctions are not the same, *see Idadaro*, 916 F.2d at 1489, but that distinction needs no elaboration here: the future costs the companies equate with injunctive relief are not even at issue. 42 U.S.C. § 9607(a)(4)(B); *Whittaker Corporation*, 99 F. 4th at 483; *Lozar*, 678 F. Supp. 2d at 608. They support their position with 40 C.F.R. § 304.12(o), but that citation is irrelevant and misleading. Doc. 104-1, at 3 n.2 (citing "response cost" definition for the suggestion that future costs "to be incurred" are recoverable). The regulation defines "response costs" for EPA arbitration—and only for costs "incurred by the United States." *Id.* at §§ 304.10, 304.11, 304.12(o). It has no bearing here and no relevance to Dalton Utilities' claims.

Dalton Utilities also seeks a declaratory judgment under CERCLA Section 113(g)(2) establishing Defendants' liability for future response costs. *See* Doc. 60-

enforcement of cleanup actions. That remedy resides solely with the United States. *See* 42 U.S.C. § 9606(a); *Idadaro*, 916 F.2d at 1489.

2, ¶¶ 182-188. While CERCLA permits this, *see* 42 U.S.C. § 9613(g)(2), that remedy carries the same limits as Dalton Utilities' Section 107(a) claim: it does not authorize a remediation order, and any future costs must first be actually incurred and—if so—proved both necessary and consistent with the NCP in more litigation. *See id.* at §§ 9607(a)(4)(B), 9613(g)(2).

All told, Dalton Utilities never asks for a "remediation order," and CERCLA wouldn't allow one even if it did. That leaves only its common-law claims. But even there—where a nuisance theory could support court-ordered remediation—Dalton Utilities does not seek it.[5] *See* Doc. 60-2, ¶¶ 205-217, Prayer for Relief. As it stands, a "remediation order" is not just conjecture—it is legally impossible. And without one, the risk of conflict is illusory.

Because there will be no property to dispose of in either case, *Colorado River*'s concern with "inconsistent dispositions of property" is off the table from

---

[5] And these claims are far from secure. Dalton Utilities has known about—and been complicit in—PFAS contamination of the LAS and Upper Coosa River Basin since at least 2003. *See infra* note 11. Its own complaint alleges it detected PFAS by 2009. Doc. 60-2, ¶ X. Under Georgia law, the statute of limitations for property-damage torts is four years, O.C.G.A. § 9-3-30, and begins to run when the plaintiff "could first have maintained [his or] her action to a successful result." *Colormatch Exteriors, Inc. v. Hickey*, 569 S.E.2d 495, 497 (Ga. 2002). Attempting to extend accrual by alleging a continuing nuisance only broadcasts a remarkable contradiction: Dalton Utilities maintained in *Johnson* that the PFAS contamination coming from its LAS was permanent and unabatable.

the start. Nor would that abstention factor apply here in any event. Dalton Utilities

concedes that this is not an *in rem* proceeding (nor is its own), and it disclaims any

argument that this Court lacks jurisdiction on that basis. Doc. 60-1, at 9. Still, it

contends that "the same reasoning underlying the jurisdictional rule" should apply

as a prudential matter. *Id*. (quoting *Colorado River*, 424 U.S. at 819). *Id.* (quoting

424 U.S. at 819). But jurisdictional or prudential, the distinction makes no

difference—*in personam* actions risk no "inconsistent disposition of property."

As the Eleventh Circuit explains, "[t]his *Colorado River* factor asks if one

court assumed jurisdiction *over property* before the other court." *Jackson-Platts v.*

*General Elec. Capital Corp.*, 727 F.3d 1127, 1141 (11th Cir. 2013) (emphasis

added) (citing *Am. Bankers Ins. Co. of Fla. v. First State Ins. Co.*, 891 F.2d 882,

884-85 (11th Cir. 1990). The Supreme Court has said the same. *See Moses H. Cone*

*Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2, 19 (1983) (citing

*Colorado River*, 424 U.S. at 818-19). And the Eleventh Circuit is clear on its

limits: it "applies only where there is a proceeding *in rem*." *Jackson-Platts*, 727

F.3d at 1141 (citing *Ambrosia Coal*, 368 F.3d at 1332). By Dalton Utilities'

admission, that is not the case here—and "this factor cannot favor abstention." *Id.*

Dalton Utilities also invokes the risk of piecemeal litigation, but it never explains what that entails.[6] Doc. 60-1, at 10-11. Instead, it recycles the same "conflicting orders" speculation where that is not possible. *Id.* at 11. Even declaratory relief would merely provide a framework for shifting response costs that Dalton Utilities may choose to incur. That is not a judicial directive to remediate; it is a contingent cost-allocation mechanism.

With no request for remediation and no authority to compel it, the specter of conflicting rulings is no basis for a stay. Dalton Utilities' own authorities illustrate the point. It cites *Melton Props., LLC v. Ill. Cent. R.R. Co.*, where the court stayed injunctive relief sought under the CWA and RCRA pursuant to primary jurisdiction. Doc. 60-1, at 9-10 (citing 539 F. Supp. 3d 593, 611 (N.D. Miss. 2021)). But Dalton Utilities omits the reason: a state agency was actively engaged in directing remediation under a formal schedule. *Melton Properties*, 539 F. Supp.

---

[6] Dalton Utilities identifies no discrete or genuine duplicative issues that remain to be litigated. *See* Doc. 60-1, at 8-11. In fact, nearly all discovery and expert work necessary here has already been completed in *Johnson*—on causation, environmental fate, allocation, and related topics. Discovery related to Mr. Perkins, his farm, and CRBI has no bearing on Dalton Utilities' case. The Carpet Companies nonetheless argue that the lack of discovery and trial date here supports a stay. *See* Doc. 104-1, at 2 n.1. But that argument fails twice over: the core discovery has already been done here, and Dalton Utilities's case has not proceeded to discovery either. If the companies' reasoning applied at all, it would apply doubly to Dalton Utilities.

14

at 610-11. Its reference to *U.S. v. Sunoco, Inc.* is even more to the point: the court

rejected the risk of conflicting orders because the defendant failed to show one.

644 F. Supp. 2d 566, 579-580 (E.D. Pa. 2009). The same result should follow

here—Dalton Utilities identifies no active remediation, much less any agency-led

efforts, and no potential conflict. *See Forest Park Nat'l Bank & Trust v. Ditchfield*,

881 F. Supp. 2d 949, 973 (N.D. Ill. 2012) (rejecting argument that RCRA

injunction claim would interfere with CERCLA cleanup, noting "[t]here is no

evidence that this litigation is delaying or will delay the completion of an *ongoing*

*cleanup action*") (emphasis added).

**B.      CERCLA cannot support a stay absent any EPA-led response action.**

Dalton Utilities next argues that its lawsuit should take precedence because

CERCLA facilitates a "unified" and "comprehensive" approach to remediation and

liability. Doc. 60-1, at 11-15. But its argument misappropriates the authority that

Congress gave only to EPA and substitutes conjecture for actual agency

involvement.

First, Dalton Utilities invokes the scope and supremacy of CERCLA's EPA-

led regime while bypassing the very process that grants those attributes. In the

abstract, it gestures toward CERCLA's "comprehensive" and "uniform" design, *see*

Doc. 60-1, at 11-13, but those features arise from a specific and mandatory procedure that must be initiated by EPA and EPA alone:

1.   A Remedial Investigation and Feasibility Study to determine whether CERCLA action is required *see* 42 U.S.C. § 9604(a); 40 C.F.R. § 300.430(d)-(e), and if so;

2.   a Remedial Action Plan, subject to public notice and comment, *see* 42 U.S.C. § 9617(a); 40 C.F.R. § 300.430(f), and;

3.   if EPA adopts a plan, implementation in one of three ways:

   (a)   EPA performs the work itself;

   (b)   it compels potentially responsible parties to act via administrative order or injunction; or

   (c)   it enters a consent agreement with those parties requiring those parties to carry it out. *See* 42 U.S.C. § 9622; 40 C.F.R. § 300.515.

This framework is not optional—it's what gives CERCLA its force. *See Atl. Richfield Co. v. Christian*, 590 U.S. 1, 6 (2020); *W. Va. State Univ. Bd. of Governors v. Dow Chemical Co.*, 23 F.4th 288, 306 (4th Cir. 2022); *Broward Gardens Tenants Ass'n v. U.S. E.P.A.*, 311 F.3d 1066, 1071 (11th Cir. 2002). And none of it has happened here.

   CERCLA's "comprehensive" scope and enforcement tools flow from EPA oversight and formal action—not private lawsuits. *See, e.g.,* 42 U.S.C. §§ 9604 (authorizing EPA to undertake, require, and approve response actions), 9606(a) (authorizing EPA and DOJ to seek abatement of releases or threatened releases),

9613(h) (stripping jurisdiction only for challenging removal or remedial actions selected by EPA under §§ 9604 or 9606(a)); *see also Holt-Orsted v. City of Dickson*, 2009 WL 10679423, at *29 (M.D. Tenn. Mar. 25, 2009) ("Congress made cleanup actions by responsible parties preclusive of citizen suits *only* when the responsible party's cleanup was *pursuant to an EPA administrative order*.") (emphasis added).

Dalton Utilities invokes that regime rhetorically but does not—and cannot— allege ***that it applies***. EPA has not undertaken, directed, or approved any action here. While it may authorize private parties to carry out response actions, *see* 42 U.S.C. § 9622, that has not happened either. So the fact remains: This is not an EPA-led response, and Congress did not empower Dalton Utilities, or anyone else, to unilaterally invoke CERCLA's authority to compel or assert exclusive control over remediation. *See* 42 U.S.C. §§ 9604, 9606(a), 9613(h); *Idarado*, 916 F.2d 1486, 1489; *Smith*, 2007 WL 313467, at *6.

Despite emphasizing CERCLA's potential jurisdiction-stripping under Section 113(h), Dalton Utilities disclaims any jurisdictional challenge. *See* Doc. 60-1, at 10–11 (citing 42 U.S.C. § 9613(h)). Rightly so—and that should be conclusive. Section 113(h) applies only when ***both*** are conditions are met: (a) EPA has selected or approved a removal or remedial action, ***and*** (b) a competing lawsuit

would "challenge" that action by interfering with its implementation. See 42

U.S.C. § 9613(h); *Broward*, 311 F.3d at 1072. Neither exist here. *Broward*, 311

F.3d at 1073 ("[W]here a suit does not call into question the selected *EPA remedial*

*or removal plan*, the suit is not a 'challenge under section 113(h)."); *see also*

*StarLink Logistics, Inc. v. ACC, LLC*, 101 F.4th 431, 450 (6th Cir. 2024) (rejecting

Section 113(h) application where consent order "was not enacted pursuant to

CERCLA" and "is not a removal or remedial action under §§ 104 and 113(h)").

Unable to satisfy Section 113(h), Dalton Utilities instead leans on its

*hypothetical* reach to support abstention. *See* Doc. 60-1, at 14-15. It suggests a

doubly speculative chain of logic—asking the Court to assume both that EPA

*might* someday get involved and that, if it does, Plaintiffs' claims *might* then

interfere.[7] *Id.* From that layered speculation, Dalton Utilities draws the wrong

conclusion: that a stay is warranted. But the logic is backwards. When the

exception does not apply, the rule controls: this Court has jurisdiction. *Broward*,

---

[7] What Dalton Utilities implies, the Carpet Companies argue outright: that Section 113(h) would divest jurisdiction if EPA were to intervene in Dalton Utilities' private CERCLA suit—in the absence of even a hint of preliminary involvement. *See* Doc. 104-1, at 4-5 n.4; *but see Dow*, 23 F.4th at 306 (rejecting speculation about future EPA involvement and explaining that it first "would be required to comply with a lengthy and detailed procedure"). Section 113(h) does not bar suits based on conjecture—and it does not counsel a stay.

*311 F.3d at 1072; Holt-Orsted*, 2009 WL 10679423, at *29. A stay should not backdoor the opposite—and unintended—result.

CERCLA does not authorize Dalton Utilities to monopolize remediation or wield it against the public downstream. It expressly disclaims preemption, *see* 42 U.S.C.§ 9614, and there can be no challenge that strips jurisdiction absent EPA involvement. *Id.* at § 9613(h). And that logic should not be inverted to justify a stay. In fact, EPA's absence counsels the opposite. Where it has taken no action at the LAS, Plaintiffs' claims "serve[] the very gap-filling purpose for which citizen suits were designed." *Forest Park*, 881 F. Supp 2d at 972; *see also Browning v. Flexsteel Indus., Inc.*, 959 F. Supp. 2d 1134, 1155 (N.D. Ind. 2013) (where no EPA-led "removal or remedial actions have been selected or are under active consideration, litigation may serve to accelerate, rather than delay, clean up efforts"); *cf. Johnson v. 3M*, 563 F. Supp. 3d 1253, 1334 (N.D. Ga. 2021) (CWA's "citizen suit provision strikes 'a balance between government and private enforcement by allowing citizens to bring suit against polluters") (citation omitted).

**C.    Dalton Utilities' operational interests are not superior to and do not displace the public's or Plaintiffs' right to be free from PFAS downstream.**

Finally, Dalton Utilities seeks a stay on grounds that *it*, not Plaintiffs, is "the entity that has the greatest interest in any remediation plan" affecting the LAS. Doc. 60-1, at 18. It claims that as the "property owner," "provider of municipal wastewater services," and a permittee accountable to ratepayers and industrial users, it alone has superior interests in "developing a remedial plan." *Id*. In contrast, it argues that Mr. Perkins and his farm are merely out to "protect[] their own property interests," downplaying the broader public interests that they and CRBI represent. *Id*.

That framing flips reality. By its own words and allegations, Dalton Utilities seeks primarily to protect its own property and financial interests—silent as to those downstream and its own complicit role in the PFAS contamination.[8] *See generally* Doc. 60-2; *see also id.* at ¶¶ 205-217 (alleging only private and not public nuisance). Plaintiffs, by contrast, bring claims on behalf of the broader public—those who use and depend on the Coosa River Basin, those exposed to

---

[8] Dalton Utilities has spent much of its existence knowingly allowing industrial pollutants to contaminate the Conasauga River while prioritizing its own interests—and those of the carpet industry—over environmental stewardship and the safety of downstream communities. *See Johnson* Doc. 1403-1, ¶¶ 75, 81-82, 84, 131-132, 153-155, 319-404. As shown in *Johnson*, Dalton Utilities knew of PFAS discharges into and from its facilities since at least 2003, if not earlier. *Id.* at 319-404. Yet it continued land application and surface water discharges of PFAS-laden effluent—all while collaborating with the very parties it now sues to delay public awareness and regulatory scrutiny for years. *See id.*

PFAS discharges, and those harmed by decades of unchecked pollution. *See* Doc. 1, ¶¶ 32-33, 256-265. That is the nature of public nuisance. *See* O.C.G.A. §§ 40-1-1, -2; *Johnson*, 563 F. Supp. 3d at 1335, 1337-38 (N.D. Ga. 2021) (compiling Georgia pollution cases). That is the purpose of citizen suits. *S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*, 484 F. Supp. 3d 1353, 1363 (N.D. Ga. 2020), *aff'd*, 69 F.4th 809 (11th Cir. 2023) ("A private citizen's ability to file suit 'is a critical component of the CWA's enforcement scheme, as it permits citizens to abate pollution when the government cannot or will not command compliance.'") (citations omitted). And it's what Dalton Utilities' own lawsuit pointedly fails to provide.

Dalton Utilities links its remedial interests to compliance and operational obligations. Doc. 60-1, at 16-17. But that does not give it priority over those harmed by its discharges. If anything, it underscores Dalton Utilities' role in the pollution—and its longstanding failure to address it. It also argues that Plaintiffs have "no sense of what engineering controls . . . are feasible," *id*., but that is neither accurate nor relevant. Plaintiffs' counsel have conducted extensive site inspections, and their experts have already evaluated and designed a remediation plan. In any event, the standard for pursuing a remedy is not operational familiarity—it is whether Plaintiffs have been harmed and whether relief is

available. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). Environmental laws were designed to prevent pollution—not to empower polluters to dictate the scope of the remedy for their own self interests. *See, e.g., Conservation Law Foundation, Inc. v. Exxon Mobil Corp.*, 3 F.4th 61, 70 (1st Cir. 2021 ("[C]itizen suit provisions demonstrate circumstances where Congress wanted to allow individuals to bring lawsuits, even where an agency has some authority.").

Plaintiffs are not interlopers in someone else's cleanup. They are the only ones asking the Court to compel one. Their claims invoke precisely the mechanisms that Congress and the common law provide when government does not act—and no parallel case does. In sum, Dalton Utilities asks the Court to sideline those suffering the consequences of contamination in favor of the entity that caused it—despite offering no enforceable remedy of its own. The only appropriate answer is no.

But there is a sensible and legally consistent path forward. Plaintiffs do not dispute that Dalton Utilities has legitimate interests in any eventual remedy. Its ratepayers matter, and so does feasibility. But those interests do not outweigh—let alone displace—the rights of downstream communities to use and enjoy the environment and their properties without toxic PFAS exposure, or Plaintiffs' right

to seek judicial relief to secure their protection. Any injunctive remedy issued in this case will necessarily contemplate *all* interests—from practical constraints and engaging regulators to ensuring that remediation does not compromise essential public services. The right course is not to halt this suit, but to allow it to fulfill its intended, gap-filling purpose: accelerate remediation with judicial oversight where no regulatory process—past or pending—offers an alternative.

## CONCLUSION

There is no agency-led cleanup at the LAS, no conflict, and no basis for delay. Plaintiffs seek the only judicially enforceable remedy on the table—and they have the standing, evidence, and legal right to pursue it. The motions to stay should be denied.

Respectfully submitted June 25, 2025.

<div style="margin-left:50%">

*/s/ Brett C. Thompson*

Brett C. Thompson (*phv*)
Hirlye R. "Ryan" Lutz, III (*phv*)
F. Jerome Tapley (*phv*)
R. Akira Watson (*phv*)
Hunter M. Phares (GA Bar # 600149)
**CORY WATSON, P.C.**
2131 Magnolia Avenue South
Birmingham, Alabama 35205
Telephone: (205) 328-2000
Fax: (205) 324-7896
bthompson@corywatson.com
rlutz@corywatson.com
jtapley@corywatson.com

</div>

23

awatson@corywatson.com
hphares@corywatson.com

Gary A. Davis (*phv*)
Keith A. Johnston (*phv*)
Louis W. Ringger, III (*phv*)
**DAVIS, JOHNSTON & RINGGER, P.C.**
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622-0044
Facsimile: (828) 398-0435
gadavis@enviroattorney.com
kjohnston@enviroattorney.com
bringger@enviroattorney.com

Thomas Causby (GA Bar # 968006)
**CAUSBY FIRM, LLC**
P.O. Box 488
Dalton, GA 30722
Telephone: (706) 278-0525
Facsimile: (706) 229-4363
tom@causbyfirm.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.

This 25th day of June, 2025.

*/s/ Brett C. Thompson*

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been filed electronically with the Clerk of the Court by using the CM/ECF system which will automatically email all counsel of record.

This 25th day of June, 2025.

/s/ Brett C. Thompson