## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| Coosa River Basin Initiative;<br>Raymond J. Perkins, Jr.; and J. Perkins Farms, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>3M Company; EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company; The Chemours Company; Corteva, Inc.; DuPont de Nemours, Inc.; INV Performance Surfaces, LLC; Daikin America, Inc.; Shaw Industries, Inc.; Shaw Industries Group, Inc.; Aladdin Manufacturing Corporation; Mohawk Industries, Inc.; Mohawk Industries, LLC; The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners d/b/a Dalton Utilities,<br><br>    Defendants. | Civil Action No. 4:25-cv-00075-AT |

## REPLY BRIEF IN SUPPORT OF DEFENDANT THE CITY OF DALTON, GEORGIA, ACTING THROUGH ITS BOARD OF WATER, LIGHT AND SINKING FUND COMMISSIONERS, D/B/A DALTON UTILITIES' MOTION TO STAY

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................1

    I.    Plaintiffs Do Not Dispute the Significant Overlap Between This
Case and Dalton Utilities' First-Filed Case. ........................................1

    II.    Plaintiffs Mischaracterize CERCLA.....................................................6

        A.    Plaintiffs Distort the Purpose of CERCLA Declaratory
Relief. .......................................................................................7

        B.    Dalton Utilities Must Conduct a Robust "CERCLA-
Quality Cleanup" with EPA and Community Input. ...............10

    III.    Plaintiffs Offer No Basis to Find that They Have a Superior
Interest in Remediating the LAS.......................................................13

CONCLUSION ...................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACE Am. Ins. Co. v. Newcomb & Boyd, LLP*,
  No. 17-CV-508, 2017 WL 7660405 (N.D. Ga. Sept. 28, 2017)......................3, 4

*ASARCO LLC v. Atl. Richfield Co., LLC*,
  975 F.3d 859 (9th Cir. 2020) .................................................................8

*Boeing Co. v. Cascade Corp.*,
  207 F.3d 1177 (9th Cir. 2000) ...............................................................8

*City of Dalton v. 3M et al.*,
  No. 4:24-cv-00293-WMR (N.D. Ga.) ...........................................................1, 15

*In re Dant & Russell, Inc.*,
  951 F.2d 246 (9th Cir. 1991) ..................................................................7

*GP Vincent II v. Est. of Beard*,
  68 F.4th 508 (9th Cir. 2023) ..................................................................8

*In re Hemingway Transp., Inc.*,
  993 F.2d 915 (1st Cir. 1993)..................................................................9

*Jenkins v. Owners Ins. Co.*,
  No. 20-cv-1738, 2021 WL 6297907 (N.D. Ga. Mar. 10, 2021)...........................3

*Johnson v. 3M*,
  No. 4:20-cv-00008-AT (Apr. 24, 2024) ...........................................12, 13, 14, 15

*MPM Silicones, LLC v. Union Carbide Corp.*,
  966 F.3d 200 (2d Cir. 2020) ..................................................................8

*Georgia ex. rel. Olens v. McCarthy*,
  833 F.3d 1317 (11th Cir. 2016) ...............................................................3

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
  714 F.3d 161 (4th Cir. 2013) ..................................................................9

*Peterson v. Aaron's, Inc.*,
  No. 14-CV-1919, 2015 WL 224750 (N.D. Ga. Jan. 15, 2015) ...........................4

*Southfund Partners III v. Sears, Roebuck & Co.,*
  57 F. Supp. 2d 1369 (N.D. Ga. 1999)............................................................11, 14

*United States v. Davis,*
  31 F. Supp. 2d 45 (D.R.I. 1998) .................................................................9

*United States v. E.I. DuPont De Nemours & Co.,*
  432 F.3d 161 (3d Cir. 2005) .....................................................................9

*United States v. Sunoco, Inc.,*
  644 F. Supp. 2d 566 (E.D. Pa. 2009).......................................................5

*Voluntary Purchasing Grps., Inc. v. Reilly,*
  889 F.2d 1380 (5th Cir. 1989) ..................................................................8

**Statutes**

42 U.S.C. § 9605(d) .......................................................................................12

**Other Authorities**

40 C.F.R. Pt. 300...........................................................................................11

40 C.F.R. § 300.700(c)(6) ..............................................................................11

## INTRODUCTION

In their Response, Plaintiffs attack arguments that Dalton Utilities did not make and yet fail to respond to the crux of the issue presented: having two courts adjudicate two cases with overlapping parties, facts, and legal issues, which both seek to remediate the same environmental contamination at the same site, creates a serious risk of duplication and inconsistent rulings. In arguing there is no risk of conflict, Plaintiffs downplay the relief that Dalton Utilities requests in its first-filed case, claiming it only seeks cost recovery for initial assessments and that future costs of remediation pursuant to a declaratory judgment are "speculative" and "untethered to any agency involvement [or] identifiable plan." Pls.' Resp. Opp. Mots. to Stay, Doc. 129 ("Resp. Br.") at 2. This argument ignores the purpose of CERCLA declaratory relief and the process that private parties follow when undertaking a voluntary cleanup of a contaminated site.

## ARGUMENT

### I.    Plaintiffs Do Not Dispute the Significant Overlap Between This Case and Dalton Utilities' First-Filed Case.

Plaintiffs fail to show any meaningful difference between this case and the case Dalton Utilities filed four months earlier that is pending before the Honorable William M. Ray, II, *City of Dalton v. 3M et al.*, No. 4:24-cv-00293-WMR (N.D. Ga.). The two cases are based on the same set of operative facts, and they involve functionally identical parties and significantly overlapping claims. Plaintiffs do not

1

dispute that both cases seek to remedy environmental contamination caused by the carpet industry's use and disposal of PFAS products supplied by the PFAS manufacturers in northwest Georgia. *Compare, e.g.*, Compl. ¶ 19, *with* Dalton Utilities' First Am. Compl., Doc. 60-2 ("FAC") ¶ 4. Likewise, Plaintiffs do not contest that both cases name as defendants the same PFAS suppliers and carpet manufacturing companies. *See* Dalton Utilities' Mem. Supp. Mot. to Stay, Doc. 60-1 ("Opening Br.") at 4. Plaintiffs also do not dispute that there is significant overlap between the claims asserted in the two cases, including the nearly complete overlap in tort claims. *See* Opening Br. at 3–5.

Most importantly, Plaintiffs do not dispute that the claims in both cases center on the same piece of property, Dalton Utilities' Land Application System ("LAS"). While Plaintiffs take issue with the nature of the remedies available under CERCLA, they do not dispute that both they and Dalton Utilities seek remediation of the LAS, nor could they. *Compare* Compl. at 92 (seeking an order requiring Dalton Utilities "to fully investigate and remediate the PFAS contamination in and around the LAS"), *with* Dalton Utilities' FAC at 58–59 (seeking an order awarding "all necessary response costs incurred and to be incurred by Dalton Utilities, including such costs incurred to remediate the Defendants' PFAS contamination and otherwise remove, contain, or address Defendants' PFAS from wastewater and, more generally, from the POTW [Publicly Owned Treatment Works]").

2

This Court would be well within its discretion to stay Plaintiffs' second-filed case on these facts alone.  When two federal cases involve overlapping parties and issues, even when the parties and issues are not identical, courts regularly exercise their inherent authority to stay proceedings as a matter of judicial economy and comity between courts.  *See, e.g.*, *Jenkins v. Owners Ins. Co.*, No. 20-cv-1738, 2021 WL 6297907, at *6 (N.D. Ga. Mar. 10, 2021) (explaining that courts strive "to maximize judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case pending in another court" (citation omitted)); *Georgia ex. rel. Olens v. McCarthy*, 833 F.3d 1317, 1321 (11th Cir. 2016) (federal courts have broad discretion to stay proceedings that overlap in parties, issues, and available relief with another pending case).

Plaintiffs favor both cases proceeding at the same time in front of this Court and Judge Ray, Resp. Br. at 22–23, but they offer no explanation as to how the two Courts might avoid the significant risks of piecemeal litigation.  Even setting aside potential remedies, allowing both cases to proceed would create a substantial risk of duplication and inconsistent rulings.  *ACE Am. Ins. Co. v. Newcomb & Boyd, LLP*, No. 17-CV-508, 2017 WL 7660405, at *3 n.3 (N.D. Ga. Sept. 28, 2017) ("Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." (quoting *Am. Int'l*

*Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988))). For example, both courts will be asked to decide whether the conduct of the PFAS suppliers and the carpet companies resulted in PFAS contamination at the LAS and, if so, how liability for such contamination will be allocated among responsible parties, in addition to many other overlapping issues. *Id*. at *3 (finding that "the facts and legal issues in both cases are virtually identical, which poses the real risk of piecemeal litigation that is excessive and deleterious").

In terms of remediating the LAS itself—which Plaintiffs do not dispute both cases seek—the risk of one Court entering an order "which may trench upon the authority of" the other is extremely high. *Peterson v. Aaron's, Inc.*, No. 14-CV-1919, 2015 WL 224750, at *1 (N.D. Ga. Jan. 15, 2015) (staying second-filed case under first-to-file rule). Plaintiffs' myopic focus on whether the specific relief available in Dalton Utilities' case is an *injunction* misses the point. Resp. Br. at 9, 11–12. The relevant concern is that both cases seek to remediate the same piece of property and determine related liability issues. If two Courts are entering orders related to that remediation at the same time, there is a significant risk of conflicting orders and, at a minimum, judicial inefficiency. Here, Raymond J. Perkins, Jr. and J. Perkins Farms, LLC ("Perkins Plaintiffs") ask this Court to enter an injunction "requiring all Defendants to undertake and/or fund measures to remediate the LAS." Compl. ¶ 264. It is unclear what Plaintiffs expect that order to look like, but Dalton

Utilities will simultaneously be pursuing a CERCLA cleanup and a declaratory judgment of liability for the costs of that cleanup.  There is no realistic probability that two Courts can enter separate orders regarding remediation at a site as complex and extensive as the LAS, and not have those orders conflict in some (or, more likely, many) ways.

In arguing a stay is not warranted based on the risk of conflicting rulings, Plaintiffs claim that Dalton Utilities "omits the reason" that a stay was ordered in one of the cases cited in its Opening Brief—namely, "a state agency was actively engaged in directing remediation."  Resp. Br. at 14.  Dalton Utilities did no such thing.  *See* Opening Br. at 9 ("[C]ourts have ordered stays in similar cases when allowing an action to proceed would risk conflicting or inconsistent rulings from other courts *or administrative agencies*." (emphasis added)).  But the distinction that Plaintiffs cling to—agency involvement—does not support their argument that no such risk exists.[1]  The risk of conflicting orders and factual findings between *two federal courts with coordinate jurisdiction and authority in the same district* is

---

[1] In another case cited by Dalton Utilities that Plaintiffs claim supports their position, the court denied the defendant's motion for summary judgment based on the doctrine of primary jurisdiction because the defendant had not sufficiently briefed res judicata issues.  But that conclusion does not diminish the court's admonition that there is a "need for uniformity" because two entities (there, a court and a state agency) had the power to issue orders related to "the same pollution," which could "significantly hinder remediation."  *United States v. Sunoco, Inc.*, 644 F. Supp. 2d 566, 580 (E.D. Pa. 2009).

arguably even greater than the risk that a federal court and a state regulatory agency would issue inconsistent instructions to a regulated party. Moreover, as explained below, any remediation that Dalton Utilities undertakes in its case will necessarily involve coordination with state and federal regulators.

## II.    Plaintiffs Mischaracterize CERCLA.

Plaintiffs' contention that Dalton Utilities cannot seek remediation under CERCLA and only seeks money "for consultants and speculative future expenses" is wrong. *See* Resp. Br. at 2. Through its pending case, Dalton Utilities is actively seeking remediation of the LAS. Dalton Utilities' FAC ¶ 16 ("Dalton Utilities must make significant and costly changes to the POTW to remedy the existing PFAS contamination caused by Defendants and to prevent future PFAS contamination caused by Defendants."). But Dalton Utilities can only accomplish a full-scale cleanup with (1) the assurance that responsible parties will pay their fair share and (2) input from state and federal regulators. *See id*. ¶ 21 ("Dalton Utilities [] brings this action to ensure that it has the funds and resources necessary to remedy these harms and to continue to provide an essential public service—wastewater treatment—to the residents and businesses of Dalton, Georgia."). CERCLA is designed to address both considerations and facilitate robust remediation projects while allocating liability among responsible parties.

**A.    Plaintiffs Distort the Purpose of CERCLA Declaratory Relief.**

Plaintiffs attempt to downplay the relief that Dalton Utilities seeks under CERCLA, arguing there is "no active remediation," and that any declaratory judgment would be a "contingent cost-allocation mechanism" and "not a judicial directive to remediate."  Resp. Br. at 14–15.  This argument misstates both the purpose served by a declaratory judgment under CERCLA and the process that private parties follow when initiating a voluntary cleanup.

Before private parties undertake a voluntary cleanup, CERCLA envisions that they will first "spend ***some*** money responding to an environmental hazard" and "then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have ***continuing liability for the cost of finishing the job***."  *In re Dant & Russell, Inc.*, 951 F.2d 246, 249–50 (9th Cir. 1991) (emphasis added).  "[B]y not requiring plaintiffs to perform full cleanup before coming to court, and by expressly providing for declaratory judgments, CERCLA substantially reduces the risk involved in performing the cleanup" and "encourages private response."  *Id.* at 250.  That is precisely what Dalton Utilities is doing in its case before Judge Ray.

The idea that Dalton Utilities would spend millions of dollars upfront to remediate the LAS and only sue for cost recovery afterward is divorced from reality and how the CERCLA process is intended to work.  "To require either the

government or a private party to complete cleanup prior to filing suit would defeat the dual purposes of CERCLA to promote rapid response to hazardous situations and to place the financial burden on the responsible parties." *Voluntary Purchasing Grps., Inc. v. Reilly*, 889 F.2d 1380, 1387 n.11 (5th Cir. 1989) (citations omitted). Cost recovery suits, including declaratory judgments as to continuing liability, incentivize "conscientious and thorough" cleanups by both private parties and the government. *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 227–28 (2d Cir. 2020); *see also Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1185 (9th Cir. 2000) (noting that "a party discovering contamination would not want to investigate if it could not easily recover those costs"). That is precisely what Dalton Utilities' case seeks to accomplish.

CERCLA expressly provides for successive cost recovery actions because, as Plaintiffs note, Section 107 only permits recovery for costs already incurred. Resp. Br. at 10. Importantly, CERCLA also ***mandates*** the entry of a declaratory judgment as to liability in Section 107 cases, and those liability determinations are binding in subsequent actions for later-incurred costs. *GP Vincent II v. Est. of Beard*, 68 F.4th 508, 517 (9th Cir. 2023) (citing 42 U.S.C. § 9613(g)(2)(B)). A CERCLA declaratory judgment determines "liability for future response costs . . . allocated at a set percentage across responsible parties" and "is the proper mechanism for recouping future response costs in the CERCLA regime." *ASARCO LLC v. Atl.*

*Richfield Co., LLC*, 975 F.3d 859, 866 (9th Cir. 2020). Courts consider factors such as the waste attributable to each party, each party's level of culpability, and each party's ability to pay. *E.g.*, *United States v. Davis*, 31 F. Supp. 2d 45, 64–67 (D.R.I. 1998) (granting request for declaratory judgment and assigning equitable shares of liability based on, *inter alia*, the volume of waste that each defendant deposited at the site).

Plaintiffs repeatedly suggest, Resp. Br. at 6–8, 15–19, that EPA needs to be involved *now* through an enforcement action, but CERCLA was written to encourage voluntary, private party remediation, which has served as a proven model for years. *See, e.g.*, *United States v. E.I. DuPont De Nemours & Co.*, 432 F.3d 161, 166 (3d Cir. 2005) (citing EPA data that half of all removal actions and nearly 90% of remedial actions were performed by private parties). Indeed, CERCLA's "primary objective" is the "promotion of spontaneous private cleanup initiatives." *In re Hemingway Transp., Inc.*, 993 F.2d 915, 921 (1st Cir. 1993). And "governmental approval is not a prerequisite to private recovery for cleanup costs." *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 179 n.7 (4th Cir. 2013) (citation omitted). The fact that Dalton Utilities has sought declaratory relief before instituting costly remediation is by design and consistent with CERCLA.[2]

---

[2] Plaintiffs argue that, without EPA, there is no "jurisdiction-stripping" and "that should be conclusive." Resp. Br. at 17. Dalton Utilities did not overstate the relevance of Section 113(h) at this stage in the proceedings and thus moved for the

**B.    Dalton Utilities Must Conduct a Robust "CERCLA-Quality Cleanup" with EPA and Community Input.**

Plaintiffs' argument that Dalton Utilities' CERCLA claim will not result in an injunctive order governing the remediation of the LAS is irrelevant and attempts to confuse the nature of CERCLA remediation. Resp. Br. at 9–11. In their efforts to hide the significant risks of conflicting orders between this case and Dalton Utilities' case, Plaintiffs attempt to create a false dichotomy—either Dalton Utilities seeks an injunction, or Judge Ray will not adjudicate issues relating to the remediation of the LAS under CERCLA. Resp. Br. at 11. Again, Plaintiffs fail to appreciate how CERCLA works, including the National Contingency Plan ("NCP"), which sets forth a general framework to be followed during the CERCLA remediation process.

Plaintiffs argue that CERCLA's comprehensive nature and uniform design only "arise from a specific and mandatory procedure that must be initiated by EPA and EPA alone," Resp. Br. at 16, apparently suggesting that a remedial investigation and feasibility study and a remedial action plan, subject to notice and comment, are only applicable in CERCLA actions initiated by EPA, but that is plainly wrong. To the contrary, a "private party seeking costs bears the burden of proving its actions

---

modest relief of a stay of proceedings rather than an outright dismissal. But the fact remains that allowing this case to proceed notwithstanding the potential involvement of EPA and its jurisdictional consequences would be wasteful and unnecessary given that Dalton Utilities' first-filed lawsuit also involves remediation of the LAS.

were consistent with the NCP" and resulted in a "CERCLA-quality clean-up." *Southfund Partners III v. Sears, Roebuck & Co.*, 57 F. Supp. 2d 1369, 1380 (N.D. Ga. 1999). "To demonstrate substantial compliance with the NCP, the party must abide by the regulations that outline requirements for response action procedures and public comment concerning the selection of the response action." *Id*.

Indeed, "[r]emedial actions," such as what will be needed at the LAS, "are subject to a complex series of regulations," which Plaintiffs ignore entirely. *Id*. For example, the NCP establishes phases and procedures for cleanup actions, including preliminary assessments, site inspections, remedial investigations, feasibility studies, remedial design plans, remedial action construction, and long-term maintenance. *See generally* 40 C.F.R. Pt. 300. Certain of these stages require EPA oversight and approval, as well as community input, before a remedial action plan is selected. *E.g.*, 40 C.F.R. § 300.700(c)(6). Ultimately, to meet the standard of a "CERCLA-quality cleanup," the end product must (1) be "protective of human health and the environment"; (2) "attain applicable and relevant and appropriate requirements"; and (3) "provide for meaningful public participation." *Southfund Partners III*, 57 F. Supp. 2d at 1381 (citations omitted).

These provisions ensure that any remediation plan that Dalton Utilities designs must be of the highest quality, and they protect the interests of the Perkins Plaintiffs and other affected individuals and groups by providing for public comment

11

and input. They also require that Dalton Utilities and its regulators, under the supervision of Judge Ray, be given sufficient latitude to design a remediation plan that meets the complex, thorough remediation scheme mandated by CERCLA. Plaintiffs' suit stands to hamper that process. If Dalton Utilities selects a remedy that meets the requirements of the NCP; EPA approves that plan; and Judge Ray confirms cleanup costs are consistent with the NCP and therefore recoverable under Section 107(a); but this Court has entered a separate order that conflicts with the plan chosen by Dalton Utilities and approved by EPA and Judge Ray, the ultimate remediation of the LAS will be delayed.

In light of this regulatory scheme, this Court should reject Plaintiffs' argument that this case should proceed because Dalton Utilities has not created a "plan" or started "active remediation." Resp Br. at 2, 15.[3] Had Dalton Utilities devised and commenced its own plan, divorced from EPA and community input, its actions could be deemed non-compliant with the NCP and none of its outlays recoverable. No rational party would follow that course, nor does CERCLA require it.[4]

_____

[3] It is also worth noting that Plaintiffs, like any citizen, could have petitioned EPA to initiate the CERCLA process for the LAS if their primary concern was to begin the cleanup process. 42 U.S.C. § 9605(d).

[4] Plaintiffs misrepresent Dalton Utilities' position in the *Johnson* litigation. Resp. Br. at 6. Dalton Utilities made clear that it "expect[ed] that there will be significant changes at the LAS" and explained that it was already assessing options to convert the POTW to a direct discharge treatment system and to address legacy groundwater and surface water impacts at the LAS. Transcript of Oral Arg. at 34:10–17, *Johnson*

CERCLA and NCP requirements ensure that any remedy Dalton Utilities and its regulators ultimately select, under the judicial oversight of Judge Ray, will be robust and comprehensive. Separate judicial orders outside that process would be unnecessary and potentially encumber Dalton Utilities and regulators in their efforts to design, test, study, and implement a "CERCLA-quality cleanup."

## III.   Plaintiffs Offer No Basis to Find that They Have a Superior Interest in Remediating the LAS.

None of the detailed regulatory requirements above would apply to Plaintiffs' claims, and Plaintiffs offer no reason that they have a superior interest in remediating the LAS. Plaintiffs repeatedly claim that they represent "the broader public interests," Resp. Br. at 20, but weighing the parties' competing interests in remediating the LAS is not a close call. Opening Br. at 15–18.

Bizarrely, while Plaintiffs do not dispute that both they and Dalton Utilities seek to remediate the LAS, somehow, Dalton Utilities' efforts to remediate the LAS are "silent as to those downstream." Resp. Br. at 20. Tellingly, Plaintiffs never mention Mr. Perkins' request to remediate his own property which is downstream of the LAS.[5] Plaintiffs seem to be more focused on the remediation of a municipal

_v. 3M_, No. 4:20-cv-00008-AT (Apr. 24, 2024). Further, those statements about what was required of Dalton Utilities "today" were made in April 2024, before the regulatory changes that prompted Dalton Utilities' CERCLA claim.

[5] If the Perkins Plaintiffs were seeking a remedy related to their own property, separate from any LAS remediation, there would be minimal risk of conflicting

utility's property than their own.  Setting aside Plaintiffs' (or their counsel's)[6] motivations for dictating to Dalton Utilities how to clean up its property, they fail to explain why their remediation plan would protect "those downstream," but a remediation plan led by Dalton Utilities would not.  And while Plaintiffs claim that Dalton Utilities' remediation plan would "dictate the scope of the remedy for [its] own self interests," Resp. Br. at 22, that is of course nothing more than rhetoric in light of the NCP's requirements.  *See Southfund Partners III*, 57 F. Supp. 2d at 1381.

Whereas Dalton Utilities' lawsuit sets in motion a path to comprehensive remediation with regulatory and community input, Plaintiffs brazenly claim they are already positioned to force Dalton Utilities to remediate based on their counsel's prior site inspections and a "remediation plan" that "their experts have already evaluated and designed" in the *Johnson* litigation.  Resp. Br. at 21.  However, in *Johnson*, Plaintiffs' counsel represented to this Court that their expert, Dr. Charles Andrews, "***was not tasked with performing the detailed design of the remediation***

---

orders and duplicative litigation.  But any cleanup of the Perkins Plaintiffs' property likely would be futile without first remediating the LAS upstream, as Plaintiffs contemplate.  Compl. ¶¶ 228, 237, 244, 253, 254, 264, 265, 279.

[6] Plaintiffs note that the *Johnson* litigation "demanded tens of thousands of hours of legal work," including "more than 100 depositions" and "millions of pages of documents."  Resp. Br. at 3.  Dalton Utilities does not dispute that the *Johnson* litigation was arduous—indeed, it also required tens of thousands of hours of legal work by Dalton Utilities (and likely all other defendants).  However, it is unclear why that is relevant here.

or with securing government agency approval for the remedy." Pl.'s Resp. Mots. to Exclude Expert Test. at 19, *Johnson v. 3M*, No. 4:20-cv-00008-AT, Doc. 1317 (N.D. Ga. Sept. 28, 2023) (emphasis added).[7]

Congress created CERCLA to be the principal vehicle for comprehensive cleanup of contaminated sites. Opening Br. at 11–15. Dalton Utilities can only recover costs *for remediation* consistent with the NCP. CERCLA was designed to allow private parties to facilitate remediation through cost recovery, and declaratory judgments ahead of remediation promote CERCLA's twin goals of ensuring "polluters pay" and efficient cleanups.

## CONCLUSION

For the foregoing reasons, and those contained in its Opening Brief, Dalton Utilities respectfully moves this Court for a stay of these proceedings pending entry of a final order in *City of Dalton v. 3M et al.*, No. 4:24-cv-00293-WMR (N.D. Ga.).

---

[7] Moreover, those opinions and purported remediation plan are subject to pending *Daubert* motions in *Johnson* and thus could be excluded entirely.

**TROUTMAN PEPPER LOCKE LLP**

/s/ *Lindsey B. Mann*

Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com
E. Fitzgerald Veira (GA Bar No. 726726)
fitzgerald.veira@troutman.com
T. Scott Mills (GA Bar No. 757063)
scott.mills@troutman.com
Anaid Reyes Kipp (GA Bar No. 703283)
anaid.reyes-kipp@troutman.com
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
404-885-3000

Brooks M. Smith (admitted *pro hac vice*)
brooks.smith@troutman.com
1001 Haxall Point, Suite 1500
Richmond, VA 23219
804-697-1200

**Counsel for Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities**

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D) of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1.

This 9th day of July, 2025.

*/s/ Lindsey B. Mann*
Lindsey B. Mann
lindsey.mann@troutman.com
Georgia Bar No. 431819

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record who have appeared.

This 9th day of July, 2025.

/s/ Lindsey B. Mann
Lindsey B. Mann
lindsey.mann@troutman.com
Georgia Bar No. 431819