IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| COOSA RIVER BASIN INITIATIVE; RAYMOND J. PERKINS, JR.; and J. PERKINS FARMS, LLC, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 4:25-cv-75-AT |
| v. | : : : | |
| 3M COMPANY; EIDP INC. f/k/a E.I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; CORTEVA, INC.; INV PERFORMANCE SURFACES, LLC; DAIKIN AMERICA, INC.; SHAW INDUSTRIES, INC.; SHAW INDUSTRIES GROUP, INC.; ALADDIN MANUFACTURING CORPORATION; MOHAWK INDUSTRIES, LLC; THE CITY OF DALTON, GEORGIA, acting through its Board of Water, Light and Sinking Fund Commissioners d/b/a DALTON UTILIES, | : : : : : : : : : : : : : : : : | |
| Defendants. | : : | |

## **ORDER**

This matter comes before the Court on three separate Motions to Stay filed by various Defendants in this action. [Docs. 60; 76; 104]. The first Motion to Stay [Doc. 60] was filed by The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a/ Dalton Utilities (the "City

of Dalton" or "Dalton Utilities"). The second Motion to Stay [Doc. 76] was filed by Defendants 3M Company ("3M"), EIDP, Inc. f/k/a E.I. DuPont de Nemours Company ("EIDP"), The Chemours Company ("Chemours"), Corteva, Inc. ("Corteva"), INV Performance Surfaces, LLC ("Invista"), and Daikin America, Inc. ("Daikin") (collectively, the "Supplier Defendants"). The third Motion to Stay [Doc. 104] was filed by Defendants Aladdin Manufacturing Corporation ("Aladdin"), Mohawk Industries, Inc., Mohawk Carpet, LLC (the "Mohawk Defendants"), Shaw Industries, Inc., and Shaw Industries Group, Inc. (the "Shaw Defendants") (collectively, the "Carpet Manufacturing Defendants").

Notably, the first Motion to Stay filed by the City of Dalton [Doc. 60] contains the bulk of substantive argument relied on by Defendants across all three motions. The Supplier Defendants and Carpet Manufacturing Defendants filed their own separate motions to stay primarily to dispute some of the City of Dalton's factual statements and implications of liability on the part of other Defendants. However, the Supplier Defendants otherwise adopted and incorporated the City of Dalton's citations of authority supporting a stay in the first Motion, and the Carpet Manufacturing Defendants also relied on some of the City of Dalton's arguments in their follow-on motion. (*See* Doc. 76-1 at 1-2; Doc. 104-1 at 4). Therefore, in this Order, the Court grapples mostly with the City of Dalton's Motion to Stay, but it engages with any additional arguments raised by the other Defendants in their separate motions as appropriate.

## I.    Background

Plaintiffs filed this action on April 2, 2025, bringing twelve counts under the Clean Water Act, other federal provisions, and state law against a dozen Defendants. (Doc. 1). These Defendants include the City of Dalton (more specifically, Dalton Utilities) as well as the six Supplier Defendants and five Carpet Manufacturing Defendants listed above.

Plaintiffs' claims against all Defendants arise from the pollution of the waterways in and around Dalton, Georgia, which is known as the "Carpet Capital of the World." (*Id.* ¶ 1). Decades of carpet manufacturing in the Dalton area has led to the run-off into the surrounding waterways of industrial wastewater containing toxic per- and polyfluoroalkyl substances, or "PFAS," which are so-called "forever chemicals" that resist degradation over time and cannot be treated by conventional wastewater treatment methods. (*Id.* ¶¶ 2-13). Plaintiffs contend that the Riverbend Land Application System ("LAS") owned and operated by Dalton Utilities is the source of PFAS run-off into the Conasauga River and Upper Coosa River Basin, and that this PFAS pollution "will persist for centuries." (*Id.* ¶¶ 2-3). According to Plaintiffs, the blame for these decades of PFAS pollution and the resultant harmful effects lies at the feet of many, from the carpet manufacturers to the chemical suppliers to the City of Dalton itself. Plaintiff alleges that all of these Defendants had knowledge of the dangers of the "massive discharges of PFAS from carpet industry waste into the Conasauga River" for decades, but that they "did nothing other than to conceal it." (*Id.* ¶¶ 5, 86-127).

Based on these allegations, Plaintiffs bring the following claims:

- Four claims under the Clean Water Act and one claim under the Georgia Water Quality Control Act against Dalton Utilities;

- A claim under the Sewer Use Rules and Regulations and Clean Water Act against the Shaw Defendants and Mohawk Defendants;

- A claim of negligent misconduct against all Defendants;

- A claim of negligent failure to warn against the Supplier Defendants;

- A claim of negligence per se against the Carpet Manufacturing Defendants and Dalton Utilities;

- Claims of both public nuisance and private nuisance against all Defendants;

- A claim for punitive damages against both the Supplier Defendants and Carpet Manufacturing Defendants;

- A claim for abatement of public and private nuisances against all Defendants under O.C.G.A. §§ 41-2-1 and 41-2-2, seeking permanent injunctive relief; and

- A claim for payment of attorneys' fees and the expenses of litigation from all Defendants under O.C.G.A. § 13-6-11.

(*Id.* ¶¶ 165-280). Plaintiffs also seek declaratory and injunctive relief under the Clean Water Act against Dalton Utilities, the Shaw Defendants, and the Mohawk Defendants. (*Id.* at 91-93).

As the parties to this litigation well know, this case is far from the first piece of litigation related to PFAS pollution in North Georgia. The undersigned has overseen a related putative class action, *Johnson v. 3M et al.*, Case No. 4:20-cv-0008, for six years now in this Court. There have been numerous other lawsuits brought in state and federal courts around the State as well. However, the plaintiffs in each case differ in terms of the specific harm alleged and the remedies sought. Relevant to the motions at hand, the Plaintiffs in this case include: (1) The Coosa River Basin Initiative, Inc., a nonprofit corporation with a mission "to protect, preserve, and restore" the Upper Coosa River Basin, (2) Raymond J. Perkins, an individual landowner who resides in Gordon County, Georgia, where he owns a 119-acre farm called J. Perkins Farms, LLC ("Perkins Farms"), and (3) Perkins Farms itself, which rests on the Conasauga River and faces intermittent flooding, leading to substantial PFAS contamination of the farm's soils.  (*Id.* ¶¶ 32-37).

Defendants' Motions to Stay center on another lawsuit in this district related to PFAS pollution: *City of Dalton v. 3M et al.*, Case No. 4:24-cv-293-WMR (N.D. Ga.) ("*City of Dalton*" or "the parallel case"), which was filed on December 9, 2024 and assigned to the Honorable William Ray, II. *See id.* In the parallel case, the City of Dalton (a Defendant in the instant case) is the plaintiff, bringing claims against a number of the Supplier Defendants and Carpet Manufacturing Defendants, including 3M, EIDP, Chemours, Daikin, Invista, Aladdin, and the Shaw Defendants. The City of Dalton filed the operative First Amended Complaint in that action on April 1, 2025, one day before Plaintiffs filed the instant lawsuit. *See*

Case No. 4:24-cv-293-WMR, Doc. 85 (Apr. 1, 2025). Each of the defendants in *City of Dalton* is also a Defendant in the instant case.

The basic factual allegations underlying the *City of Dalton* case do not differ from those alleged here, although the nature of the City of Dalton's claims is different. Specifically, in the parallel case, the City of Dalton blames the Supplier and Carpet Manufacturing Defendants for harm sustained as a result of long-running contamination of Dalton Utilities' wastewater treatment operations through the sale, purchase, use, and disposal of PFAS. Dalton Utilities alleges that Supplier Defendants 3M, DuPont, Daikin, and Invista knowingly and willfully sold PFAS and PFAS-containing products to carpet and flooring manufacturers in and around Dalton, including the Carpet Manufacturing Defendants, who then used these products in their manufacturing facilities. Dalton Utilities contends that 3M, DuPont, Daikin, and Invista sold these products despite knowing that they would generate industrial wastewater containing PFAS that could not be treated through traditional wastewater treatment operations. According to the City of Dalton, these Supplier Defendants exercised control over the Carpet Manufacturing Defendants' operations and arranged for the disposal of PFAS-laden wastewater at Dalton Utilities' wastewater treatment plants without disclosing the presence of PFAS and its environmental risks to Dalton Utilities. PFAS have been detected in the influent, effluent, biosolids, soils, groundwater, and surface water at and around the LAS.

Also in the parallel case before Judge Ray, the City of Dalton asserts that the sale, use, and disposal of these PFAS and PFAS-containing products has generated

significant profits for all Supplier and Carpet Manufacturing Defendants and has caused significant harm to Dalton Utilities. For example, Dalton Utilities states that it must make costly changes to its wastewater treatment system to remedy the PFAS contamination caused by the *City of Dalton* Defendants. Dalton Utilities claims that decades of PFAS contamination will likely cost the City hundreds of millions of dollars. Based on these allegations, the City of Dalton seeks relief in the parallel case against all Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Georgia Water Quality Control Act. The City of Dalton also brings state law tort claims—including negligence, nuisance, trespass, and wantonness and punitive damages claims—against all Defendants in the parallel case, as well as claims for negligent design and negligent failure to warn against 3M, DuPont, EIDP, Daikin, and Invista.[1]

Across their Motions to Stay, Defendants argue that this case should be stayed pending resolution of the *City of Dalton* case. (Doc. 60). In support, Defendants argue that allowing the instant case to proceed on a parallel track with the *City of Dalton* case would create duplicative litigation and risk conflicting

---

[1] On March 18, 2026, Judge Ray ruled on Motions to Dismiss filed by Defendants in *City of Dalton*. In his order, Judge Ray dismissed the CERCLA, nuisance, and trespass claims against Daikin, but he allowed all other claims against all other Defendants to survive. *See* Case No. 4:24-cv-293-WMR, Doc. 162 (Mar. 18, 2026). The remaining claims in the parallel case thus include (1) CERCLA claims against 3M, EIDP, Chemours, Invista, Aladdin, and the Shaw Defendants; (2) negligence claims against all Defendants; (3) nuisance claims against 3M, EIDP, Chemours, Invista, Aladdin, and the Shaw Defendants; (4) trespass claims against 3M, EIDP, Chemours, Invista, Aladdin, and the Shaw Defendants; (5) a Georgia Water Quality Control Act claim against all Defendants; (6) a negligent design claim against 3M, DuPont, EIDP, Daikin, and Invista; (7) a negligent failure to warn claim against 3M, DuPont, EIDP, Daikin, and Invista; and (8) a claim for punitive damages and attorneys' fees against all Defendants.

rulings within this district. Specifically, they contend that the plaintiffs in each case seek the same relief—remediation of the LAS—against a substantially similar list of defendants. Defendants cite two primary reasons that the parallel case, which was filed first, is more suitable for resolving these overlapping issues. First, in the parallel action, the City of Dalton brings some of its claims under CERCLA, a statute Congress created to be the principal vehicle for responding to hazardous waste sites to ensure a single, comprehensive cleanup rather than competing individual ones. A stay of this case would prevent two injunctive remediation orders pertaining to the same piece of land. Second, Defendants argue that Dalton Utilities, the plaintiff in the parallel case, has more at stake than the Plaintiffs in this case. As the owner of the LAS, Dalton Utilities will be responsible for implementing the remediation decided upon and is thus best positioned to pursue cost recovery for remediation through its federal case. Defendants thus assert that a stay of this action would streamline the resolution of these two related cases without posing harm to Plaintiffs' interests.

For the reasons that follow, Defendants' Motions to Stay are **DENIED**.

## II. Legal Standard

The Court has broad discretion to stay proceedings, as a power which is incidental to the power inherent in every court to control its own docket. *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). However, the Court's power to manage its docket in this way requires "the exercise of judgment, which must weigh competing interests and maintain an even

balance." *Id.* at 254-55 (citations omitted). To weigh competing interests, courts generally consider the following factors: "(1) whether a stay would unduly prejudice or present a tactical disadvantage to the nonmovant; (2) whether a stay will simplify the issues in the case; and (3) whether discovery is complete and a trial date [has] been set"—i.e., whether it is "sufficiently early in the litigation" for a stay to be appropriate and effective. *See Tomco Equip. Co. v. Se. Agri-Sys., Inc.*, 542 F. Supp. 2d 1303, 1307, 1311-12 (N.D. Ga. 2008) (staying a patent infringement action pending the resolution of an *inter partes* reexamination of the plaintiff's patent before the United States Patent and Trademark Office).

A "variety of circumstances" may justify staying a case on the Court's docket "pending the resolution of a related case in another court." *Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000). For example, a stay may be authorized as a means of controlling the Court's docket or justified by principles of abstention. *Id.* But the circumstances justifying a stay are not limitless. A court abuses its discretion by granting a stay that is "immoderate," a standard that takes into account "both the scope of the stay (including its potential duration) and the reasons cited by the district court for the stay." *Id.* The Eleventh Circuit has held a stay to be "immoderate" and thus an abuse of discretion where it was "indefinite" in scope and justified by "the interests of judicial economy alone[.]" *Id.* at 1265. *See also Landis*, 299 U.S. at 254 (noting that a "stay of indefinite duration in the absence of a pressing need will constitute an abuse of discretion").

9

"The proponent of the stay bears the burden of establishing its need." *Clinton*, 520 U.S. at 708. Prejudice to the nonmovant is a key consideration in the Court's evaluation of whether the movant has met this burden. "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis*, 299 U.S. at 255. Therefore, a party moving for a stay "must make out a clear case of hardship or inequity in order to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Id.*

## III. Discussion

Although the Court generally has discretion to stay proceedings as a matter of docket management, the Court finds that it would be an abuse of discretion in this instance to force Plaintiffs to wait on the sidelines while Defendants determine liability amongst themselves in the parallel case.

In support of a stay, Defendants focus on Plaintiffs' request for injunctive relief in this case, arguing that the City of Dalton's case before Judge Ray seeks the same relief, "but through the comprehensive, unified authority of CERCLA." [Doc. 60-1 at 12]. Defendants thus urge that this case seeks duplicative relief and that permitting it to move forward simultaneously with the *City of Dalton* case might result in conflicting rulings. But this argument ignores Plaintiffs' tort claims and Clean Water Act claims in this case and the related punitive damages and civil penalties sought. (*See* Compl. ¶¶ 266-71 (seeking punitive damages against all Defendants except Dalton Utilities); *id.* at 93 (seeking civil penalties from Dalton

Utilities, the Shaw Defendants, and the Mohawk Defendants of up to $55,800 per day for each day of each violation of the Clean Water Act alleged)). Even if the City of Dalton prevails on all claims in the parallel case, Plaintiffs here would stand to recover nothing in the way of damages.

Moreover, the injunctive relief sought by Plaintiffs here goes far beyond what is contemplated by the *City of Dalton* case. Defendants characterize that case as one where the City of Dalton seeks to remediate the LAS. That is not quite accurate. The Court has reviewed the City of Dalton's complaint in the parallel case, and it is not seeking any order from the Court imposing injunctive relief and requiring it to remediate the LAS. Rather, the City of Dalton has ***already*** been compelled to remediate the LAS, in order to come into compliance with new regulations passed by the Environmental Protection Agency ("EPA"). *See* Case No. 4:24-cv-293-WMR, Doc. 85, FAC ¶¶ 13-21 (Apr. 1, 2025) (explaining that, as a result of new EPA regulations passed in 2024, the City of Dalton will have to make "significant and costly changes" to Dalton Utilities' Publicly Owned Treatment Works ("POTW") to remedy the PFAS contamination at the POTW, and noting that "[t]he total amount of cleanup costs resulting from Defendants' PFAS contamination "is not yet known but is likely to total hundreds of millions of dollars, if not more"). s Judge Ray described the factual basis of the City of Dalton's claims in his Order on the numerous Motions to Dismiss:

> In early 2024 (perhaps decades too late), the EPA finalized a new National Primary Drinking Water Regulation for a Maximum Contaminant Levels ("MCLs") for six PFAS compounds: PFOS, PFOA,

> PFHxS, HFPOA-DA, and mistures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS. The regulation was effective on June 25, 2024. In May 2024, EPA also finalized a regulation designating PFOA and PFOS as hazardous substances under [CERCLA]; the regulation was effective on July 8, 2024.
>
> . . .
>
> Once the MCLs for PFAS went into effect in June of 2024, surface water and groundwater sampling at the POTW around the LAS boundaries showed levels far exceeding the MCLS for PFAS and, for the first time, Dalton was subject to compliance with obligations related to PFAS in the incoming wastewater, as well as the PFAS already disposed of in the POTW. . . . The LAS permit does not allow groundwater at the LAS boundary to exceed MCLs for drinking water. **This situation requires Dalton to make significant and costly upgrades to the POTW to remedy the existing PFAS contamination and prevent future contamination.**

Case No. 4:24-cv-293-WMR, Doc. 162 at 5, 6 (internal record citations omitted) (emphasis added).

Judge Ray went on to explain that, after the City of Dalton became aware of elevated PFAS in its Publicly Owned Treatment Works in 2024, the City engaged technical consultants to investigate potential remedial options. *Id.* at 6. Those consultants are now helping the City of Dalton mount cleanup efforts to mitigate existing contamination and develop new engineering measures to prevent future contamination. *Id.* The City of Dalton filed the lawsuit before Judge Ray to recover payment of the anticipated recovery and clean-up costs associated with the PFAS contamination. *Id.*

Thus, in the parallel case, the City merely seeks to have the Supplier Defendants and Carpet Manufacturing Defendants pay for the already-planned

remediation. There is no grant of relief that could be provided or denied to the City of Dalton that would compensate Plaintiffs for the harm they allege in this case. It is true that one form of relief Plaintiffs seek in this case is injunctive relief in the form of abatement of public and private nuisances. (Compl. ¶¶ 275-280). Indeed, in their claim for abatement, Plaintiffs note that "Dalton Utilities has indicated it will permit Defendants to fund the abatement of the PFAS pollution of the LAS and the continuing discharges of PFAS to the Conasauga River[,]" rendering the abatement claim potentially duplicative of voluntary actions that the City of Dalton is already taking. (*Id.* ¶ 278). But beyond that sliver of relief sought here, this litigation is not duplicative of anything the City of Dalton is already doing. More importantly, even that overlap between the two cases poses no real risk of conflicting rulings, because the City of Dalton has not asked Judge Ray to order it to engage in any particular form of remediation. Rather, as described above, the case before Judge Ray has only to do with ***who will pay for*** the remediation, not whether the remediation will take place and/or in what form it will be carried out. Therefore, the Court finds there is little to no risk of conflicting remediation orders from two different courts. Defendants have thus failed to meet their burden of establishing the need for a stay based on a "clear case of hardship or inequity," an essential showing when weighed against Plaintiffs' competing interests in recovering damages for the harm both they and their property have suffered, harm which is given no platform in the parallel action. *Landis*, 299 U.S. at 255.

Defendants' argument that the lawsuit arising under CERCLA should take precedence is also unavailing in this circumstance. As the City of Dalton notes in its Motion to Stay, Congress passed CERCLA to provide, as the name suggests, a "comprehensive environmental response" to hazardous waste pollution. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 19 (2020). The statute was "principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). Under CERCLA's statutory scheme, federal courts are stripped of jurisdiction to review any challenges to (1) remedial or removal actions initiated by the President of the United States under Section 9604 of the statute, or (2) any abatement orders directed or issued by the President under Section 9606 of the statute. 42 U.S.C. § 9613(h). The City of Dalton points to this jurisdiction-stripping provision as evidence of "Congress's intent to effectuate a single, comprehensive remediation plan" through CERCLA. [Doc. 60-1 at 18]. But importantly, Defendants cite to no authority suggesting that the pendency of any ***private action*** bringing a CERCLA claim counsels in favor of staying a related private action where no CERCLA claims are brought. As Plaintiffs point out, CERCLA only provides for jurisdiction-stripping where the President (through the EPA) initiates remedial or abatement actions under CERCLA to respond to environmental hazards. *See* 42 U.S.C. §§ 9604, 9606, 9613(h). (*See also* Doc. 129 at 16-17) (outlining the statutory framework for EPA oversight and formal action under CERCLA). Thus, the Court does not find that the pendency of a

14

CERCLA claim in the parallel action renders it sufficiently superior to this case to justify a stay of Plaintiffs' claims here.[2]

Additionally, even if the Court agreed with Defendants that the CERCLA action is "the superior and preferred mechanism for effectuating a cleanup of the LAS", [Doc. 60-1 at 20], the Court reiterates that the action before Judge Ray does not, in fact, seek to effectuate a cleanup of the LAS. Rather, through its CERCLA claim, the City of Dalton seeks only a declaratory judgment under Section 9607(a)(4)(B) of CERCLA that the defendants in that case are liable to pay "costs incurred or to be incurred by Dalton Utilities as a result of releases or threatened releases of hazardous substances at or from the Dalton Utilities POTW[.]" Case No. 4:24-cv-293-WMR, Doc. 85 at 58. No injunctive relief of any kind is sought. Thus, again, there is no real overlap between the relief sought by Plaintiffs here and the relief sought by the City of Dalton in the related case. At most, the City of Dalton might face additional damages as a result of this action that it might be forced to add to the bill it is asking the other Defendants to foot in the parallel case.

In sum, Defendants have failed to meet their burden of showing that Plaintiffs should be "compelled to stand aside" while the City of Dalton seeks relief in the parallel case against the other Defendants here. *Landis*, 299 U.S. at 255. A

---

[2] As the Carpet Manufacturing Defendants note in their separate Motion to Stay, there is a chance the EPA "could get involved in the CERCLA Lawsuit [i.e., the parallel case before Judge Ray], which would divest this Court of jurisdiction[.]" [Doc. 104-1 at 1, 4]. However, the EPA's potential involvement in the parallel action is merely a hypothetical scenario at this juncture, and there is no indication that the EPA plans to intervene in that lawsuit. Defendants may renew their request for a stay of this case in the event the EPA intervenes in the related action.

stay of this action would unduly prejudice Plaintiffs, and the resolution of the parallel action will do little to simplify Plaintiffs' claims here. Regardless of which parties are held responsible for paying for the already-planned remediation of the LAS in the parallel case, Plaintiffs' claims seeking compensation for *their* harm will remain to be resolved here. Accordingly, a stay is not warranted.

## IV.  Conclusion

For the reasons explained above, Defendants have failed to meet their burden of establishing a need for a stay of this action pending the resolution of the related litigation before another court in this district. Therefore, the Motions to Stay [Docs. 60; 76; 104] are **DENIED**.

The Court previously stayed Defendants' responsive pleading deadline pending its resolution of the Motions to Stay. (Doc. 108). As previously ordered, the deadline for Defendants to answer or otherwise respond to the Complaint shall be **twenty (20) days** from the date of this Order.[3]

**IT IS SO ORDERED** this 31st day of March, 2026.

_____
**Honorable Amy Totenberg**
**United States District Judge**

---

[3] The Court recognizes that Plaintiffs have filed a Motion to Consolidate this action with the related *Johnson* action, which is fully briefed. (Doc. 148). The Court will issue a decision on that motion shortly. In the meantime, the parties shall proceed with this action in the ordinary course.