IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

COOSA RIVER BASIN INITIATIVE;
RAYMOND J. PERKINS, JR., and J.
PERKINS FARMS, LLC;

    *Plaintiffs*,

    v.

3M COMPANY; EIDP, INC. (F/K/A
E.I. DU PONT DE NEMOURS AND
COMPANY); THE CHEMOURS
COMPANY; CORTEVA, INC.;
DUPONT DE NEMOURS, INC.; INV
PERFORMANCE SURFACES, LLC;
DAIKIN AMERICA, INC.; SHAW
INDUSTRIES, INC.; SHAW
INDUSTRIES GROUP, INC.;
ALADDIN MANUFACTURING
CORPORATION; MOHAWK
INDUSTRIES, INC.; MOHAWK
INDUSTRIES, LLC; THE CITY OF
DALTON, GEORGIA, acting through its
BOARD OF WATER, LIGHT AND
SINKING FUND COMMISSIONERS,
d/b/a DALTON UTILITIES,

    *Defendants*.

Civil Action No. 4:25-cv-00075

TRIAL BY JURY REQUESTED

## **FIRST AMENDED COMPLAINT**

Plaintiffs Coosa River Basin Initiative ("CRBI"), Raymond J. Perkins, Jr. and

J. Perkins Farms, LLC ("Plaintiffs") file this Complaint against Defendants and

allege as follows:

## STATEMENT OF THE CASE

1.     Industries in Dalton, Georgia supply over 90% of carpet on Earth, a dominance that crowned Dalton the "Carpet Capital of the World." But the industry celebrated in this title has another side—one not measured in production, but in pollution. The environmental cost does not appear in civic slogans, nor is it contained within city limits. It is felt downstream—in the land, water, and communities forced to bear its burden. This case is about that cost.

2.     At the center of this burden is the Riverbend Land Application System ("Riverbend LAS" or "LAS"), owned and operated by the City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners ("Dalton Utilities"), where toxic pollutants escape to contaminate the Conasauga River and the broader Upper Coosa River Basin. The problem began even before construction of the LAS was completed in the late 1980s, and it has persisted ever since. The cause was just as clear then as it is now: chemicals discharged by the carpet industry to Dalton Utilities' publicly owned treatment works ("POTW") repeatedly run off the LAS and into the river.

3.     From its inception, the LAS has continuously polluted the Conasauga River and Upper Coosa River Basin with toxic per- and polyfluoroalkyl substances ("PFAS")—otherwise known as "forever chemicals"—that will persist for centuries.

4.      Throughout the 1990s, both EPA and the Georgia Environmental Protection Division ("EPD") regularly cited Dalton Utilities for its chronic Clean Water Act ("CWA") violations at the LAS—violations that ultimately got Dalton Utilities sued by EPA in the late 1990s.[1] But not even EPA could stop the LAS from destroying the rivers and lands downstream of it.

5.      These violations were caused by the carpet industry's wastewater carrying various industrial chemical pollutants. Among them were PFAS—highly toxic, persistent pollutants now known to pose serious risks to human health and the environment. But Defendants knew what EPA and EPD did not: Dalton Utilities' chronic violations resulted in massive discharges of PFAS from carpet industry waste into the Conasauga River. Despite their long-standing knowledge, Defendants did nothing other than to conceal it.

6.      3M Company ("3M"), EIDP, Inc. ("Old DuPont"),[2] and later Daikin America, Inc. ("Daikin") have been the dominant manufacturers and suppliers of

---

[1] That lawsuit resulted in the entry of a consent decree and payment of a $6,000,000 penalty.

[2] In 2004, INV Performance Surfaces, LLC ("Invista") acquired the Stainmaster brand from Old DuPont, and began manufacturing, selling, and/or supplying it to the carpet industry. It also acquired Old DuPont's longstanding corporate knowledge that PFAS were persistent, toxic, bioaccumulative, resistant to degradation, and incapable of treatment by the conventional methods used by Dalton Utilities.

PFAS to the Dalton carpet industry. Since the late 1980s, 3M and Old DuPont regularly consulted with and advised Dalton Utilities and the carpet manufacturers on the application and use of PFAS *and the disposal* of it—including addressing the pollutant runoff that plagued the LAS from the beginning. 3M and Old DuPont even had offices and laboratories in Dalton, regularly visiting carpet manufacturers and Dalton Utilities to understand their operations and provide guidance on the application, use and disposal of PFAS, and testing their PFAS-based products while disposing their own PFAS-laden wastewater to Dalton Utilities.

7.    Daikin jumped onto the scene with its own PFAS product in the late 1990's seeking to capitalize when 3M withdrew its PFOS product from the market after a whistleblower informed EPA that PFOS was persistent, toxic, and incapable of breaking down in the environment. Like 3M and Old DuPont, Daikin regularly consulted with and advised Dalton Utilities and the carpet manufacturers on the application and use of PFAS *and the disposal* of it.

8.    Shaw Industries Group, Inc. and Shaw Industries, Inc. (collectively "Shaw"), and Aladdin Manufacturing Corporation, Mohawk Industries, Inc., Mohawk Industries, LLC (collectively "Mohawk") are the world's largest and most sophisticated carpet manufacturers. They have purchased and used tens of millions of pounds of PFAS and discharged billions of gallons of wastewater to Dalton

Utilities. They have known for decades that the chemicals they discharge to Dalton's POTW would repeatedly run off the LAS to contaminate the Conasauga River.

9. Shaw and Mohawk have dedicated laboratories and employ scientists and chemists who have the knowledge and expertise to understand the chemical properties of the products they use in their carpet manufacturing processes, including how to dispose of them without causing harm to human health or the environment. They even have departments purportedly dedicated to environmental responsibility who are charged with understanding the impact their products and waste have on human health and the environment.

10. 3M's announced withdrawal of its products based on perfluorooctane sulfonate ("PFOS")—a prevalent type of PFAS chemistry—from the market in 2000 should have ended the carpet industry's reliance on PFAS. It left no doubt that PFAS were persistent, toxic, bioaccumulative, resistant to degradation, and harmful to human health and the environment. EPA even warned Defendants in the early 2000s to stop using these chemicals and to replace them with safe, environmentally responsible ones. But Defendants did not heed EPA's warnings; instead, they spent the next two decades conspiring together to conceal the widespread PFAS contamination of the Conasauga River and downplay the dangers of PFAS exposure.

11. By 2003, EPA began investigating areas suspected of having high levels of PFAS contamination. As part of its investigation, EPA asked Dalton Utilities and the carpet industry to voluntarily allow it to inspect and sample their sites for PFAS. Defendants—conspiring together through the Carpet and Rug Institute ("CRI") and otherwise, rejected EPA's efforts to uncover what was already certain to them: widespread and continuing PFAS pollution of the Conasauga River.

12. Defendants have long known that their toxic chemical pollutants pass through the LAS into the Conasauga River. Defendants have known for decades that PFAS chemicals are persistent, toxic, bioaccumulative, and resistant to degradation. Worse, Defendants knew that PFAS chemicals were incapable of treatment by the conventional methods used by Dalton Utilities. Defendants knew that Dalton Utilities improperly applied wastewater contaminated with their PFAS to the LAS.

13. Armed with this knowledge, the onslaught of PFAS contamination and pollution in the Conasauga River was a certainty to Defendants. Despite the inevitable consequence, Defendants acting in concert, conspired for decades to manufacture, supply, sell, purchase, use, discharge, and dispose of PFAS chemicals in the same manner—knowingly contaminating and polluting the Conasauga River with these insidious chemicals that plague downstream communities and endanger human health and the environment.

14.     Through CRI and otherwise, together Defendants conspired with one another to conceal their PFAS contamination, evade liability, and avoid paying to clean up the mess they made—a mess now considered to be the largest point source of PFAS within the United States. This environmental catastrophe could have been avoided had Defendants made responsible decisions instead of malicious ones. The chemical manufacturers could have required their carpet industry customers to properly dispose of PFAS to prevent environmental contamination. They could have stopped selling PFAS altogether or developed alternative chemicals without the harmful effects. Likewise, both Shaw and Mohawk had the option to stop purchasing and using PFAS, and both had the option to dispose of it in an environmentally responsible manner. Dalton Utilities had the option to refuse to accept the carpet industry's PFAS-laden waste or require them to remove it. Despite these choices, Defendants willfully, knowingly, and intentionally polluted the Conasauga River with their toxic PFAS chemicals that they knew would endanger human health and the environment. As long as the LAS remains unabated, PFAS will continue to wreak havoc on the Upper Coosa River Basin and the communities, farmers, recreational users, properties, plants, and animals unlucky enough to be downstream of it.

15.    Plaintiffs Coosa River Basin Initiative, Inc. ("CRBI"), Raymond J. Perkins, Jr., and J. Perkins Farms, LLC (collectively "Perkins") bring this action pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing unlawful pollution of surface waters by discharges of toxic PFAS from Defendant Dalton Utilities and from industrial users, including  Defendants Shaw and Mohawk, who discharge these chemicals into the Dalton Utilities publicly owned treatment works ("POTW"). As a result of unauthorized discharges by these industrial users, Dalton Utilities has discharged and continues to discharge PFAS from the Riverbend Wastewater Land Application System to the Conasauga River and its tributaries without a permit authorizing such discharges in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). Shaw and Mohawk have discharged, and continue to discharge, PFAS into the Dalton Utilities POTW, where these chemicals resist treatment and cause Pass Through resulting in their exit from the Riverbend LAS in violation of Dalton Utilities' Sewer Use Rules and Regulations and Section 307(d) of the Act, 33 U.S.C. § 1317(d). These toxic and persistent chemicals contaminate properties along the Conasauga River, then travel downstream and contaminate other surface waters within the Upper Coosa River Basin. Plaintiffs seek a declaratory judgment, injunctive relief,

the imposition of civil penalties, and an award of costs, including attorney and expert witness fees, for these Defendants' repeated and ongoing violations of the CWA.

16.    In addition to their CWA claims, Raymond J. Perkins, Jr., and J. Perkins Farms, LLC, bring Georgia state law claims against all Defendants, who have injured and continue to injure their property due to the intentional, willful, wanton, reckless, and negligent discharge of PFAS into the Conasauga River from the LAS. The PFAS were and are manufactured by Defendants 3M, Old DuPont, Chemours, Daikin, and Invista and sold to Defendant carpet manufacturers Shaw and Mohawk, who discharge PFAS from their manufacturing processes and facilities into Dalton Utilities' water pollution control plants ("WPCPs"), or POTW, from which PFAS have been and are being discharged into the Conasauga River. By such wrongful acts and omissions, Defendants have jointly created and maintained a continuing public nuisance causing harm and injury to the public and special injuries to Plaintiffs.

17.    The Chemical Manufacturing Defendants are 3M Company ("3M"), EIDP, Inc. ("Old DuPont"); The Chemours Company ("Chemours"); Corteva, Inc. ("Corteva"); DuPont de Nemours, Inc. ("New DuPont"); INV Performance Surfaces, LLC ("Invista"); and Daikin America, Inc. ("Daikin"), who manufactured the PFAS sold to the Carpet Manufacturing Defendants.

9

18.     The Carpet Manufacturing Defendants are Shaw Industries, Inc., Shaw Industries Group, Inc. (collectively "Shaw"), Aladdin Manufacturing Corporation, Mohawk Industries, Inc., and Mohawk Carpets, LLC (collectively "Mohawk").

19.     The Chemical Manufacturing Defendants for many years produced and sold PFAS-containing products to Carpet Manufacturing Defendants in Dalton, Georgia. Carpet Manufacturing Defendants use PFAS at their facilities to impart water, stain, soil, oil, and/or grease resistance to their carpet. Chemical Manufacturing Defendants exerted control over the application of the PFAS-containing products at Carpet Manufacturing Defendants' facilities and had knowledge about the persistence and toxicity of these chemicals and the failure of conventional sewage treatment, like that of Dalton Utilities, to remove or destroy PFAS.

20.     The Carpet Manufacturing Defendants own and/or operate carpet manufacturing facilities and have used PFAS as part of their manufacturing processes. Their use of Chemical Manufacturing Defendants' PFAS-containing products results in the generation of industrial wastewater. The Carpet Manufacturing Defendants were sophisticated users of PFAS, familiar with their chemical properties, toxicities, and the failure of conventional sewage treatment, like that of Dalton Utilities, to remove or destroy PFAS.  The Carpet Manufacturing

10

Defendants nonetheless discharged PFAS-laden industrial wastewater into the Dalton Utilities POTW. This industrial wastewater has contained high levels of PFAS, which resist degradation during treatment at Dalton Utilities' WPCPs and thus are sprayed on the Dalton Utilities LAS and continue to be discharged into the Conasauga River and related surface waters in the Upper Coosa River Basin.

21.     The City of Dalton, Georgia, acting through its Board of Water, Light, and Sinking Fund Commissioners ("Dalton Utilities") operates the wastewater treatment facilities, including the LAS, which receive the contaminated industrial wastewater discharged by the Carpet Manufacturing Defendants. The treatment methods used by Dalton Utilities are incapable of removing PFAS from the effluent that is ultimately discharged into the Conasauga River from the LAS, and Dalton Utilities and the other Defendants have known this for decades.

22.     Discharges of Defendants' PFAS have contaminated surface waters in the Upper Coosa River basin, including, but not limited to, the Conasauga River and related surface waters in the Upper Coosa River Basin.

23.     As a result of the Defendants' intentional, willful, wanton, reckless, and negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiffs have suffered property injuries and other injuries different in kind and degree from the those suffered by the public in general. Plaintiffs seek

equitable and injunctive relief to compel the Defendants to remediate and cease the spread of toxic PFAS into the Conasauga River and Upper Coosa River Basin and onto Plaintiffs' property.

## DISCLAIMER

24.    Plaintiffs make no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, MilSpec, or other variety. Plaintiffs expressly disclaim any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

26.    Plaintiffs have complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs, on December 20, 2024, mailed notices of intent to file suit under the CWA to Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners and Dalton Utilities, to Shaw Industries, Inc.,

12

Shaw Industries Group, Inc., Aladdin Manufacturing Corporation, Mohawk Industries, Inc., and Mohawk Carpet, LLC, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Georgia Department of Natural Resources' Environmental Protection Division ("EPD"), and the United States Attorney General [Notices attached hereto as Exhibit "A" and incorporated by reference herein]. These Notices complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since these Notices were served on the Defendants and these agencies.

27. Neither EPA nor EPD has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendants Dalton Utilities, Shaw, or Mohawk. In addition, neither EPA nor EPD has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Georgia law, to redress the violations of the CWA by these Defendants. Even if EPD has commenced an administrative action to address these violations, Georgia's water pollution enforcement scheme is not comparable to the provisions of the CWA. *See*, *e.g.*, *Leakey v. Corridor Materials, LLC*, 839 F.Supp.2d 1340, 1350 (M.D. Ga. 2012).

13

28.     Plaintiffs will, immediately upon receipt of a file-stamped copy of this First Amended Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States.

29.     This Court has supplemental jurisdiction over the state law claims in this action in accordance with 28 U.S.C. § 1367(a), because they are so related to federal claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

30.     Venue is appropriate in the Northern District of Georgia, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations of the Act alleged herein are located within this judicial district.

31.     Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(b), because Defendants have conducted substantial business in this District, and Defendants have caused harm to Plaintiffs residing in this District. In addition, Plaintiffs reside in this District, and a substantial part of the events or omissions giving rise to their claims occurred in the Northern District of Georgia.

## PARTIES

**A.     Plaintiffs**

32.     The Coosa River Basin Initiative, Inc. ("CRBI") is a not-for-profit corporation organized under Georgia Law with its principal place of business in

Floyd County, Georgia. The CRBI mission is to protect, preserve, and restore one of North America's most biologically diverse river systems – the Upper Coosa River Basin. The Upper Coosa River Basin includes the Conasauga, Oostanaula, and Coosa Rivers and their tributaries. CRBI is the official Riverkeeper for these rivers and their tributaries and has conducted water quality monitoring and advocacy to prevent pollution and remedy existing pollution, including PFAS pollution.

33.    The CWA violations alleged herein have directly and substantially harmed CRBI members and lessened these members' economic interests, as well as their recreational and aesthetic enjoyment of the Upper Coosa River Basin, and tributaries to these waters, as well as connected groundwater and springs that feed these waters. These members would use and enjoy these waters more if the violations alleged herein ceased.

34.    The interests CRBI seeks to protect in this lawsuit are germane to its purposes and objectives, but neither the claims asserted herein, nor any of the relief requested, require the participation of individual members in this lawsuit.

35.    CRBI is a membership organization and has organizational standing to file this suit through its members who have individual standing.

36.    Plaintiff Raymond J. Perkins is a resident of Gordon County, Georgia, and resides at 120 Woodridge Drive NW, Calhoun, GA, 30701. Plaintiff is the

owner/manager of Plaintiff J. Perkins Farms, LLC ("Perkins Farms"), which owns approximately 119 acres of real property on Nicklesville Road, Gordon County, Georgia. Mr. Perkins uses this property for farming and for duck hunting.

37.   Plaintiff J. Perkins Farms, LLC, is a Georgia limited liability company that owns approximately 119 acres of real property located on Nicklesville Road, Gordon County, Georgia. The Perkins Farms property rests on the Conasauga River approximately three miles downstream of the confluence of Polecat Creek and the Conasauga River. Perkins Farms uses its property for the cultivation and sale of agricultural hay, in addition to raising cattle. The Perkins Farms property is subject to intermittent flooding from the Conasauga River, which results in contamination of the property's soil and surface waters with extremely high levels of PFAS. For example, recent sampling confirms that surface waters of the Perkins Farms pond—1,000 feet inland from the banks of the Conasauga River—are contaminated with over 200 parts per trillion ("ppt") of PFOA and over 120 ppt of PFOS. Surface waters accumulated on cattle-grazing fields bordering the Conasauga River measured over 1,000 ppt of PFOS and over 600 ppt of PFOA following river flooding. The fields' soil measured over 27,000 ppt of PFOS and 2,000 ppt of PFOA, demonstrating that river flooding causes continual and ever-increasing contamination of the farm's soils with PFAS. Plaintiff has and will continually suffer property injury and interference

16

in the use and enjoyment of its property as a result of Defendants' acts and omissions.

**B.    Defendants**

38.    Defendant 3M Company ("3M") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant 3M has for many years manufactured and supplied PFAS to one or more Carpet Manufacturing Defendants who discharge wastewater with PFAS into the Dalton Utilities' POTW.

39.    Defendant EIDP, Inc. ("Old DuPont") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business in this District. E.I. du Pont de Nemours and Company changed its name to EIDP, Inc., in 2023. Among other acts and omissions, Defendant Old DuPont has for many years manufactured and supplied PFAS to one or more Carpet Manufacturing Defendants who discharge wastewater with PFAS into the Dalton Utilities' POTW.

40.    Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Chemours has assumed PFAS-related liabilities from Old

DuPont and continued to manufacture products sold to the Carpet Manufacturing Defendants after Old DuPont created the company.

41.    Defendant Corteva, Inc. ("Corteva") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Corteva has assumed PFAS-related liabilities from Old DuPont.

42.    Defendant DuPont de Nemours, Inc. ("New DuPont") is a foreign corporation that conducts business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant New DuPont has assumed PFAS-related liabilities from Old DuPont.

43.    Defendant Daikin America, Inc. ("Daikin") is a foreign corporation that, at all times relevant hereto, has conducted business within this District. Among other acts and omissions, Defendant Daikin has for many years manufactured and supplied PFAS to one or more Carpet Manufacturing Defendants who discharge wastewater with PFAS into the Dalton Utilities' POTW.

44.    Defendant INV Performance Surfaces, LLC ("Invista") is a foreign limited liability company that, at all times relevant hereto, has conducted business within this District. Among other acts and omissions, Defendant Invista has for many

years manufactured and supplied PFAS to one or more carpet manufacturers who discharge wastewater with PFAS into the Dalton Utilities POTW.

45. Collectively, the Chemical Manufacturing Defendants have manufactured and supplied most, if not substantially all, of the PFAS discharged to the Dalton Utilities' POTW. 3M has manufactured and supplied all of the PFOS and PFOS precursors discharged to the Dalton Utilities' POTW.

46. Defendant Aladdin Manufacturing Corporation ("Mohawk") is a foreign corporation authorized to do business in the State of Georgia, and, at all times relevant hereto, has conducted business in this District. Defendant Aladdin is the owner and operator of multiple facilities that manufacture carpet and various floor products, including the Antioch Production Facility located at 2001 Antioch Road, Dalton, Georgia 30721, the Industrial Park Production Facility, located at 2100 S. Hamilton Street, Dalton, Georgia 30721, and the Virgil Drive Facility, located at 496 Virgil Drive, Dalton, Georgia 30721. These facilities have used PFAS-containing products from the Chemical Manufacturing Defendants and discharged and continue to discharge industrial wastewater containing PFAS into the Dalton POTW.

47. Defendant Mohawk Carpet, LLC ("Mohawk") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times

19

relevant hereto, has conducted business within this District. Defendant Mohawk Carpet is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

48.    Defendant Mohawk Industries, Inc. ("Mohawk") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Mohawk Industries is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

49.    Defendant Shaw Industries Group, Inc. ("Shaw") is a domestic corporation and, at all times relevant hereto, has conducted business within this District. Defendant Shaw is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have discharged industrial wastewater containing PFAS into the Dalton POTW. Shaw has also formulated PFAS for its own supply and use.

50.    Defendant Shaw Industries, Inc. ("Shaw") is a domestic corporation and a wholly owned subsidiary of Defendant Shaw Industries Group, Inc., and, at all

times relevant hereto, has conducted business within this District. Defendant Shaw is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have discharged industrial wastewater containing PFAS into the Dalton POTW. Shaw has also formulated PFAS for its own supply and use.

51.    Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities") is a municipal corporation organized under the laws of the State of Georgia, owning and operating a municipal utility whose principal office is located at 1200 V.D. Parrot Jr. Parkway, Dalton, Georgia, 30722-0869. Dalton Utilities operates the Dalton POTW, consisting of various wastewater collection and treatment facilities and the associated 9,800-acre LAS. Dalton Utilities has and continues to accept PFAS laden waste which it cannot adequately treat or dispose of without release into the environment.

**FACTUAL ALLEGATIONS**

**Background and Hazards of PFAS**

52.    Over 90% of the world's carpet comes from manufacturing plants in and around Dalton, Georgia—the "Carpet Capital of the World." The Carpet Manufacturing Defendants are owners and operators of the largest carpet

21

manufacturing plants and related facilities, and they use and have used PFAS in the manufacturing of carpet and associated processes. The Chemical Manufacturing Defendants have long been the suppliers of PFAS to the Carpet Manufacturing Defendants.

53.    PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable and repel both oil and water and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial and commercial applications, and a large percentage of PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain, soil, water and/or oil resistance.

54.    The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. Terminal degradation products, such as perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), have no known environmental breakdown mechanism, and they are readily absorbed into biota and tend to bioaccumulate with repeated exposure. PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to

contamination, and a major source of human exposure to PFAS is through ingestion of contaminated drinking water.

55.    PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization. 3M is the only known U.S. company to use ECF to manufacture PFAS. Uniquely, PFOS can only be produced via ECF, and it is entirely attributable to 3M.

56.    PFOA and PFOS are the most studied PFAS chemicals and, while they have been largely phased out by industry, they are persistent and still remain in the environment, including at the LAS. PFOA and PFOS are considered "Long-Chain" PFAS, which are PFAS compounds containing eight or more fluorinated carbon atoms. PFOA and PFOS have been replaced by substitute PFAS, including Short-Chain PFAS, which have fewer than eight fluorinated carbon atoms but can be equally pernicious.

57.    When humans ingest PFAS, they bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiological changes to these and other organs. Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals accumulate in the body and

23

cause long-term physiological alterations and damage to the blood, liver, kidneys, immune system, and other organs. For instance, PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

58.   The human diseases caused by exposure to PFAS include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. PFAS can cause reproductive effects such as decreased fertility or increased high blood pressure in pregnant women. PFAS can cause developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes. PFAS can cause immune system and hormone disorders, increased cholesterol, and obesity. A recent ecological study[3] published in 2025 that included counties in Georgia concluded that PFAS in drinking water was associated with increased cancer incidence in the digestive, endocrine, oral cavity/pharynx, and respiratory systems. Specifically, PFAS in drinking water was associated with

---

[3] Shiwen Li et al., *Associations Between Per- and Polyfluoroalkyl Substances (PFAS) and County-Level Cancer Incidence Between 2016 and 2021 and Incident Cancer Burden Attributable to PFAS in Drinking Water in the United States*, J. EXPOSURE SCI. & ENVTL. EPIDEMIOLOGY (2025). Available at https://www.nature.com/articles/s41370-024-00742-2.

cancer in the organ system including the oral cavity/pharynx, lung, digestive system, brain, urinary system, soft tissue, and thyroid.

59.     The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer, and they further suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer. The C8 Science Panel has also found probable links between exposure to certain PFAS and pregnancy-induced hypertension, ulcerative colitis, and high cholesterol.

60.     In 2000, after 3M announced the withdrawal of PFOS from the market because it was persistent, toxic, and bioaccumulative, EPA began investigating similar fluorochemicals like PFOA, which like PFOS is persistent, toxic, and bioaccumulative. By 2002, EPA had released a Draft Hazard Assessment for PFOA warning that PFOA could be a human carcinogen and warning about its potential to cause developmental toxicity, detrimental immune system and metabolic effects, and liver toxicity. The majority of an EPA Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

25

61.    The International Agency for Research on Cancer ("IARC") in 2023 classified PFOA as carcinogenic to humans (Group 1) and PFOS as possibly carcinogenic to humans (Group 2B). EPA in 2024concluded that both PFOA and PFOS are likely to be carcinogenic in humans.

62.    PFAS immunotoxicity has been demonstrated in a wide variety of species and models, including humans, in recent years. For instance, in 2016, the U.S. Department of Health and Human Service's National Toxicology Program ("NTP"), after conducting a systematic review of the evidence pertaining to PFAS exposure and immune-related health effects, concluded that PFOA and PFOS constitute a hazard to immune system function in humans.

63.    On May 19, 2016, EPA published lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA was 0.07 micrograms per liter ("µg/L"), or 70 ppt.  The Health Advisory for PFOS was also 0.07 µg/L, or 70 ppt. When both PFOA and PFOS are found in drinking water, the combined concentrations were compared with the 70 ppt level.

64.    The Agency for Toxic Substances and Disease Registry ("ATSDR") issued an updated draft Toxicological Profile for Perfluoroalkyls in 2018, which found, *inter alia,* strong associations between PFAS exposure and several adverse

health outcomes, including pregnancy-induced hypertension, liver damage, increased serum lipids, thyroid disease, and immunotoxicity.

65.    ATSDR's updated Toxicological Profile significantly lowered minimum risk levels ("MRLs") for both PFOA and PFOS, and using the methods EPA developed for its May 2016 EPA Health Advisories, these updated MRLs translated to drinking water health levels of approximately 7 ppt for PFOA and 11 ppt for PFOS.

66.    On June 15, 2022, EPA issued interim lifetime Drinking Water Health Advisories for PFOA at 0.004 ppt, PFOS at 0.02 ppt, and PFBS at 2,000 ppt. For PFOA and PFOS, these levels are far below the level of detection for the compounds in drinking water.

67.    On April 10, 2024, the EPA established Maximum Contaminant Levels ("MCLs") for drinking water for six PFAS, including PFOS and PFOA. The MCLs for PFOS and PFOA are 4 ppt (the lowest detection limit with current technology), and the Maximum Contaminant Level Goals for these compounds are zero ppt, based on EPA's finding that these two compounds are likely carcinogenic in humans. *See* 89 Fed. Reg. 32532, *et seq*. (April 10, 2024). The MCLs include limits for four other PFAS, including short-chain PFAS found in the LAS. The MCL Goals

27

of zero ppt for PFOA and PFOS, in particular, reflect EPA's conclusion that there is no safe level of either compound in drinking water.

68.    In addition, on May 8, 2024, EPA designated PFOS and PFOA as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). *See* 89 Fed. Reg. 39124, et seq. (May 8, 2024).

**The Chemical Manufacturing Defendants' Involvement in the Carpet Manufacturing Defendants' Use of PFAS**

69.    The Carpet Manufacturing Defendants began using PFAS-containing "fluorochemical" products in the manufacture of carpet products beginning in the 1970s, if not earlier.

70.    Fluorochemicals are used to impart water, stain, soil, and/or grease resistance to carpet. While these characteristics may be commercially desirable, they are not necessary to the functionality of carpet.

71.    Alternative non-PFAS treatments that have comparable performance and do not have the negative health and environmental effects of PFAS have long been available. Those alternatives were not commercially pursued until recently, however, because of souring consumer sentiment and increased regulatory and legal risk with respect to PFAS.

28

72.    Fluorochemicals are applied in the finishing stage of the carpet manufacturing process, using application methods such as spray application and foam application.

73.    During the application of fluorochemicals to carpets, a portion of the fluorochemicals does not adhere to the carpet and enters the industrial wastewater stream that the Carpet Manufacturing Defendants discharge to the sewer.

74.    For as long as they have used fluorochemicals, the Carpet Manufacturing Defendants have known that some of the fluorochemicals do not adhere to the carpet during the finishing process and instead are discharged with their facilities' industrial wastewater.

75.    In addition to being a user of fluorochemicals, Shaw researched and developed its own fluorochemicals products to use in its manufacture of carpet products. Shaw purchased PFAS intermediates from Daikin, for instance, and produced its own carpet treatment products under its own label.

76.    The Chemical Manufacturing Defendants were directly involved in, and exercised control over, the Carpet Manufacturing Defendants' use, handling, and disposal of the Chemical Manufacturing Defendants' fluorochemical products.

77.    The Chemical Manufacturing Defendants specified the type and amount of their fluorochemicals to be used in the Carpet Manufacturing Defendants'

respective manufacturing of carpet products. The Chemical Manufacturing Defendants also specified the manner in which their fluorochemicals were to be used or applied in the manufacture of carpet products.

78. The Chemical Manufacturing Defendants designed and provided equipment for the Carpet Manufacturing Defendants to use when applying the Chemical Manufacturing Defendants' fluorochemicals to carpet products.

79. The Chemical Manufacturing Defendants jointly conducted research with the Carpet Manufacturing Defendants related to the development of fluorochemical products and methods of using or applying these products.

80. The Chemical Manufacturing Defendants monitored the carpet products manufactured by the Carpet Manufacturing Defendants for the amount of fluorochemicals applied to those products in order to ensure the products met the Chemical Manufacturing Defendants' specifications on the amount of fluorochemicals to be used.

81. The Chemical Manufacturing Defendants provided warranties to consumers of the carpet products on which their fluorochemicals were applied, and they paid for warranty claims by consumers.

82. At least Defendants 3M, Old DuPont, and Invista (which purchased or otherwise obtained Old DuPont's office and laboratory) maintained physical offices

and/or laboratories in the Dalton area in order to provide technical support to their customers in the carpet industry. These laboratories tested PFAS application to carpets and discharged PFAS to the Dalton Utilities sewer system and the LAS.

83.    The Chemical Manufacturing Defendants were in constant contact with the Carpet Manufacturing Defendants concerning the use, handling, and disposal of fluorochemicals. Employees of the Chemical Manufacturing Defendants were routinely present in Carpet Manufacturing Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, and disposal of the Chemical Manufacturing Defendants' fluorochemicals.

84.    The Carpet Manufacturing Defendants claim to have ceased the use of PFAS-containing fluorochemicals in the manufacture of carpet at their Dalton area facilities by 2019.

85.    The Carpet Manufacturing Defendants continue to discharge PFAS to Dalton Utilities to this day, attributable to PFAS from decades of their use of fluorochemicals which has contaminated their manufacturing facilities and the discharge pipes, as well as PFAS contained in non-fluorochemical materials they continue to use in the manufacture of carpet products.

**Defendants' Knowledge of Toxicity and Persistence of PFAS**

86.     All Defendants have long been aware of the persistence and toxicity of PFAS, and all Defendants knew or should have known that, in its intended and/or common use, PFAS would very likely cause harm and injury, and/or threaten public health and the environment.

87.     All Defendants knew or should have known that PFAS are mobile and persistent, bioaccumulative, biomagnifying, toxic, and cannot be treated by conventional methods. Defendants nonetheless concealed their knowledge from the public and government agencies.

88.     Chemical Manufacturing Defendants have known or should have known for more than 40 years that PFAS chemicals persist in the environment and accumulate in the bodies of humans, fish, and animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant in Decatur, Alabama) showed that these chemicals bioaccumulate in fish.

89.     Defendant 3M has also known for more than 40 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects

of PFAS on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the PFAS. Twenty-one years later, 3M told the public that a "new study" on these compounds' effects on Rhesus monkeys was one reason 3M pulled its PFAS products based on Long-Chain PFAS, like PFOS and PFOA, off the market.

90.    In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's PFAS on the environment and human beings.

91.    Defendant 3M has known for more than 30 years that its disposal of PFOA and PFOS and related chemicals through discharge into waterways, such as the Conasauga River, was unsafe. For instance, a Materials Safety Data Sheet ("MSDS") produced by 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped (or sprayed) onto the ground.

92.    Defendant 3M has known for more than 40 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and accumulate in the sludge from wastewater treatment processes. For example, in 1978, 3M found that the bacteria in wastewater treatment plants would not biodegrade PFOA. In 2001, 3M found high concentrations of these chemicals in samples of effluent and

33

sludge from the Decatur, Alabama wastewater treatment plant as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities or the public.

93.    A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

94.    Beginning in the 1990s, 3M conducted a comprehensive evaluation of potential sources and routes of exposure to its Long-Chain PFAS products.

95.    3M's research in the 1990s confirmed what it had already known since the late 1970s: 3M's PFAS, in particular, PFOS, bioaccumulated in human blood. Moreover, 3M confirmed that its PFAS were not only in the blood of its exposed workers but also widespread in the blood of the general population.

96.    In light of its knowledge about the pervasive ongoing human exposure to its PFAS, by the late 1990s, 3M recognized that its continued extreme secrecy regarding this knowledge was becoming untenable. Around this time, 3M began disclosing some of its human exposure findings with Old DuPont and Daikin as well as with EPA.

97.    In May 2000, 3M announced that it would be phasing out its manufacture and sale of products based on Long-Chain PFAS by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public. However, 3M claimed—contrary to its own internal research—that no adverse human health effects were linked to PFAS exposure. Nevertheless, the information 3M did publicly disclose should have been highly alarming to users of PFAS-containing products, like the Carpet Manufacturing Defendants.

98.    In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

99.    In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The

prior study showed elevated liver enzymes in the blood of Old DuPont workers. For the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

100.   When 3M shared some of its findings pertaining to the widespread human exposure to PFAS with Old DuPont in or around the mid-1990s, Old DuPont took the self-serving position that the problem was unique to the ECF process 3M used to produce PFAS, and that it didn't implicate Old DuPont's products, which instead were produced via the telomerization process. This position was contrary to Old DuPont's own knowledge that, for instance, PFOA contamination was extensive in the Ohio River and public drinking water supplies downstream from its Washington Works facility.

101.   Old DuPont knew that its telomer-based products, such as those sold to the carpet industry, contained PFOA by the late 1990s, and likely earlier.

102.   When 3M announced its phaseout of Long-Chain PFAS in May 2000, Old DuPont responded by stockpiling PFOA, which up until then it had been purchasing from 3M for use as a processing aid in DuPont's manufacture of fluoropolymers. Old DuPont also began manufacturing PFOA in-house, at a manufacturing facility in Fayetteville, North Carolina.

103.  In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. In statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks.

104.  In 2006 3M agreed to pay a $1.5 million civil penalty for failure to disclose years of information to EPA about the health risks and environmental persistence of PFAS chemicals.

105.  For decades, 3M manufactured PFOA and supplied it to Old DuPont for its manufacture of Teflon and other products. Despite Old DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market in May of 2000, Old DuPont opened its own plant to manufacture PFOA for its own products.

106. In 2015, Old DuPont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as a substantial portion of Old DuPont's PFAS-related environmental liabilities) to Chemours.

107. Daikin is a wholly-owned subsidiary of a Japanese parent company, Daikin Industries, Ltd., which has been in the PFAS business for at least 80 years. Daikin began operating a plant in Decatur, Alabama in 1994 which purchased PFOA from 3M as a processing chemical for fluoropolymers. Daikin was in routine communication with 3M about the toxicity and persistence of PFOA as early as 1997. At the very latest, Daikin became aware of 3M and Old DuPont documents concerning the toxicity and persistence of PFAS beginning in 2000.

108. Daikin was aware of a 1981 3M study that PFAS ingredients of products made by the telomerization process likely degraded to PFOA.

109. When 3M withdrew Long-Chain PFAS from the market beginning in 2000, Daikin decided to expand its marketing for Long-Chain PFAS based on the telomerization process to replace 3M and become number one in the world.

110. Daikin understood that PFAS were highly persistent, resistant to conventional wastewater treatment, and otherwise environmentally damaging. For

instance, Daikin began incinerating the process wastewater generated by its PFAS manufacturing activities at its Decatur, Alabama plant in or around the mid-2000s.

111.  Around the time of 3M's phaseout announcement in 2000, EPA approached Old DuPont, Daikin, and other PFAS manufacturers to solicit data and information pertaining to PFOA and these manufacturers' telomer-based products. EPA wanted to understand if the problems posed by 3M's PFOS and other ECF-derived PFAS also implicated telomer products.

112.  Old DuPont, Daikin, and the other telomer PFAS manufacturers formed the Telomer Research Program ("TRP") to exchange information and jointly conduct research pursuant to EPA's information requests.

113.  Through working groups like the TRP, as well as trade associations like the American Chemistry Council ("ACC") (formerly known as the Chemical Manufacturers Association), the Chemical Manufacturing Defendants have exchanged their knowledge about the health and environmental effects of PFAS, and have sought to suppress and delay independent scientific understanding and government regulation of PFAS.

114.  The Carpet Manufacturing Defendants have known that PFAS are persistent, bioaccumulative, and toxic since the late 1990s, if not earlier.

115. In the late 1990s, prior to deciding to phaseout Long-Chain PFAS in May 2000, 3M secretly informed the Carpet Manufacturing Defendants of 3M's finding that PFOS was in the blood of the general public. Nevertheless, the Carpet Manufacturing Defendants continued to use 3M products based on this chemistry until 3M discontinued their sale in or around 2002.

116. The Chemical Manufacturing Defendants provided the Carpet Manufacturing Defendants information concerning the health and environmental effects of PFAS and the Chemical Manufacturing Defendants' PFAS-containing products, and the Carpet Manufacturing Defendants, at least in part, relied on this information.

117. In addition to bilateral exchanges of information between individual Chemical Manufacturing Defendants and Carpet Manufacturing Defendants, much PFAS-related information has been exchanged through the carpet industry trade association the Carpet and Rug Institute ("CRI"), headquartered in Dalton.

118. Defendants' activities at the CRI have not been limited to sharing information, however. Through the CRI, Defendants developed and issued communications on behalf of the carpet industry that downplayed the risks of PFAS and Defendants' actual knowledge of those risks; hindered EPA efforts to investigate the contamination Defendants had caused in northwest Georgia; and coordinated

40

lobbying efforts at the state and federal levels to impede PFAS regulation—among other concerted efforts.

119. The Carpet Manufacturing Defendants also have a sophisticated understanding of PFAS in their own right. Shaw and Mohawk are the world's largest carpet manufacturers and have dedicated ample resources towards understanding the chemistry and environmental aspects of the materials they use, including PFAS.

120. For instance, Shaw, with assistance from Old DuPont, developed the in-house capability to analytically test the levels of PFAS, including PFOA, in the fluorochemicals it was using in or around the mid-2000s.

121. In 2002, EPA took regulatory action under the Toxic Substances Control Act ("TSCA") to limit the future manufacture of PFOA, PFOS, and related Long-Chain PFAS. In response, the Chemical Manufacturing Defendants undertook to develop, manufacture, and supply (years later) Short-Chain PFAS to the Carpet Manufacturing Defendants. Defendants are aware that these Short-Chain PFAS are, like PFOA and PFOS, persistent and not subject to biodegradation, and that they accumulate in human blood. Likewise, Defendants are aware that Short-Chain PFAS are toxic and known to cause cancer in animal studies.

41

122.    Amidst rising scrutiny of PFOA, the Carpet Manufacturing Defendants, through the CRI, briefly considered moving away from PFOA-based telomer products in 2004. However, the idea was quickly squashed.

123.    Years later, in or around 2008, the Carpet Manufacturing Defendants finally transitioned away from PFOA-based products. But rather than dispensing with PFAS altogether, the carpet industry instead moved to Short-Chain PFAS despite warning signs that this new chemistry was also persistent, bioaccumulative, and toxic.

124.    Finally, in 2019, the Carpet Manufacturing Defendants claim to have ceased using PFAS-containing fluorochemicals in their manufacture of carpet. However, because of the preceding decades of fluorochemical usage, the Carpet Manufacturing Defendants' wastewater discharges to Dalton Utilities remain contaminated with PFAS today. Shaw continues to discharge PFAS, at least from Plant #4, #80, and #81, during the period 2016 to present, as evidenced by sampling performed by Shaw of its wastewater in 2021-2025. PFAS continues to be present in Mohawk's wastewater and within Mohawk's pipes, because of PFAS's persistence and other properties.

125.    Despite their vast knowledge of the adverse health and environmental effects of PFAS, and their knowledge that the PFAS they sold to the Carpet

Manufacturing Defendants was passing through Dalton Utilities' treatment works and contaminating the Upper Coosa River Basin, the Chemical Manufacturing Defendants, for years, continued to sell PFAS-containing products to the Carpet Manufacturing Defendants while also failing to provide adequate guidance and instructions to their customers to avoid environmental contamination and human exposure.

126.   Despite their also significant knowledge of the adverse health and environmental effects of PFAS, and their knowledge that the PFAS they were using was passing through Dalton Utilities' treatment works and contaminating the Upper Coosa River Basin, the Carpet Manufacturing Defendants, for years, continued to use and improperly dispose of the PFAS-containing products they purchased from the Chemical Manufacturing Defendants.

127.   Despite its knowledge of the adverse health and environmental effects of PFAS, and its knowledge that its LAS and treatment works are contaminated with PFAS discharged by the carpet industry, which flow into the Conasauga River in violation of its permitting, Dalton Utilities, for years, has failed to abate the PFAS discharges from the LAS and has not exercised its authority, via the pretreatment program, to control its sewer users' discharges of PFAS.

**Contamination of Upper Coosa River Basin with PFAS**

43

128. The Carpet Manufacturing Defendants discharge PFAS in their industrial wastewater into the City of Dalton, Georgia's POTW, operated by Dalton Utilities.

129. Notably, Dalton Utilities' Board of Commissioners, which oversees and controls the utility, has consistently been comprised of current and former carpet industry executives.

130. Dalton Utilities operates the Riverbend and Loopers Bend Water Pollution Control Plants ("WPCPs"), or publicly owned treatment works ("POTW"), which treat this wastewater before it is pumped to the approximate 9,800-acre LAS for land application using approximately 19,000 sprayheads. According to EPA, approximately 90% of the wastewater which enters these treatment facilities for ultimate disposal at the LAS originates from industrial sources, primarily carpet manufacturers.

131. Dalton Utilities' LAS began operations in or around 1986. From the very outset, the LAS was plagued with permit violations and treatment problems owing to the vast amounts of chemically intense wastewater the LAS received from the carpet industry.

132. In the 1980s, the use of 3M and Old DuPont's stainblocker chemicals by the carpet industry caused fish kills and foamy water in the Conasauga River for

dozens of miles downstream from the Dalton Utilities POTW. 3M and Old DuPont sent specialists to meet with Dalton Utilities and offer their assistance. 3M and Old DuPont ultimately resolved the matter by changing one of the components used in their stainblocker products.

133.    Nevertheless, pollution problems at Dalton Utilities' LAS persisted throughout the 1990s, culminating in a civil lawsuit brought by EPA for numerous violations of the Clean Water Act as well as criminal charges for falsifying wastewater records. Dalton Utilities pleaded guilty to five criminal counts in 1999, and in 2001, it entered a consent decree to settle the civil lawsuit, which required Dalton Utilities to undertake significant infrastructure improvements and reform its pretreatment program.

134.    The operation of Dalton Utilities' wastewater collection and disposal system, which is a "no discharge" system and includes the Riverbend and Loopers Bend WPCPs, as well as the LAS, is governed by the terms and conditions of Land Application System Permit No. GAJ020056 ("LAS permit"). The LAS permit authorizes Dalton Utilities to discharge up to 30 million gallons per day ("MGD") of wastewater effluent to the LAS. However, among other things, the LAS permit expressly prohibits any discharge from the LAS to surface waters. Despite this prohibition, EPA has found that a "significant amount" of the wastewater effluent

sprayed onto the LAS by Dalton Utilities "leaves [the LAS] via surface waters and enters the Conasauga River."

135.   Defendants' PFAS resist degradation during the conventional treatment process at these WPCPs and further increase in concentration as these toxic chemicals accumulate on the LAS. Defendants have known for decades that PFAS cannot be removed from the industrial wastewater discharges sent to the Dalton POTW and that the Dalton Utilities' conventional treatment processes and land application will not remove these chemicals prior to discharge to the Conasauga River and its tributaries in and around the LAS.

136.   PFAS have been detected in dangerously high levels in the soil, compost, sewage sludge, groundwater, and wastewater effluent at the LAS, which borders and is hydrologically connected to the Conasauga River and its tributaries, some of which flow through the LAS. Historical applications of PFAS at the LAS continue to be discharged from the LAS to the Conasauga River or its tributaries, having the same net polluting effect on these surface waters for decades and longer after their initial deposit. Stormwater discharges contaminated with PFAS also pollute the Conasauga River or its tributaries as they flow/pass through the LAS, as do discharges of PFAS-contaminated groundwater.

46

137. EPA, the University of Georgia ("UGA"), and the Georgia Environmental Protection Division ("EPD") have identified industrial wastewater originating from Dalton carpet manufacturers' facilities, and ultimately discharged from the LAS, as the source of PFAS contamination in the Conasauga River, and the Upper Coosa River Basin.

138. Defendants conspired for years to delay regulators and the public from understanding the scope of their PFAS contamination of the Conasauga River and the Upper Coosa River Basin.

139. 3M conducted a secret study of the releases of PFOS-based products through a consultant, Battelle, in 1997-2001, concluding that the carpet mills in Dalton were the largest source of customer discharges of PFOS to wastewater in the United States. During this evaluation 3M also sampled the Conasauga River downstream of the LAS and found PFOS.

140. In 2003, EPA approached the Chemical Manufacturing Defendants via the Telomer Research Program ("TRP") to request environmental monitoring data from locations where the Chemical Manufacturing Defendants' PFAS-containing products were being used in manufacturing applications. One of the "user-site" categories for which EPA needed monitoring data was the carpet industry.

47

141. The Chemical Manufacturing Defendants presented EPA's monitoring request to the Carpet Manufacturing Defendants through the CRI. The carpet industry was averse to the notion of collecting sampling data from specific carpet mills, fearing that the identity of the participating mills could be disclosed to the public. Indicative of Defendants' knowledge that the carpet industry was discharging PFAS and that this PFAS resisted wastewater treatment, the CRI counteroffered with a proposal to collect samples from Dalton Utilities' treatment works and the Conasauga River.

142. The TRP presented CRI's counteroffer to EPA, and EPA accepted it in or around December 2003. However, the CRI proposal required Dalton Utilities' cooperation, and Dalton Utilities stonewalled the effort, refusing to allow access to its property for sample collection. By Spring of 2004, EPA's effort to get PFAS monitoring data in Dalton was frozen in the face of industry resistance.

143. The failure of this testing effort was cemented by a meeting of the CRI Board of Directors in May 2004—attended, incidentally, by the president of Dalton Utilities, which was not a CRI member—at which the carpet industry unanimously declined to move forward with environmental monitoring.

144. Almost two years later, as a separate effort that did not involve Defendants' participation, UGA conducted surface water sampling in March 2006

48

to determine the presence and distribution of PFAS in the Conasauga River above and below the LAS near Dalton ("UGA Study"). Based on extremely high concentrations of PFAS downstream of the LAS, including PFOA at levels as high as 1,150 ppt and PFOS as high as 318 ppt, the UGA study concluded that the LAS is an "important point source of [PFAS] contamination." The UGA Study further found these concentrations of PFAS were among the "highest ever recorded in surface waters."

145. The United Steelworkers Union sampled surface waters downstream from the LAS in August and October of 2006, and analytical results from this sampling showed concentrations of PFOA of up to 526 ppt in the Conasauga River and PFOS as high as 923 ppt.

146. Shaw developed the methodology to detect PFOA and PFOS in water and PFAS products with the assistance of Old DuPont and Daikin in around 2004 and began testing the Conasauga and Oostanuala Rivers for these chemicals in 2005-06. Significant levels were found downstream of the LAS at the time. Yet, Shaw never reported these findings to the EPA, Georgia EPD, downstream river users, downstream landowners or downstream drinking water utilities.

147. Pursuant to a binding EPA request in 2009, sampling conducted by Dalton Utilities between July 2009 and August 2010 showed, *inter alia,* PFOA levels

as high as 400 ppt and PFOS levels as high as 1,200 ppt in the Conasauga River or its tributaries, including Holly Creek, downstream of the LAS. Elevated levels of PFAS were also consistently found in Dalton Utilities' compost, sewage sludge, as well as soil and groundwater at the LAS.

148.    Also pursuant to this binding EPA request, Dalton Utilities conducted sampling of its industrial users' wastewater discharges for PFAS, including from Shaw and Mohawk facilities.

149.    Wastewater effluent from Shaw facilities was sampled by Dalton Utilities on at least November 20, 2009; December 4, 2009; December 18, 2009; January 15, 2010; August 30, 2011; August 14, 2012; December 17, 2013; December 19, 2013; June 21, 2016; June 22, 2016; July 5, 2016; and July 14, 2016. Analytical results from this sampling showed PFOA as high as 294 ppt and PFOS as high as 2,100 ppt, among other PFAS found in Shaw's wastewater effluent. Shaw continues to discharge PFAS, at least from Plant #4, #80, and #81, during the period 2016 to present, as evidenced by sampling performed by Shaw of its wastewater in 2021-2025.

150.    Wastewater effluent from Mohawk facilities was sampled by Dalton Utilities on at least December 18, 2009; January 15, 2010; December 20, 2011; March 14, 2013; May 15, 2013; August 26, 2014; June 21, 2016; and July 12, 2016.

Analytical results from this sampling showed PFOA as high as 142 ppt and PFOS as high as 538 ppt, among other PFAS found in Mohawk's wastewater effluent. PFAS continues to be present in Mohawk's wastewater and within Mohawk's pipes, because of PFAS's persistence and other properties.

151.  In July 2012, EPA conducted a "Conasauga River [PFAS] Study," consisting of surface water sampling in the Conasauga River and its tributaries in and around the LAS, as well as the Oostanaula and Coosa Rivers downstream. Analytical results from this sampling showed elevated levels of PFAS in all surface water samples downstream of the LAS as compared to upstream samples, including PFOA as high as 210 ppt and PFOS as high as 180 ppt in the Conasauga River. The Oostanaula River downstream of its confluence with the Conasauga was also contaminated with PFOA and PFOS at unsafe levels.

152.  Additional sampling of surface waters within the Upper Coosa River Basin, including in the Conasauga River, demonstrates that Dalton Utilities discharged PFAS from the LAS to the Conasauga River or its tributaries on at least the following occasions: June 19, 2016; June 20, 2016; June 21, 2016; June 22, 2016; June 23, 2016; June 24, 2016; July 20, 2016; July 21, 2016; September 16, 2019; September 17, 2019; November 20, 2019; November 21, 2019; May 12, 2022; and June 27-28, 2022.

153.    Sampling performed on September 22, 2020, in the Conasauga River and tributaries near the LAS showed:

| Sample ID | Location | PFOA (ppt) | PFOS (ppt) | Total PFOA + PFOS (ppt) |
|---|---|---|---|---|
| SW-1 | Conasauga River Upstream LAS | 1.87 | 2.51 | 4.38 |
| SW-2 | Conasauga River Upstream LAS | 8.16 | 7.08 | 15.2 |
| SW-3 | Conasauga River Upstream LAS | 9.31 | 10.2 | 19.5 |
| SW-4 | Conasauga River Downstream LAS | 137 | 231 | 368 |
| SW-5 | Conasauga River Downstream LAS | 123 | 215 | 338 |
| SW-8 | Polecat Creek from LAS | 113 | 191 | 304 |
| SW-9 | Big Jack Creek from LAS | 508 | 1,100 | 1,608 |

154.    Sampling conducted on May 20, 2021, of ditches, drainage channels and similar conveyances at the LAS, demonstrates that Dalton Utilities had discharged, and continues to discharge, PFAS from the LAS directly to the

Conasauga River and/or its tributaries. As set out below, analytical results of this sampling showed extremely high levels of PFOA, PFOS and other PFAS pollutants:

| Sample ID | Location (lat/lon) | PFOA (ppt) | PFOS (ppt) | Total PFAS (ppt) |
|---|---|---|---|---|
| SW-01 | 34.71464, -84.93105 | 3,820 | 5,710 | 19,190 |
| SW-02 | 34.719291, -84.91393 | 301 | 431 | 4,090 |
| SW-03 | 34.719325, -84.91389 | 3,970 | 7,300 | 19,820 |
| SW-04 | 34.702714, -84.92508 | 26,700 | 18,100 | 180,800 |
| SW-05 | 34.695758, -84.91291 | 771/759 | 1,460/1,550 | 10,230/10,210 |
| SW-06 | 34.708247, -84.90243 | 1,170 | 3,540 | 16,630 |
| SW-07 | 34.698083, -84.88613 | 1,100 | 5,190 | 18,540 |
| SW-08 | 34.683239, -84.86352 | 2,100 | 8,270 | 29,240 |
| SW-09 | 34.683054, -84.86365 | 1,750 | 6,650 | 23,480 |
| SW-10 | 34.683008, -84.85779 | 1,860 | 6,490 | 23,160 |
| SW-11 | 34.679399, -84.84922 | 1,970 | 7,580 | 22,220 |

| SW-12 | 34.68079, -84.8497 | 1,830 | 7,170 | 20,860 |
| SW-13 | 34.670432, -84.83752 | 1,320/1,340 | 3,230/2,990 | 16,320/16,370 |
| SW-14 | 34.669904, -84.83761 | 1,520 | 4,030 | 20,710 |
| SW-15 | 34.646288, -84.8557 | 1,640 | 4,810 | 25,820 |
| SW-16 | 34.646024, -84.86596 | 2,530 | 7,350 | 38,700 |
| SW-17 | 34.646067, -84.87633 | 1,200 | 3,470 | 19,680 |

155. Sampling conducted on May 19, 2021, of shallow groundwater monitoring wells at the LAS along the banks of the Conasauga River demonstrates that Dalton Utilities had discharged, and continues to discharge, PFAS from the LAS to the Conasauga River and/or its tributaries indirectly through groundwater in a manner that is functionally equivalent to a direct discharge. Due to the geography and hydrogeology of the LAS, PFAS contaminated effluent enters the groundwater and flows rapidly through porous material and enters the Conasauga River and its tributaries through both diffuse and channelized flows all along the banks of these waters. As set out below, analytical results of sampling of the following groundwater

monitoring wells showed extremely high levels of PFOA, PFOS and other PFAS

pollutants:

| Sample ID | Location | PFOA (ppt) | PFOS (ppt) | Total PFAS (ppt) |
|---|---|---|---|---|
| GW-01 | MW-21-D2 | 2,710 | 5,420 | 16,220 |
| GW-02 | MW-7A-U2 | 2,500 | 616 | 24,050 |
| GW-03 | MW-10-D4 | 4,150/3,880 | 4,790/4,490 | 33,600/32,000 |
| GW-04 | MW-15B-D13 | 5,380 | 15,000 | 32,800 |
| GW-05 | MW-13A-D8 | 4,070 | 8,710 | 34,590 |

156.   Sampling on May 12, 2022, in the Conasauga River and its tributaries

showed:

| Sample ID | Location | PFOA (ppt) | PFOS (ppt) | Total PFOA + PFOS (ppt) |
|---|---|---|---|---|
| SW-19 | Conasauga River Upstream LAS | 10.1 | 11.3 | 21.4 |
| SW-20 | Conasauga River Downstream LAS | 91.7 | 144 | 235 |
| SW-21 | Conasauga River Downstream LAS | 116 | 107 | 223 |
| SW-22 | Polecat Creek from LAS | 431 | 1,360 | 1,891 |
| SW-23 | Holly Creek at LAS | 11.5 | 15.4 | 26.9 |

55

157.  Samples taken at and around the LAS in June 27-28, 2022, showed elevated levels of PFAS, including PFOA and PFOS, as follows:

| Sample ID | Location | PFOS (ppt) | PFOA (ppt) | Total PFOA+PFOS (ppt) |
|---|---|---|---|---|
| GSW-1 | Conasauga US of LAS | 17 | 14 | 31 |
| GSW-2 | Holly Creek DS of LAS | 250 | 67 | 317 |
| GSW-3 | LAS Runoff (Stormwater Outfall 5B/5C) | 4900 | 1600 | 6500 |
| FB-1 | Field Blank (Day 1; collected at SW-3) | 2.4 | <0.73 | 2.4 |
| GSW-4 | Little Creek | 210 | 130 | 340 |
| GSW-5 | LAS Runoff | 13000 | 4200 | 17200 |
| GSW-6 | Conasauga DS of Drowning Bear Creek | 96 | 82 | 178 |
| GSW-7 | LAS Runoff | 4400 | 1700 | 6100 |
| GSW-8 | LAS Runoff | 7300 | 1700 | 9000 |
| GSW-9 | LAS Runoff | 7600 | 3100 | 10700 |
| GSW-10 | LAS Runoff | 9000 | 2800 | 11800 |
| GSW-11 | LAS Runoff | 5400 | 1900 | 7300 |

| GSW-12 | Conasauga DS of LAS | 130 | 120 | 250 |
| GSW-13 | Holly Creek US of LAS | 24 | 22 | 46 |
| GSW-14 | Polecat Creek US of LAS | 7.2 | 1.7 | 8.9 |
| GSW-15 | Polecat Creek DS of LAS | 1300 | 360 | 1660 |

**Old DuPont's Multi-Step Corporate Restructuing Designed to Shield Its Valuable Assets from Its PFAS Liabilities**

158.    By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

159.    Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

160.    The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

57

161. Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

162. Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

163. In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

164. Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

165. This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont), which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

166. Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

167. Further, to resolve a lawsuit, Chemours, Old DuPont, New DuPont, and Corteva agreed to accept responsibility for and to allocate liabilities related to PFAS.

## CAUSES OF ACTION

### COUNT ONE:
### DISCHARGE OF POLLUTANTS TO SURFACE WATERS WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT
### (Defendant Dalton Utilities)

168. Plaintiffs incorporate by reference paragraphs 1 through 167 as if restated herein.

59

169.   Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Each discharge not authorized by a permit, and each violation of a permit, is a violation of the CWA.

170.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b).  EPD is the state water pollution control agency for purposes of the CWA, and it administers statutes and regulations implementing the CWA's permitting programs within the State of Georgia.  *See, e.g.,* O.C.G.A. § 12-5-30.

171.   A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA. 33 U.S.C. § 1365(f). There is also CWA jurisdiction where pollutants are discharged from a point source to navigable surface waters through hydrologically connected ground water, where the discharge is the

"functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife, Fund,* 140 S. Ct. 1462, 1476 (2020).

172.    Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries, constitute the discharge of a pollutant from a point source requiring an NPDES Permit authorizing such discharge.

173.    Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries through hydrologically connected groundwater beneath the LAS, constitute the "functional equivalent" of a direct discharge to these surface waters requiring an NPDES Permit authorizing such discharges.

174.    Per- and polyfluoroalkyl substances ("PFAS"), including PFOS and PFOA, are "pollutants" within the meaning of the CWA. 33 U.S.C. § 1362(6).

175.    The LAS, the sprayheads located thereon, and ditches and drainage channels that flow from the LAS to the Conasauga River and/or tributaries thereto are all "point sources" within the meaning of the CWA. 33 U.S.C. § 1362(14).

61

176. The Conasauga River and its tributaries are waters of the State of Georgia and waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

177. The requirement for an NPDES permit authorizing these discharges arose when at the time that Dalton Utilities first knew or should have known that PFAS was being discharged from the LAS into surface waters. Each day since that time is a violation of the CWA, and these violations are continuing as of the date of this Complaint.

178. Since as early as 2006, and every day since February 2020, and on at least the specific occasions set forth in paragraphs 143 to 155, Dalton Utilities has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging PFAS from the LAS into the Conasauga River and/or its tributaries, directly or indirectly through hydrologically connected groundwater beneath the LAS, without an NPDES Permit authorizing such discharges.

179. Defendant Dalton Utilities should be subject to an enforcement order or injunction order to cease its discharges of PFAS from the LAS and its collection system into the Conasauga River or its tributaries without an NPDES Permit authorizing such discharges.

180.    Defendant Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

181.    For the purpose of assessing the maximum civil penalty for which Defendant Dalton Utilities is liable, each day that Dalton Utilities has discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

**COUNT TWO:**
**DISCHARGES OF NON-STORMWATER CONTAINING PFAS IN VIOLATION OF NPDES GENERAL STORMWATER PERMIT AND THE CLEAN WATER ACT**
**(Defendant Dalton Utilities)**

182.    Plaintiffs incorporate by reference paragraphs 1 through 181 as if restated herein.

183.    Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by,

63

or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

184.    The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b).  EPD is the state water pollution control agency for purposes of the CWA, and it administers statutes and regulations implementing the CWA's permitting programs within the State of Georgia.  *See, e.g.,* O.C.G.A. § 12-5-30.

185.    A violation of an NPDES permit issued by EPD is a violation of the federal CWA, and a citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations of the terms and conditions of NPDES permits. 33 U.S.C. § 1365(f)(7).

186.    On at least the occasions listed in paragraphs 154, 156, and 157, Dalton Utilities has violated Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by discharging non-stormwater containing PFAS at the LAS in violation of Parts 1.1.4, 8.L.3.1, and 8.T.3 of the NDPES General Stormwater Permit. These violations are continuing and ongoing, or are likely to recur, as of the date this Complaint is being filed.

64

187.    Defendant Dalton Utilities should be subject to an enforcement order or injunction ordering Dalton Utilities to cease its violations of the NPDES General Stormwater Permit.

188.    Defendant Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

189.    For the purpose of assessing the maximum civil penalty for which Defendant Dalton Utilities is liable, each day that Dalton Utilities has violated the terms and conditions of its NPDES Permit constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

## COUNT THREE:
## VIOLATIONS OF LAND APPLICATION SYSTEM PERMIT NO. GAJ020056 AND THE CLEAN WATER ACT
### (Defendant Dalton Utilities)

190.    Plaintiffs incorporate by reference paragraphs 1 through 189 as if restated herein.

191.    Dalton Utilities' Riverbend LAS is covered by and governed by the terms and conditions of Land Application System Permit No. GAJ020056, which

became effective on December 1, 2015, and expired on March 31, 2020.[4]  The LAS Permit serves as a substitute for an NPDES Permit, and as such, should be treated as a state permit issued pursuant to the CWA. As set forth below, Dalton Utilities has violated several conditions of its LAS Permit, each violation of which constitutes a separate violation of the CWA.  33 U.S.C. § 1319(d).

192.   Condition I.B.8 of the LAS Permit provides that "groundwater leaving the land application boundaries must not exceed maximum contaminant levels for drinking water." As set out in Paragraph 155, above, Dalton Utilities has illegally exceeded MCLs (4 ppt) for PFOS and PFOA in the groundwater leaving the LAS, and these violations are ongoing and continuous.

193.   Condition II.A.12 of the LAS Permit provides, in pertinent part, that the "wastewater and disposal system must be maintained *as a no-discharge to surface waters*" (emphasis added).  As set forth above*,* Dalton Utilities has, since as early as 2006, and every day since, including the specific instances identified in paragraphs 144 to 157, been in continuous violation of this effluent limitation by discharging PFAS from the Riverbend LAS into the Conasauga River and/or tributaries thereto.

---

[4] Dalton Utilities applied for reissuance of its LAS Permit in September of 2019; however, there is no indication on the Georgia EPD website that a new LAS Permit has been issued.

66

194. Condition II.A.I of the LAS Permit provides, in pertinent part:

The permittee shall at times maintain in good working order and operate as efficiently as possible all treatment or control facilities (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit.

Dalton Utilities has violated this condition since at least June of 2006 by, among other acts/omissions, failing to maintain and operate the LAS in such a manner as to prevent the discharge of PFAS to surface waters, including the Conasauga River and/or tributaries thereto, as identified in paragraphs 144 to 157.

195. Condition II.A.9 of the LAS Permit provides:

Whenever, because of an accident or otherwise, any toxic or taste or color producing substance, or any other substance which would endanger downstream users of the waters of the State or would damage property, is discharged into such waters, or is so placed so that it might flow, be washed, or fall into them, it shall be the duty of the person in charge … at the time to forthwith notify EPD in person or by telephone of the location and nature of the danger, and it shall be such person's further duty to immediately take all reasonable and necessary steps to prevent injury to property and downstream users of said water.

Dalton Utilities has violated this condition since at least 2006 by, among other acts/omissions, failing to notify EPD of the location and nature of repeated and ongoing discharges of toxic PFAS from the LAS into waters of the State, including the Conasauga River and/or tributaries thereto, as identified in paragraphs 144 to 157, and by failing to immediately take all reasonable and necessary steps to prevent

67

injury to property and downstream users of such water as a result of these illegal discharges.

196.   Part III.A. of Dalton Utilities' LAS Permit provides that the "the permittee's approved pretreatment program shall be enforceable through this permit," and requires Dalton Utilities to, among other things, administer its approved pretreatment program by:

> Enforcing and obtaining appropriate remedies for noncompliance by any industrial user with any applicable pretreatment standard or requirement defined by Section 307(b) and (c) of the [CWA], 40 CFR Part 403.5 and 403.6 or any State or local requirement, which is more stringent.

LAS Permit, Part III.A.2.b.

197.   Dalton Utilities is also required to revise "the adopted local limits based on technical analyses to ensure the local limits continue to prevent":

1. Interference with the operation of the POTW;
2. Pass-through of pollutants in violation of this permit;
3. Municipal sludge contamination; and
4. Toxicity to life in the receiving stream.

LAS Permit, Part III.A.2.c. *See also* GA. COMP. R. & REGS. § 391-3-6-0(9)(a) ("The POTW shall have authority ... to immediately and effectively halt or prevent any discharge of pollutants to the POTW which reasonably appears to present an imminent endangerment to the health or welfare of persons"); Dalton Utilities Sewer

68

Use Rules and Regulations ("SURR"), § 2.4.1 ("No User shall contribute or cause to be contributed directly or indirectly to the POTW any Pollutant or Wastewater that causes Pass Through or Interference"); 40 C.F.R. § 403.5 (Prohibited Discharges) ("A User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference").

198.   At the request of EPA, Dalton Utilities began sampling its industrial users for PFAS in 2009. The results of these samples showed PFAS discharges to the POTW from carpet manufacturers, including Shaw and Mohawk plants, but Dalton Utilities has done nothing since that time to prevent or require pretreatment for these discharges. Dalton Utilities has violated, and continues to violate, Part II.A.2.b, 2.c, and 2.d of the LAS Permit, Georgia law, its own SURR, and the CWA continuously since at least 2009 with regard to numerous industrial users by failing to require compliance with these users' pretreatment permits and national pretreatment standards.   This includes the failure to prevent and/or enforce prohibited discharges,  to revise local limits to prevent Pass-Through of pollutants, and PFAS in particular, through the Dalton collection and disposal system, and the LAS in particular, as well as the contamination of municipal sludge with PFAS, and to halt or prevent discharges of PFAS into the POTW which present an imminent and substantial endangerment to the health and welfare of persons.

69

199.    These violations of the LAS Permit are violations of the CWA and may be enforced in a citizen suit pursuant to Section 505 of the Act, 33 U.S.C. § 1365 as an effluent standard or limitation.

200.    Dalton Utilities should be subject to an enforcement order or injunction ordering Dalton Utilities to cease its violations of the LAS Permit.

201.    Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

202.    For the purpose of assessing the maximum civil penalty for which Dalton Utilities is liable, each day that Dalton Utilities has violated the terms and conditions of its LAS Permit constitutes a separate violation of Section 301(a) of the Act, pursuant to Section 309(d), 33 U.S.C. 1319(d), for ach day on which it has occurred or will occur after the filing of the Complaint.

### COUNT FOUR:
### VIOLATIONS OF THE GEORGIA WATER QUALITY CONTROL ACT
### AND THE CLEAN WATER ACT
### (Defendant Dalton Utilities)

203.    Plaintiffs incorporate by reference paragraphs 1 through 202 as if restated herein.

204.    Pursuant to the Georgia Water Quality Control Act, O.C.G.A. § 12-5-30, *et seq.* ("GWQCA"), it is the declared policy of the State of Georgia that:

70

the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state and reasonable treatment of sewage, industrial wastes, and other wastes prior to their discharge into such waters.

O.C.G.A. §12-5-21(a).  To effectuate this policy, the GWQCA provides, *inter alia*, that it "shall be unlawful to use any waters of the state for disposal of sewage, industrial wastes, or other wastes …." O.C.G.A. § 12-5-29(a).

205.    Dalton Utilities' conventional treatment technology cannot remove PFAS from its wastewater prior to application at the LAS.  Thus, in addition to the violations of the CWA for discharging without a permit, Dalton Utilities has also, since as early as 2006, and every day since at least June of 2015, violated the GWQCA, O.C.G.A. § 12-5-29(a), and the CWA, by using waters of the State for disposal of sewage, industrial wastes, or other wastes.

206.    Dalton Utilities should be subject to an enforcement order or injunction to cease its violations of the GWQCA and the CWA.

207.    Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

208.    For the purpose of assessing the maximum civil penalty for which Dalton Utilities is liable, each day that Dalton Utilities has violated the GWQCA

71

and the CWA constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of the Complaint.

**COUNT FIVE:**
**INDUSTRIAL USER PASS THROUGH DISCHARGES OF POLLUTANTS IN VIOLATION OF FEDERAL PROHIBITIONS, DALTON UTITLITIES' SEWER USE RULES AND REGULATIONS, AND THE CLEAN WATER ACT**
**(Defendants Shaw and Mohawk)**

209. Plaintiffs incorporate by reference paragraphs 1 through 208 as if restated herein.

210. Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works. Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

211. Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works. Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits industrial facilities from discharging pollutants to a

publicly owned treatment works that violate, among other things, the prohibitions on discharges contained in the regulations implementing the Act.

212.  EPA has adopted pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 404 through 471, including both general regulations and categorical regulations for specific industrial categories.

213.  The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the pretreatment program for industrial discharges into wastewater facilities, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutes and regulations implementing the CWA's permitting programs within the State of Georgia.  *See, e.g.,* GA. COMP. R. & REGS. §§ 391-3-6-0(8), 391-3-6-0(9).

214.  Both the EPA and EPD rules prohibit the discharge into a POTW of "any pollutant(s) which cause Pass Through or Interference."  40 C.F.R. § 403.5(a); GA. COMP. R. & REGS. §§ 391-3-6-0(8)(3)(a)(2).

215.  Dalton Utilities has enacted Sewer Use Rules and Regulations ("SURR"), which incorporate federal and state pretreatment standards for discharges of industrial wastes into the Dalton POTW, so that Defendant Dalton Utilities can "comply with all State and Federal laws, including the Clean Water Act, the General

Pretreatment Regulations, the Georgia Water Quality Control Act, and Georgia Department of Natural Resources Rules."

216. A citizen suit may be brought for violations of pretreatment standards under Section 307 of the CWA, including violations of local limits like the SURR. 33 U.S.C. § 1365(f).

217. Section 2.4.1 of the SURR provides that "No User shall contribute or cause to be contributed directly or indirectly to the POTW any Pollutant or Wastewater that causes Pass Through or Interference." Section 1.4 of the SURR defines "Pass Through" as:

> A discharge that exits any point from the Wastewater Treatment Plants into the waters of the State of Georgia containing quantities or concentrations, which, alone, or in conjunction with a discharge or discharges from other sources, are a cause of a violation of any requirement of Dalton Utilities' LAS Permit including an increase in the magnitude or duration of a violation.

218. On at least the dates referenced in paragraph 149 above, Defendant Shaw has violated 40 C.F.R. § 403.5(a) and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries along with stormwater. These non-stormwater discharges of industrial/process wastewater containing PFAS, which are ongoing and/or likely to recur into the future, have

74

caused violations of Part 1.1.4 of Dalton Utilities' NPDES Permit, which prohibits such "non-stormwater" discharges.

219. On at least the dates referenced in paragraph 150 above, Defendant Mohawk has violated 40 C.F.R. § 403.5(a) and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries along with stormwater. These non-stormwater discharges of industrial/process wastewater containing PFAS, which are ongoing and/or likely to recur into the future, have caused violations of Part 1.1.4 of Dalton Utilities' NPDES Permit, which prohibits such "non-stormwater" discharges.

220. Defendant Shaw should be subject to an enforcement order or injunction ordering Defendant Shaw to cease its violations of pretreatment requirements and standards.

221. Defendant Mohawk should be subject to an enforcement order or injunction ordering Defendant Mohawk to cease its violations of pretreatment requirements and standards.

222. Defendant Shaw should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

223. Defendant Mohawk should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

224. For the purpose of assessing the maximum civil penalty for which Defendants Shaw and Mohawk are liable, each instance of Defendants' violation of pretreatment requirements and standards constitutes a separate violation of Section 307(d) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

## COUNT SIX:
## NEGLIGENT MISCONDUCT
### (All Defendants)

225. The Perkins Plaintiffs incorporate by reference paragraphs 1 through 224 as if restated herein.

226. Defendants have known for decades that PFAS are toxic, persistent, bioaccumulative, resistant to degradation, and incapable of treatment by the conventional treatment processes used by Dalton Utilities. Defendants have known for decades that their PFAS pass through the Dalton Utilities POTW and LAS and discharge into the Conasauga River and downstream surface waters thereby contaminating downstream waters, properties, and the environment. Defendants thus owed a duty to Plaintiffs and any other persons who might be foreseeably harmed to

exercise due and reasonable care in their manufacture, supply, use, and disposal of PFAS to prevent injuring Plaintiff's property by the discharge of toxic PFAS chemicals into waters of the State and waters of the United States, and the Conasauga River in particular. Despite their knowledge, for decades Defendants continued to manufacture, supply, use, dispose, and discharge PFAS in the same manner— knowingly contaminating and polluting the Conasauga River, downstream surface waters, properties (including the Perkins Plaintiffs'), and the environment with toxic PFAS chemicals they knew were unsafe and hazardous to human health and the environment. Defendants acted with willful, wanton, reckless, and/or conscious disregard, breached their duties owed to the Perkins Plaintiffs, and damaged the Perkins Plaintiffs' property.

227. Chemical Manufacturing Defendants supplied a knowingly hazardous product with knowledge that PFAS was unsafe for its probable use and would likely cause physical harm. Chemical Manufacturing Defendants failed to take reasonable precautions when supplying PFAS, including failing to provide adequate warnings and/or instructions to prevent PFAS from contaminating the Conasauga River and downstream surface waters and properties. As the suppliers of a knowingly hazardous product, Chemical Manufacturing Defendants had a duty to protect Plaintiffs and Plaintiffs' property from PFAS contamination. Despite their duty and

knowledge, Chemical Manufacturing Defendants continued to supply PFAS to the carpet industry with knowledge that PFAS were unlikely to be made reasonably safe in their regular use and with knowledge that their PFAS would contaminate the Conasauga River and downstream surface waters and properties, including the Perkins Plaintiffs' property.

228. Old DuPont, 3M, and Invista, discharged PFAS to Dalton Utilities and the LAS from own their laboratories in Dalton, contributing to PFAS pollution and evidencing their knowledge of wastewater disposal practices in Dalton.

229. Carpet Manufacturing Defendants purchased, used and disposed of PFAS that they knew were toxic, persistent, bioaccumulative, resistant to degradation, and incapable of the conventional treatment used by Dalton Utilities. Carpet Manufacturing Defendants owed a duty to Plaintiffs to exercise reasonable and due care in the use, handling, and disposal of PFAS to prevent it escaping from their premises and discharging into the Conasauga River and contaminating the Perkins Plaintiffs' property. Despite their duty and knowledge, Carpet Manufacturing Defendants continued to handle, use, dispose, and discharge PFAS-contaminated wastewater into the same surface waters which they knew would cause widespread pollution and damage to the Perkins Plaintiffs' property.

230. Dalton Utilities knew since 2006, if not earlier, that it was discharging PFAS into the Conasauga River and that the polluted waters would damage downstream properties, including the Perkins Plaintiffs' property. Yet, despite a duty to exercise reasonable and due care in the disposal of PFAS to prevent it escaping from their premises and discharging into the Conasauga River and contaminating the Perkins Plaintiffs' property, Dalton Utilities has done nothing to reduce or eliminate those discharges which they knew would cause damage to the Perkins Plaintiffs' property.

231. Defendants knew or should have known that the discharge of toxic PFAS chemicals would result in contaminated surface waters, primarily the Conasauga River, and its tributaries, and cause injury to person and property, including the Perkins Plaintiffs' property.

232. As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, the Perkins Plaintiffs have been caused to suffer, and will continue to suffer, injury to property and other injuries to be proved at trial, including the costs of remediating the Perkins property and/or the costs for remediating the LAS.

233.    The Perkins Plaintiffs further request an Order requiring Defendants to remove all PFAS from their property and implement measures to permanently prevent PFAS from further contaminating their property.

**COUNT SEVEN:**
**NEGLIGENT FAILURE TO WARN**
**(Chemical Manufacturing Defendants)**

234.    The Perkins Plaintiffs incorporate by reference paragraphs 1 through 233 as if restated herein.

235.    As manufacturers, distributors, and/or suppliers of PFAS with superior knowledge of its hazards, the Chemical Manufacturing Defendants had a duty to warn the purchasers and users of their PFAS products, including carpet manufacturers, of the dangers associated with PFAS, including the existence and extent of the risks PFAS pose to human health and the environment and the inability of conventional wastewater treatment to remove these chemicals. This duty extended to those who may be foreseeably and unreasonably harmed by PFAS, including the Perkins Plaintiffs, who are reasonably foreseeable third parties.

236.    The Chemical Manufacturing Defendants have a duty to warn of the dangers associated with PFAS that is commensurate with the inherently dangerous, harmful, toxic, injurious, environmentally persistent, water soluble and highly

80

mobile and bio-accumulative nature of these chemicals that are incapable of treatment through conventional means.

237.    The Defendants knew, foresaw, anticipated, and/or should have known, foreseen, and/or anticipated that their manufacture, distribution, and/or supply of PFAS to users like carpet manufacturers without adequate warnings of their hazards and disposal requirements, and/or other acts and omissions as described in this Complaint, would likely result in the improper disposal of and the environmental contamination of surrounding areas, including surface waters and downstream properties, including the Perkins Plaintiffs' property.

238.    Despite knowing, anticipating, and/or foreseeing of the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, and its inability to be effectively treated by wastewater treatment plants like the Dalton Utilities POTW, the Defendants breached the foregoing duty owed to Plaintiffs by failing to warn Defendant Carpet Manufacturers of the existence and extent of the dangers associated with PFAS and its use and disposal. The warnings that were given to the Carpet Manufacturing Defendants were inadequate, unreasonable, and knowingly ineffective. The harms from the breach of the duty to warn extended to those who were foreseeably and unreasonably harmed by the PFAS

81

discharges, including the Perkins Plaintiffs, who are reasonably foreseeable third parties.

239.   It was reasonably foreseeable to Defendants that the Perkins Plaintiffs would suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of their duty to warn.

240.   But for Defendants' negligent failure to warn, the Perkins Plaintiffs would not have been injured or harmed. Furthermore, as described throughout this Complaint, Defendants' acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as the Perkins Plaintiffs who foreseeably might be harmed by Defendants' acts and/or omissions.

241.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, the Perkins Plaintiffs have been caused to suffer, and will continue to suffer injury to property and other injuries to be proved at trial, including costs of remediating their property and/or the costs for remediating the LAS.

242.   The Perkins Plaintiffs further request an Order requiring Defendants to implement measures to permanently prevent PFAS from further contaminating the Perkins Plaintiffs' property.

## COUNT EIGHT:
## NEGLIGENCE PER SE
### (Carpet Manufacturing Defendants and Dalton Utilities)

243.   The Perkins Plaintiffs incorporate by reference paragraphs 1 through 242 as if restated herein.

244.   Defendants Shaw and Mohawk have violated the CWA, Georgia law, and the Dalton SURR as set out Count Five of this Complaint.

245.   Defendant Dalton Utilities has violated the CWA and Georgia law as set out in Counts One through Four of this Complaint.

246.   These statutes and rules were enacted for the protection of riparian property owners such as the Perkins Plaintiffs and create a duty of care for the Defendants.

247.   O.G.C.A. § 51-1-6 provides that the Perkins Plaintiffs may recover for the breach of Defendants' duties caused by the Defendants' violations.

248.   As a direct, proximate, and foreseeable result of Defendants' violations, the Perkins Plaintiffs have been caused to suffer, and will continue to suffer injury to property and other injuries to be proved at trial, including costs of remediating their property and/or the costs for remediating the LAS.

249. The Perkins Plaintiffs further request an Order requiring Defendants to implement measures to permanently prevent PFAS from further contaminating the Perkins Plaintiffs' property.

## COUNT NINE:
## PRIVATE NUISANCE
## (All Defendants)

250. The Perkins Plaintiffs incorporate by reference paragraphs 1 through 245 as if restated herein.

251. The Perkins Plaintiffs own riparian land abutting the Conasauga River and have a riparian property right in the reasonable use of these waters. The Perkins Plaintiffs use their property for hunting, farming cattle, and cultivating agricultural hay.

252. Through the conduct described herein, Defendants have created and maintained a continuous private nuisance by causing and contributing to cause the proliferation of PFAS including, but not limited to PFOA, PFOS, and related chemicals, into the Conasauga River and related tributaries and watersheds, which has caused, and continues to cause, contamination of these waters and the Upper Coosa River Basin, and contamination of the properties adjacent to these waters, including the Perkins Plaintiffs' property, thereby proximately causing Plaintiffs' past, present, and future harm, injury, and inconvenience.

253. Defendants concurrently have created, caused or contributed to the continuing nuisance by using and continuing to use PFAS products, discharging and continuing to discharge PFAS products, disposing and continuing to dispose of PFAS products, and improperly directing and/or instructing the purchasers and users of their PFAS products, including the carpet manufacturers, as to disposal requirements the result of which Defendants knew or should have known would cause contamination of the Conasauga River, downstream surface waters, and properties adjacent to these waters. Therefore, Defendants controlled the cause of the harm.

254. The Chemical Manufacturing Defendants have controlled, created, caused or contributed to a continuing private nuisance by improperly directing and/or instructing the Carpet Manufacturing Defendants as to disposal requirements that the Chemical Manufacturing Defendants knew or should have known would result in the contamination of surface waters and ultimately downstream properties.

255. The Carpet Manufacturing Defendants have controlled, created, caused or contributed to a continuing private nuisance by discharging PFAS contaminated wastewater to Dalton Utilities and the LAS from which PFAS, including PFOS and PFOA, continue to contaminate the Conasauga River and downstream properties. No permit authorizes them to create a nuisance with their discharges.

256. Dalton Utilities has controlled, created, caused, or contributed to a continuing private nuisance by discharging PFAS contaminated wastewater from the LAS to the Conasauga River which contaminates downstream properties. The nuisance is a continuing abatable nuisance because it has been and continues to be caused by improper operation of the LAS.The PFAS contamination caused by the Defendants has unreasonably interfered, and continues to interfere, with the use and enjoyment of the Perkins Plaintiffs' property and caused injury to their property.

257. It was reasonably foreseeable, and in fact known to the Defendants, that their actions would cause property injury to, and interfere with the property rights of, the Perkins Plaintiffs.

258. The nuisance created by Defendants' wrongful conduct is continuing, because the discharges and releases of Defendants' PFAS into the Conasauga River from the LAS are continuing as a result of the continuing degradation of PFAS precursors to PFOA and PFOS and the continuing migration of these chemicals into the River as a result of improper operation of the LAS. In addition, the past discharges of PFAS have caused contamination of sediments in the river and its tributaries, which provide a continuing source of contamination of the water.

259. The private nuisance posed by Defendants' contamination of the Conasauga River and the Upper Coosa River Basin can be abated by requiring the

Carpet Manufacturing Defendants to cease their discharges of PFAS to Dalton Utilities' POTW and by requiring all Defendants to undertake and/or fund measures to remediate the LAS to cease the ongoing discharges of PFAS from the LAS to surface waters.

260.   As a result of the private nuisance caused by Defendants, the Perkins Plaintiffs have been caused to suffer, and will continue to suffer, injuries to property, interference with the use and enjoyment of their property, and additional injuries to be proved at trial, including the cost of remediating Plaintiffs' property and/or the costs for remediating the LAS.

## COUNT NINE:
## PUBLIC NUISANCE
### (All Defendants)

261.   The Perkins Plaintiffs incorporate by reference paragraphs 1 through 254 as if restated herein.

262.   Through the conduct described herein, Defendants have created and maintained a continuous public nuisance by causing and contributing to cause the proliferation of PFAS including, but not limited to PFOA, PFOS, and related chemicals, into the Conasauga River and related tributaries and watersheds, which has caused, and continues to cause, contamination of these waters and the Upper

Coosa River Basin, and contamination of the properties adjacent to these waters, including the Perkins Plaintiffs' property.

263. Defendants concurrently have created, caused or contributed to the continuing nuisance by using and continuing to use PFAS products, discharging and continuing to discharge PFAS products, disposing and continuing to dispose of PFAS products, and improperly directing and/or instructing the purchasers and users of their PFAS products, including the carpet manufacturers, as to disposal requirements the result of which Defendants knew or should have known would cause contamination of the Conasauga River, downstream surface waters, and properties adjacent to these waters. Therefore, Defendants controlled the cause of the harm.

264. The Chemical Manufacturing Defendants have controlled, created, caused or contributed to a continuing public nuisance by improperly directing and/or instructing the Carpet Manufacturing Defendants as to disposal requirements that the Chemical Manufacturing Defendants knew or should have known would result in the contamination of surface waters and ultimately downstream properties.

265. The Carpet Manufacturing Defendants have controlled, created, caused or contributed to a continuing public nuisance by discharging PFAS contaminated wastewater to Dalton Utilities and the LAS from which PFAS, including PFOS and

PFOA, continue to contaminate the Conasauga River and downstream properties. No permit authorizes them to create a nuisance with their discharges.

266. Dalton Utilities has controlled, created, caused, or contributed to a continuing public nuisance by discharging PFAS contaminated wastewater from the LAS to the Conasauga River which continues to contaminate downstream properties. The nuisance is a continuing abatable nuisance because it has been and continues to be caused by improper operation of the LAS.

267. The PFAS contamination caused by Defendants has unreasonably interfered, and continues to interfere, with rights common to the general public—including, but not limited to, the use the Conasauga River and the Upper Coosa River Basin for drinking water, irrigation, farming, hunting, fishing, boating, swimming, and recreation—and has unreasonably interfered, and continues to interfere, with public health and the environment.

268. All who come into contact with Defendants' PFAS are hurt, inconvenienced, or damaged by, among other things, being exposed to the harmful effects of PFAS. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste; rather Defendants' conduct is such that it affects all ordinary, reasonable people who come into contact with the PFAS contaminated water. *See* O.C.G.A. § 41-1-1.

89

269.    The levels of toxic PFAS contamination found in the surface waters of the Conasauga River and Upper Coosa River Basin, directly caused by Defendants' pollution, have created a condition that has threatened, and continues to threaten, the health and well-being of everyone who uses and/or owns property adjacent to the Conasauga River and related surface waters in the Upper Coosa River Basin. It was reasonably foreseeable, and in fact known to Defendants, that their actions would cause property injury to, interfere with the property rights of, endanger the health of, and/or cause physical harm to Plaintiffs and to the public.

270.    The Perkins Plaintiffs have suffered, and will continue to suffer, special injuries as a result of the continuous public nuisance created and maintained by Defendants because Defendants' tortious conduct has substantially interfered with the Perkins Plaintiffs' use and enjoyment of their property, which is riparian to the Conasauga River.

271.    It was reasonably foreseeable, and in fact known to the Defendants, that their actions would harm public health and the environment; interfere with public rights pertaining to the use of the Conasauga River and Upper Coosa River basin for drinking water, agriculture, recreation, aesthetic purposes, and other purposes; and interfere with the rights of riparian landowners, including the Perkins Plaintiffs, to use and enjoy their property.

272.    The nuisance created by Defendants' wrongful conduct is continuing, because the discharges and releases of Defendants' PFAS into the Conasauga River are continuing as a result of the continuing degradation of PFAS precursors to PFOA and PFOS and the continuing migration of these chemicals into the River as a result of improper operation of the LAS. In addition, the past discharges of PFAS have caused contamination of sediments in the river and its tributaries, which provide a continuing source of contamination of the water.

273.    The public nuisance posed by Defendants' contamination of the Conasauga River and the Upper Coosa River Basin can be abated by requiring the Carpet Manufacturing Defendants to cease their discharges of PFAS to Dalton Utilities' POTW and by requiring all Defendants to undertake and/or fund measures to remediate the LAS to cease the ongoing discharges of PFAS from the LAS to surface waters.

274.    As a result of the public nuisance created and maintained by Defendants, the Perkins Plaintiffs have been caused to suffer, and will continue to suffer, injuries to property, interference with the use and enjoyment of their property, and additional injuries to be proved at trial, including the cost of remediating Plaintiffs' property and/or the costs for remediating the LAS.

## COUNT TEN:
## PUNITIVE DAMAGES
### (All Defendants except Dalton Utilities)

275. Plaintiffs incorporate by reference paragraphs 1 through 265 as if restated herein.

276. As manufacturers, distributors, suppliers, handlers, users, transporters, and disposers of PFAS, Defendants owed a duty to Plaintiffs and any other persons who might be foreseeably harmed to exercise due and reasonable care to prevent the discharge of toxic PFAS chemicals into waters of the State and the United States thereby contaminating the Conasauga River and related surface waters in the Upper Coosa River Basin, including Plaintiff's property.

277. In breaching these duties and performing the other tortious acts and omissions described above, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

278. Defendants knew or should have known that the discharge of their toxic PFAS chemicals would result in contaminated surface waters, thereby damaging Plaintiff's property and endangering human health and the environment.

279. Defendants acted, or failed to act, with the specific intent to cause harm, and did, and continue to, cause harm and injury to Plaintiff.

280.    Defendants acted, or failed to act, knowingly and willfully with conscious disregard and indifference to the rights and safety of others with knowledge that the actions and inactions would cause injury and harm to Plaintiff. Punitive damages should be imposed on Defendants in an amount sufficient to punish, penalize and deter them from repeating such wrongful conduct.

**COUNT ELEVEN:**
**EXPENSES OF LITIGATION**
**GA. CODE ANN. § 13-6-11**
**(All Defendants)**

281.    Plaintiffs incorporate by reference paragraphs 1 through 271 as if restated herein.

282.    Defendants have in bad faith denied their responsibility for the PFAS contamination of the Dalton Utilities LAS, the Conasauga River, and downstream waters and properties for over two decades, and have been stubbornly litigious in lawsuits brought to hold them responsible for the remediation of the LAS to reduce the contamination. As a result, Defendants have caused Plaintiffs unnecessary trouble and expense in having to prosecute this case.

283.    Pursuant to Ga. Code Ann. § 13-6-11, Plaintiffs are entitled to recover his expenses of litigation, including attorney fees, from the Defendants.

**COUNT TWELVE:**
**ABATEMENT OF PUBLIC AND PRIVATE NUISANCES**
**(All Defendants)**

284.    The Perkins Plaintiffs incorporate by reference paragraphs 1 through 274 as if restated herein.

285.    Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, the Perkins Plaintiffs have the right to bring an action to abate the nuisance caused by Defendants' manufacture, supply, handling, use, disposal and discharge of PFOA, PFOS, and related chemicals, which has caused and continues to cause contamination of the Conasauga River and related surface waters in the Upper Coosa River Basin.

286.    The Perkins Plaintiffs request this Court to issue an order and decree requiring Defendants to remove their chemicals and toxins from the Conasauga River and related surface waters in the Upper Coosa River Basin; and/or fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate these waters, based on the continuing irreparable injury to them posed by the continuing nuisance, for which there is no adequate remedy at law.

287.    Dalton Utilities has indicated it will permit Defendants to fund the abatement of the PFAS pollution of the LAS and the continuing discharges of PFAS to the Conasauga River.

288.    The Perkins Plaintiffs request that this Court enter an order and decree permanently enjoining Defendants from continuing the conduct described herein, and requiring Defendants to take all steps necessary to remove their chemicals from

94

the Conasauga River and related surface waters in the Upper Coosa River Basin, and from Plaintiffs' property, including remediation of the LAS.

289.    There is continuing irreparable injury to the Perkins Plaintiffs and indeed all who use these bodies of water for any purpose—if an injunction does not issue, as Defendants' PFAS pose a continuing threat, and there is no adequate remedy at law.

**WHEREFORE,** Plaintiffs demand trial by jury, and respectfully request that the Court grant the following relief:

(a)    Enter a declaratory judgment that Defendant Dalton Utilities has violated and is in violation of the CWA, 33 U.S.C. § 1311;

(b)    Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from the LAS into waters of the United States without an NPDES permit, including the full remediation and elimination of the LAS and construction of a wastewater treatment facility that is capable of removing all PFAS from wastewater discharged into the Dalton POTW prior to release into the Conasauga River or its tributaries;

(c)     Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from its wastewater collection system into waters of the United States without an NPDES permit;

(d)     Enter an enforcement order or an injunction under the CWA ordering Defendant Dalton Utilities to fully investigate and remediate the PFAS contamination in and around the LAS, including in soils and sediments, as well as the groundwater aquifer beneath the LAS;

(e)     Enter a declaratory judgment that Defendant Shaw has violated and is in violation of the CWA, 33 U.S.C. §§ 1311 and 1317;

(f)     Order or Enjoin Defendant Shaw to cease discharge of wastewater containing PFAS into the Dalton POTW in violation of industrial pretreatment requirements and standards, including federal prohibitions and Dalton Utilities' Sewer Use Rules and Regulations;

(g)     Enter a declaratory judgment that Defendant Mohawk has violated and is in violation of the CWA, 33 U.S.C. §§ 1311 and 1317;

(h)     Order or Enjoin Defendant Mohawk to cease discharge of wastewater containing PFAS into the Dalton POTW in violation of industrial pretreatment requirements and standards, including federal prohibitions and Dalton Utilities' Sewer Use Rules and Regulations;

(i)     Order Defendants Dalton Utilities, Shaw, and Mohawk, to pay civil penalties of up to fifty-five thousand eight hundred dollars ($55,800) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(j)     Award Plaintiffs their costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

(k)     Enter a judgment and decree against all Defendants enjoining them from maintaining the nuisance they have caused, created, and maintained;

(l)     Enter a judgment and decree against all Defendants, jointly and severally for acting in concert with one another, requiring them to abate the nuisance they have caused, created, and maintained;

(m)     Enter a judgment and decree against all Defendants, jointly and severally for acting in concert with one another, requiring them to prevent any kind of PFAS chemicals from being released into rivers, streams, and tributaries;

(n)     Enter a judgment and decree against all Defendants, jointly and severally for acting in concert with one another, requiring them to remove any kind of PFAS chemicals from the Perkins Plaintiffs' properties;

(o)     Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

                                *Attorneys for Plaintiffs:*

                     By:    */s/ Ryan Lutz*
                            Hirlye R. "Ryan" Lutz, III (*pro hac vice*)
                            F. Jerome Tapley (*pro hac vice*)
                            Brett C. Thompson (*pro hac vice*)
                            R. Akira Watson (*pro hac vice*)
                            Hunter Phares (Ga. Bar No. 600149)
                            **CORY WATSON, P.C.**
                            2131 Magnolia Avenue South
                            Birmingham, AL 35205
                            Telephone: 205-328-2200
                            Facsimile: 205-324-7896
                            rlutz@corywatson.com
                            jtapley@corywatson.com
                            bthompson@corywatson.com
                            awatson@corywatson.com
                            hphares@corywatson.com

                            Thomas Causby
                            **CAUSBY FIRM, LLC**
                            Ga. Bar # 968006
                            P.O. Box 488
                            Dalton, GA 30722-488
                            Telephone: 706-278-0525
                            Facsimile: 706-229-4363

                            Gary A. Davis (*pro hac vice*)
                            Keith Johnston (*pro hac vice*)
                            Louis W. Ringger, III (*pro hac vice*)
                            **DAVIS, JOHNSTON & RINGGER, P.C.**
                            21 Battery Park Avenue, Suite 206
                            Asheville, NC 28801
                            Telephone: 828-622-0044
                            Facsimile: 828-398-0435
                            gadavis@enviroattorney.com
                            kjohnston@enviroattorney.com

bringger@enviroattorney.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.

*/s/ Ryan Lutz*
Hirlye R. "Ryan" Lutz, III

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been filed electronically with the Clerk of the Court by using the CM/ECF system which will automatically email all counsel of record.

This 18th day of May, 2026.

*/s/ Ryan Lutz*
Hirlye R. "Ryan" Lutz, III