**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| COOSA RIVER BASIN INITIATIVE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> 3M COMPANY, et al., <br><br> Defendants. | Case No. 4:25-cv-00075-AT |

**MEMORANDUM OF LAW IN SUPPORT OF THE CARPET
MANUFACTURING DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL ALLEGATIONS ...................................................................................4

PROCEDURAL HISTORY...................................................................................10

STANDARD OF REVIEW ...................................................................................12

ARGUMENT .......................................................................................................13

I.    The Court Should Dismiss Plaintiffs' Claims for Lack of Subject
      Matter Jurisdiction Under Rule 12(b)(1)........................................................13

      A.    The Court Lacks Jurisdiction Over Count Five Against the
            Carpet Manufacturing Defendants. .......................................................13

      B.    Plaintiffs' Claims Should Be Dismissed for Lack of Standing...........18

            1.    CRBI Lacks Associational Standing to Pursue Its Claims. .......19

                  a.    CRBI Fails to Plead Facts Showing that any
                        Specific Member Has Standing. ....................................19

                  b.    CRBI Pursues Damages, Which Requires the
                        Participation of Individual Members.............................21

            2.    The Perkins Plaintiffs Lack Standing Under Article III. ..........22

II.   The Court Should Dismiss Plaintiffs' Claims for Failure to State a
      Claim Under Rule 12(b)(6)..............................................................................26

      A.    Plaintiffs Fail to State a Claim in Count Five. ...................................26

            1.    Plaintiffs Fail to State a Claim Under the CWA.......................26

            2.    Plaintiffs Fail to State a Claim Under the SURR. ....................31

      B.    Plaintiffs Do Not Plausibly Allege that the Carpet
            Manufacturing Defendants Owed a Duty as Required to State a
            Claim for Negligent Misconduct..........................................................32

      C.    Plaintiffs' Negligence Per Se Claim Fails...........................................35

D.    The Court Should Dismiss Plaintiffs' Nuisance Claims. .....................35

E.    Plaintiffs' Derivative Claims Must Be Dismissed. ............................38

CONCLUSION ..................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013).................................................................................................24

*Artis v. Crenshaw*,
256 Ga. 488, 350 S.E.2d 247 (1986) ...................................................................22

*Baker v. Dwyer*,
2018 WL 11214862 (N.D. Ga. May 30, 2018).....................................................37

*Bano v. Union Carbide Corp.*,
361 F.3d 696 (2d Cir. 2004) .................................................................................21

*Boring v. Pattillo Indus. Real Estate*,
426 F. Supp. 3d 1341 (N.D. Ga. 2019)..................................................................26

*Browman v. Kendall Patient Recovery U.S., LLC*,
2022 WL 4451339 (S.D. Ga. Sept. 23, 2022) ................................................34, 37

*Bryant v. Avado Brands*,
187 F.3d 1271 (11th Cir. 1999) .............................................................................10

*Chamber of Commerce of U.S. v. E.P.A.*,
642 F.3d 192 (D.C. Cir. 2011)...............................................................................20

*City & County of San Francisco v. EPA*,
604 U.S. 334 (2025)............................................................................................2, 29

*City of Douglasville v. Queen*,
270 Ga. 770 (1999) .................................................................................................37

*City of Mountain Park v. Lakeside of Ansley, LLC*,
560 F. Supp. 2d 1288 (N.D. Ga. 2008).................................................................16

*Cone Corp. v. Fla. Dep't. of Transp.*,
921 F.2d 1190 (11th Cir. 1991) .............................................................................23

iii

*Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*,
591 F.3d 1337 (11th Cir. 2009) ...............................................................21

*Corp. of Mercer Univ. v. Nat'l Gypsum Co.*,
1986 WL 12447 (M.D. Ga. Mar. 9, 1986)..........................................36

*Davis v. Federal Election Comm'n*,
554 U.S. 724 (2008)...............................................................................18

*Dickerson v. Colonial Pipeline Co.*,
2022 WL 18717801 (N.D. Ga. June 17, 2022)..........................................35

*Draper v. H. Roberts Family, LLC*,
2009 WL 10668404 (N.D. Ga. Mar. 30, 2009) .................................16

*Fenello v. Bank of Am., N.A.*,
926 F. Supp. 1342 (N.D. Ga. 2013)..........................................................8

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
629 F.3d 387 (4th Cir. 2011) ...................................................14

*Friends of the Earth, Inc. v. Laidlaw Env. Svcs., Inc.*,
528 U.S. 167, 120 S.Ct. 693 (2000)...................................................19

*Georgia Republican Party v. SEC*,
888 F.3d 1198 (11th Cir. 2018) .........................................................19

*Grinold v. Farist*,
284 Ga. App. 120 (2007) ...................................................................36

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)..........................................................13, 16, 17

*Hallstrom v. Tillamook Cty.*,
493 U.S. 20 (1989)..........................................................................14, 17

*Hamker v. Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985) ............................................................16

*Hendren v. Patton*,
2026 WL 1662631 (N.D. Ga. 2026)...............................................38

iv

*Hernandez v. Crown Equip. Corp.*,
  92 F. Supp. 3d 1325 (M.D. Ga. 2015) ..................................................................40

*Historic Green Springs, Inc. v. Louisa Cty. Water Auth.*,
  833 F. Supp. 2d 562 (W.D. Va. 2011) ...........................................................14, 17

*Houston v. Marod Supermarkets, Inc.*,
  733 F.3d 1323 (11th Cir. 2013) ....................................................................18, 23

*Howell v. Ansley*,
  169 Ga. App. 935, 315 S.E.2d 476 (1984) .........................................................22

*Int'l Brotherhood of Teamsters v. Sun Country, Inc.*,
  753 F. Supp. 3d 764 (D. Minn. 2024).................................................................21

*Johnson v. 3M Co.*,
  2024 WL 6956476 (N.D. Ga. Dec. 10, 2024) .............................................*passim*

*Kempton v. S. Flavor Real Estate, L.P.*,
  362 Ga. App. 137 (2021) .....................................................................................37

*Lawrence v. Dunbar*,
  919 F.2d 1525 (11th Cir. 1990) ..........................................................................12

*M.H. v. Omegle.com, LLC*,
  122 F.4th 1266 (11th Cir. 2024) .........................................................................12

*Martin v. Martin*,
  267 Ga. App. 596 (2004) .....................................................................................22

*Maynard v. Snapchat, Inc.*,
  870 S.E.2d 739 (Ga. 2022) ..................................................................................34

*Mims v. Wright Med. Tech., Inc.*,
  2012 WL 1681810 (N.D. Ga. May 11, 2012)......................................................40

*Morgan v. Dick's Sporting Goods, Inc.*,
  359 F. Supp. 3d 1283 (N.D. Ga. 2019)................................................................34

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024).........................................................................................23

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*,
  966 F.2d 1292 (9th Cir. 1992) .................................................................28

*Parris v. 3M Co.*,
  595 F. Supp. 3d 1288 (N.D. Ga. 2022)....................................................30

*Pirgim Public Interest Lobby v. Dow Chem. Co.*,
  1996 WL 903838 (E.D. Mich. Feb. 16, 1996)...............................14, 15

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
  2 F.4th 1002 (7th Cir. 2021)....................................................................20

*Pub. Serv. Tel. Co. v. Ga. Pub. Serv. Comm'n*,
  755 F. Supp. 2d 1263 (N.D. Ga. 2010).....................................................37

*Puget Soundkeeper All. v. Whitley Mfg. Co.*,
  145 F. Supp. 3d 1054 (W.D. Wash. 2015) ................................................28

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
  906 F. Supp. 2d 1264 (N.D. Ga. 2012).......................................................7

*Sheaffer v. Marriott Int'l, Inc.*,
  349 Ga. App. 338 (2019) .........................................................................32

*South River Watershed Alliance, Inc. v. Dekalb County*,
  69 F.4th 809 (11th Cir. 2023) ..................................................18, 20, 21

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..................................................................................22

*State Farm Mut. Ins. Co. v. Hernandez Auto Painting & Body Works, Inc.*,
  312 Ga. App. 756 (2011) ..........................................................................31

*Steel Co. v. Citizens for a Better Environment*,
  523 U.S. 83 (1998)....................................................................................24

*Stephens v. Koch Foods, LLC*,
  667 F. Supp. 2d 768 (E.D. Tenn. 2009).....................................................14

*Stone Man Inc. v. Green*,
  263 Ga. 470 (1993) ...................................................................................40

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)................................................................................19, 20

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) ........................................................................18

*Tennessee Riverkeeper v. Waste Connections of Tenn., Inc.*,
769 F. Supp. 3d 784 (M.D. Tenn. 2025) .................................................14, 15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)......................................................................................18

*U.S. v. Blue Cross & Blue Shield of Ala., Inc.*,
156 F.3d 1098 (11th Cir. 1998) ....................................................................12

*Stalley ex rel. U.S. v. Orlando Reg. Healthcare Sys., Inc.*,
524 F.3d 1229 (11th Cir. 2008) ....................................................................12

*United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996)......................................................................................22

*Warde v. Stucke*,
2021 WL 4033166 (S.D. Ohio Sept. 3, 2021) ..............................................16

*Warth v. Seldin*,
422 U.S. 490 (1975)......................................................................................21

*Westpark Walk Owners, LLC v. Stewart Holdings, LLC*,
288 Ga. App. 633 (2007) ..............................................................................37

*White-Lett v. New Penn. Fin., LLC*,
2018 WL 6839277 (N.D. Ga. Sept. 4, 2018)................................................35

*Wilson v. Amoco Corp.*,
33 F. Supp. 2d 969 (D. Wyo. 1998)..............................................................16

*Woods Knoll, LLC v. City of Lincoln, Ala.*,
2011 WL 13228126 (N.D. Ala. Jan. 20, 2011) .............................................17

**Statutes**

33 U.S.C. § 1251 ..............................................................................................3

33 U.S.C. § 1317..............................................................................................10

33 U.S.C. § 1365(a) ...............................................................................10, 13

33 U.S.C. § 1365(b)(1)(A) ..........................................................................14

O.C.G.A. § 12-5-29(a) ................................................................................11

O.C.G.A. § 12-5-30.4(a) .............................................................................11

O.C.G.A. § 13-6-11 .....................................................................................38

O.C.G.A. § 51-12-5.1(b)..............................................................................38

**Other Authorities**

40 C.F.R. § 401 ...........................................................................................27

40 C.F.R. § 305(a)(1) ............................................................................17, 18

40 C.F.R. § 403(a)(5) ..................................................................................26

40 C.F.R. § 403.3(p) ....................................................................................26

89 Fed. Reg. 32532 ........................................................................................9

89 Fed. Reg. 32533 ......................................................................................10

Federal Rule of Civil Procedure 12(b)(1) .............................................12, 13

Federal Rule of Civil Procedure 12(b)(6) .............................................12, 26

Plaintiff Coosa River Basin Initiative ("CRBI"), as well as Plaintiffs Raymond J. Perkins, Jr., and J. Perkins Farms, LLC (the "Perkins Plaintiffs," and collectively "Plaintiffs") seek to hold Defendants liable for alleged contamination by PFAS chemicals attributed to leaks from the Dalton Utilities land application system (the "LAS"). But Plaintiffs affirmatively allege that Mohawk[1] and Shaw[2] (collectively, the "Carpet Manufacturing Defendants") did not create PFAS and did not directly deposit PFAS onto the LAS. Plaintiffs also acknowledge that the Carpet Manufacturing Defendants discharged wastewater to the Dalton POTW pursuant to permits issued by Dalton Utilities, which allegedly knew about PFAS in the wastewater at least **twenty years ago**. And the First Amended Complaint ("FAC") does not identify a single specific violation of those permits by the Carpet Manufacturing Defendants (which makes sense, as the permits do not regulate PFAS). Equally important, and as highlighted by this Court in the *Johnson* case, the Chemical Manufacturers "knew *for decades* about the potential health impacts of

---

[1] "Mohawk" refers collectively to Defendants Aladdin Manufacturing Corporation, Mohawk Carpet, LLC, and Mohawk Industries, Inc. However, Mohawk states at the outset that Mohawk Industries, Inc. and Mohawk Carpet, LLC are not proper parties to this action. Aladdin Manufacturing Corporation owns and operates manufacturing facilities in Georgia, while Mohawk Industries, Inc. and Mohawk Carpet, LLC are holding companies that do not own or operate such assets.

[2] "Shaw" refers collectively to Shaw Industries, Inc. and Shaw Industries Group, Inc. Shaw states at the outset that Shaw Industries, Inc. is not a proper party to this action because it does not own or operate any manufacturing facilities in Georgia.

PFAS on humans" (*Johnson v. 3M Co.*, 2024 WL 6956476, at \*15 (N.D. Ga. Dec. 10, 2024)), yet Plaintiffs here admit that those same Chemical Manufacturers "fail[ed] to provide adequate guidance and instructions to their customers to avoid environmental contamination and human exposure[.]"

These allegations—that the Carpet Manufacturing Defendants complied with the instructions and permits of their regulators and were simultaneously being misled by their suppliers—underscore the various reasons why Plaintiffs' claims against the Carpet Manufacturing Defendants should be dismissed.  To be sure, Plaintiffs' counsel will likely paint this case as merely a new-and-improved iteration of *Johnson*, in which this Court denied the Carpet Manufacturing Defendants' motions to dismiss, but that would ignore the sea change that has occurred since that ruling. On the law, the Supreme Court decided *City & County of San Francisco v. EPA*, 604 U.S. 334 (2025), which strengthens the Carpet Manufacturing Defendants' permit-related defenses.  And in *Johnson* itself, the Court later held that the plaintiffs were not entitled to injunctive relief because the claimed injuries were not redressable through such relief.  *See Johnson*, 2024 WL 6956476, at \*12-13.  On the facts, the prior discovery in *Johnson*—as confirmed by the Court's order in that case and Plaintiffs' new allegations here—is that the Chemical Manufacturers were the bad actors.  This is a new case with new law and new facts that deserve a fresh look.

2

At the outset, Plaintiffs' claims suffer from two jurisdictional defects. First, their claim against the Carpet Manufacturing Defendants for a violation of the Clean Water Act, *see* 33 U.S.C. § 1251 *et seq.* (the "CWA"), fails the jurisdictional requirements for a citizen suit under the CWA. Plaintiffs fail to plead a continuing violation by the Carpet Manufacturing Defendants as required under binding Supreme Court precedent, and they failed to properly notice their alleged violations as required by the statute. Second, CRBI lacks associational standing to pursue its only claim (the CWA claim), and the Perkins Plaintiffs lack Article III standing (under the rationale that led to the *Johnson* decision) to pursue the relief they seek in the FAC (which is seemingly only purely injunctive relief).

Plaintiffs also fail to state a CWA claim. The CWA "pass through" claim rests on a theory that the Carpet Manufacturing Defendants caused Dalton Utilities to violate a permit requirement. But the alleged permit requirement is non-existent, and if Dalton Utilities cannot have violated it, then the claims against the Carpet Manufacturing Defendants must fail as well. Plaintiffs' alternative theory that the Carpet Manufacturing Defendants violated Dalton's sewer rules fails as well, as those rules do not give rise to a private right of action, and Plaintiffs fail to allege facts that would give rise to a violation in any event.

Plaintiffs' tacked-on tort claims likewise fail to state a claim. The Carpet Manufacturing Defendants did not owe any negligence duty to Plaintiffs. Unlike the

3

Chemical Manufacturers, which owed Plaintiffs a duty under well-established law requiring manufacturers to exercise reasonable care to ensure that their products are reasonably safe for foreseeable uses, there is no statute or common law principle in a reported appellate decision that required the Carpet Manufacturing Defendants to act any differently—*e.g.*, to have not used PFAS, to have removed any PFAS from their wastewater, etc.  And Plaintiffs' negligence per se claim must be dismissed because the predicate count under the CWA fails.  As for Plaintiffs' nuisance claims, Plaintiffs do not and cannot show that the Carpet Manufacturing Defendants controlled the nuisance when the Chemical Manufacturers (3M, DuPont, etc.) concealed the existence (and then later the risks) of PFAS from the Carpet Manufacturing Defendants and when Dalton Utilities permitted the Carpet Manufacturing Defendants' wastewater discharges.  Finally, Plaintiffs' derivative claims should be dismissed because the underlying claims fail as a matter of law and because punitive damages and attorneys' fees should be assessed not against the Carpet Manufacturing Defendants but against the Chemical Manufacturers that created and sold the complained-of PFAS chemicals.

**FACTUAL ALLEGATIONS**

The Carpet Manufacturing Defendants are carpet makers based in Northwest Georgia.  *See* FAC ¶¶ 46-50.  For decades, the Carpet Manufacturing Defendants purchased certain products from the Chemical Manufacturers in order to impart soil

4

resistance qualities to their carpet. *See id.* ¶¶ 69-70. At times, some of those products contained or degraded into PFOS and/or PFOA, which are chemicals designed, manufactured, and sold by the Chemical Manufacturers (not the Carpet Manufacturing Defendants) and which, according to Plaintiffs, "tend to bioaccumulate" and "persist[] in the environment." *Id.* ¶¶ 38-43, 54, 69.

For decades, the Chemical Manufacturers knew about but concealed the presence and the risks of their PFOS and PFOA-containing products from the Carpet Manufacturing Defendants and the public at large. *See id.* ¶¶ 88-113. For example, Plaintiffs allege that "3M has known for more than 40 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes" and that "PFAS chemicals persist in the environment and accumulate in the bodies." *Id.* ¶¶ 88, 92. But Plaintiffs do not allege that the Chemical Manufacturers shared the full extent of their knowledge with the Carpet Manufacturing Defendants. To the contrary, the Chemical Manufacturers, "for years, continued to sell PFAS-containing products to the Carpet Manufacturing Defendants while also failing to provide adequate guidance and instructions to their customers to avoid environmental contamination and human exposure." *Id.* ¶ 125.[3]

---

[3] At best, Plaintiffs allege that the Chemical Manufacturers shared certain knowledge about the alleged persistence and bioaccumulative nature of PFAS. *See, e.g.*, FAC ¶¶ 97, 114. Even assuming the truth of those allegations, that does not mean that the Carpet Manufacturing Defendants had sufficient knowledge. Indeed, Plaintiffs' own allegations admit that—at the exact same time the Chemical Manufacturers shared

Not only did the Chemical Manufacturers fraudulently conceal this information from the Carpet Manufacturing Defendants, but they also controlled the Carpet Manufacturing Defendants' use and application of their chemicals from the very beginning. As Plaintiffs acknowledge, the Chemical Manufacturers "were directly involved in, and exercised control over, the Carpet Manufacturing Defendants' use, handling, and disposal of the [Chemical Manufacturers'] fluorochemical products." *Id.* ¶ 76. For example, the Chemical Manufacturers "specified the type and amount" of their products and "the manner" of application to the carpet; they "designed and provided equipment" that the Carpet Manufacturing Defendants had to use when applying the products; they "monitored the carpet products" manufactured by the Carpet Manufacturing Defendants to "ensure the products met the [Chemical Manufacturers'] specifications"; they "provide[d] technical support" to the Carpet Manufacturing Defendants; and their employees "were routinely present in [the Carpet Manufacturing Defendants'] facilities to provide direction." *Id.* ¶¶ 77-78, 80, 82-83.

Put simply, the Chemical Manufacturers kept the Carpet Manufacturing Defendants in the dark as to whether their products were unreasonably hazardous, and they controlled the chemical application process that resulted in the discharge

---

some knowledge—they misrepresented that "no adverse human health effects were linked to PFAS exposure" and that exposure "does not pose a health risk to the general public." *Id.* ¶ 97, 103.

of PFAS-containing wastewater from the Carpet Manufacturing Defendants' facilities. Ultimately, the Carpet Manufacturing Defendants voluntarily ceased using PFAS-based soil resistant products in the carpet manufacturing process by 2019. *See id.* ¶ 84. And the Carpet Manufacturing Defendants ceased using soil resistant products related to PFOS and PFOA by approximately 2002 and 2008, respectively. *Id.* ¶¶ 115, 123. Separately, to hold the Chemical Manufacturers accountable for their misconduct, Mohawk sued the Chemical Manufacturers in November 2024 (before Plaintiffs' lawsuit was ever filed) for fraud based on their deceptive conduct in selling their "products to [Mohawk] without disclosing the actual or potential presence of PFAS" and in "conceal[ing] from [Mohawk] their internal studies regarding the toxicological and environmental effects of PFAS." *See Aladdin Mfg. Corp. v. 3M Co.*, No. 24CI01575, FAC ¶¶ 4-7 (Whitfield Cnty. Ga. Super. Ct.) (attached as **Ex. A**).[4]

After applying the Chemical Manufacturers' products and following their established processes, the Carpet Manufacturing Defendants discharged their wastewater to Dalton Utilities' publicly-owned treatment works (the "POTW"). *See* FAC ¶ 128. The POTW consists of multiple water pollution control plants

---

[4] "A court may also take judicial notice of publicly filed documents at the motion to dismiss stage[.]" *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1271 (N.D. Ga. 2012) (taking judicial notice of complaints filed in other lawsuits).

("WPCPs") which treat wastewater received through the Dalton sewer system, and the 9,600-acre LAS, where Dalton Utilities sprays treated wastewater across forested spray fields. *Id.* ¶¶ 2, 16, 130. All of these facilities are owned, operated and maintained solely by Dalton Utilities. *Id.*

Dalton Utilities operates the POTW pursuant to two permits issued by its regulators: (1) a National Pollutant Discharge Elimination System permit ("NPDES Permit") issued by the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") under authority granted to it by the Environmental Protection Agency ("EPA") and (2) a Land Application System Permit ("LAS Permit") issued by EPD. *Id.* ¶ 51; *see* **Ex. B** (NPDES Permit); **Ex. C** (LAS Permit).[5] As to both permits, Dalton Utilities is the sole permittee. *See* **Exs. B, C** (NPDES Permit and LAS Permit). Pursuant to the LAS Permit, Dalton Utilities enacted Sewer User Rules and Regulations ("SURR"), which authorized it to issue permits to industrial customers ("Industrial User Permits"). *See* **Ex. D** (SURR). Under this authority, Dalton Utilities issued Industrial User Permits to the Carpet Manufacturing Defendants. *See* **Exs. E, F** (Mohawk and Shaw Permits). As shown in the example below, the Industrial User Permits Dalton Utilities issued to the Carpet Manufacturing Defendants set discharge limitations on a host of chemicals,

---

[5] "A document attached to a motion to dismiss may be considered . . . if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Fenello v. Bank of Am., N.A.*, 926 F. Supp. 1342, 1344 n.2 (N.D. Ga. 2013).

including ammonia, lead, mercury, arsenic, and cyanide—but not any PFAS substance. *See, e.g.*, **Exs. E, F** (Mohawk and Shaw Permits).

B. During the effective period of this permit, the discharge from the above listed outfall(s) shall not exceed the following limitations:

Table 1 - DISCHARGE PERMIT LIMITATIONS

| Parameter | | Limitations | Units | Frequency* | Sample Type |
|---|---|---|---|---|---|
| Wastewater Flow† | | Monitor Only | MGD | Daily | Continuous |
| Biochemical Oxygen Demand | BOD | 21,000 | lbs/day | Twice Monthly | Composite |
| Chemical Oxygen Demand | COD | 34,000 | lbs/day | Twice Monthly | Composite |
| Ammonia | NH₃ | Monitor Only | mg/L | Monthly | Composite |
| Oil & Grease (Total)^A | | Monitor Only | mg/L | Monthly | Grab |
| Oil & Grease (TPH)^B | | 200 | mg/L | Monthly | Grab |
| pH | | 6.0 - 9.0 | std units | Monthly | Grab |
| Phosphorus | P | Monitor Only | mg/L | Monthly | Composite |
| Temperature | | 65°C / 150°F | degrees | Monthly | Grab |
| Total Suspended Solids | TSS | 675 | mg/L | Monthly | Composite |
| Flash Point* | | 65°C / 150°F | degrees | Biannually | Composite |
| Chromium | Cr | 1.0 | mg/L | Biannually | Composite |
| Copper | Cu | 0.6 | mg/L | Biannually | Composite |
| Lead | Pb | 0.10 | mg/L | Biannually | Composite |
| Mercury | Hg | 0.01 | mg/L | Biannually | Composite |
| Nickel | Ni | 0.12 | mg/L | Biannually | Composite |
| Zinc | Zn | 95 | lbs/day | Biannually | Composite |
| Antimony | Sb | Monitor Only | mg/L | Biannually | Composite |
| Arsenic | As | Monitor Only | mg/L | Biannually | Composite |
| Cadmium | Cd | Monitor Only | mg/L | Biannually | Composite |
| Cyanide | CN | Monitor Only | mg/L | Biannually | Composite |
| Molybdenum | Mo | Monitor Only | mg/L | Biannually | Composite |
| Selenium | Se | Monitor Only | mg/L | Biannually | Composite |
| Silver | Ag | Monitor Only | mg/L | Biannually | Composite |

Dalton Utilities then elected to spray both its industrial and residential treated wastewater over its LAS, which then allegedly "leaves the LAS via surface wasters and enters the Conasauga River," despite knowing "since 2006, if not earlier, that it was discharging PFAS into" the environment. *See* FAC ¶¶ 130, 134, 230 (brackets omitted). According to Plaintiffs, "PFAS have been detected . . . at the LAS" and in the Conasauga River. *See id.* ¶¶ 136-37.

In 2024, the EPA finalized a rule establishing Maximum Contaminant Levels ("MCLs") for drinking water for PFOS, PFOA and four other PFAS and combinations of PFAS. *Id.* ¶ 67, *see* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532, *et seq*. (Apr. 26, 2024). The rule requires public

9

water systems to be compliant by April 26, 2029.  *See* 89 Fed. Reg. at 32533.  On May 18, 2026, the EPA announced proposed rules extending the compliance date to 2031 and rescinding the MCLs for all substances other than PFOA and PFOS.  *See* Proposed PFOA and PFOS Compliance Extension Rule, Environmental Protection Agency (May 18, 2026), https://www.epa.gov/sdwa/proposed-pfoa-and-pfos-compliance-extension-rule.[6]  In addition, in 2024, the EPA designated PFOA and PFOS as "hazardous substances" for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  FAC ¶ 68.  These are the only enforceable federal regulations that reference PFAS in any way.

## **PROCEDURAL HISTORY**

On or about December 20, 2024, counsel for Plaintiffs delivered separate letters (the "Notices") to Shaw and Mohawk purporting to serve as notices of intent to file a citizen suit under the Clean Water Act, 33 U.S.C. § 1365(a)(1).  *See* FAC ¶ 26; FAC, Ex. A at 2-9 (Mohawk Notice); FAC, Ex. A at 25-32 (Shaw Notice).[7] The Notices allege violations of Section 307 of the Clean Water Act, 33 U.S.C. § 1317, violations of Section 2.4.1 of the SURR, and violations of the Georgia Water

---

[6] The proposed rule is a public record that may be considered on a motion to dismiss. *See Bryant v. Avado Brands*, 187 F.3d 1271, 1298 (11th Cir. 1999).

[7] In addition to Plaintiffs, the Notices are brought on behalf of three individuals who are not named plaintiffs in this action: Alvin Jackson, Denise Champagne and Nina Lovel.  *See* FAC, Ex. A at 2-9, 25-32 (Mohawk and Shaw Notices).

Quality Control Act ("GWQCA"), specifically O.C.G.A. § 12-5-30.4(a) and § 12-5-29(a). The contents of the Notices are addressed in further detail below.

On April 2, 2025, Plaintiffs filed this action. *See* ECF No. 1. On May 18, 2026, Plaintiffs filed the operative FAC. *See* FAC. Plaintiffs do not allege that they delivered an amended notice at any time prior to amending their complaint. Count Five of the FAC, brought by all Plaintiffs, seeks injunctive relief and civil penalties under the CWA. FAC ¶¶ 209-24. The remaining counts against the Carpet Manufacturing Defendants, brought only by the Perkins Plaintiffs, are brought under state law. *Id.* ¶¶ 225-33, 243-89.[8] Plaintiffs seek the following relief against the Carpet Manufacturing Defendants: (1) declaratory judgment that the Carpet Manufacturing Defendants have violated and are in violation of the CWA; (2) various injunctions regarding the discharge and removal of PFAS; (3) civil penalties under the CWA; (4) costs and fees under the CWA; and (5) "other and further relief." *See* FAC Prayer for Relief at (e)-(o). Plaintiffs' prayer for relief does not request money damages. *See id.*

---

[8] Plaintiffs assert separate environmental claims against only Dalton Utilities. *See* FAC ¶¶ 168-208. In addition, consistent with the fact that the Chemical Manufacturers concealed the existence and then the risks of PFAS, Plaintiffs assert a failure to warn claim against only the Chemical Manufacturers. *See id.* ¶¶ 234-42. The Carpet Manufacturing Defendants do not respond to these claims.

11

## STANDARD OF REVIEW

Lack of subject matter jurisdiction is a ground for dismissal under Federal Rule of Civil Procedure 12(b)(1). *See United States v. Blue Cross & Blue Shield of Ala., Inc.*, 156 F.3d 1098, 1101 n.7 (11th Cir. 1998). An attack on subject matter jurisdiction under Rule 12(b)(1) may either be facial (challenging the sufficiency of the allegations supporting jurisdiction, which are taken as true) or factual (challenging the existence of subject matter jurisdiction irrespective of the pleadings). *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). The party seeking to invoke federal subject matter jurisdiction—here, Plaintiffs—bears the burden of establishing its existence. *See Stalley ex rel. U.S. v. Orlando Reg. Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

"To survive dismissal" under Federal Rule of Civil Procedure 12(b)(6), "the complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *M.H. v. Omegle.com, LLC*, 122 F.4th 1266, 1270 (11th Cir. 2024). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Id.* "Similarly, a formulaic recitation of the elements of a cause of action is not adequate to survive a Rule 12(b)(6) motion to dismiss." *Id.* (quotation marks omitted).

12

## **ARGUMENT**

**I.    The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1).**

**A. The Court Lacks Jurisdiction Over Count Five Against the Carpet Manufacturing Defendants.**

Count Five is brought under Section 505(a) of the Clean Water Act, which grants a limited right to file a citizen suit against any person "alleged to be in violation" of an effluent standard or limitation under Title 33, Chapter 26 of the United States Code. 33 U.S.C. § 1365(a). This provision does not confer federal court jurisdiction over citizen suits for "wholly past violations." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 (1987). Instead, a plaintiff must, at the pleadings stage, allege "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future" at the time of filing. *Id.* at 57. This jurisdictional bar exists because, as explained by the Supreme Court in *Gwaltney*, Congress intended for citizen suits (unlike actions brought by the EPA) to be prospective in nature only, and drafted Section 505(a) accordingly. *Id.* at 57-59. A contrary rule would frustrate the CWA's purposes by interfering with the EPA's authority to enforce violations. *See id.* at 60.

In addition, under Section 505(b) of the CWA, a CWA citizen suit plaintiff must give the defendant at least 60 days' notice of the alleged ongoing violation. *See*

13

33 U.S.C. § 1365(b)(1)(A).  Adequate notice is another jurisdictional prerequisite for maintaining a citizen suit.  *See Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 31 (1989) (holding that the nearly identical notice provision of the Resource Conservation and Recovery Act was a mandatory condition precedent to an action under the statute); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011) (extending *Hallstrom* to CWA cases).  Such notice "must inform the alleged violator of ***each*** violation that will be targeted in the citizen suit."  *Historic Green Springs, Inc. v. Louisa Cty. Water Auth.*, 833 F. Supp. 2d 562, 566 (W.D. Va. 2011) (emphasis added).

Here, both the Notices and the FAC fail these jurisdictional requirements. Although they do state that the Carpet Manufacturing Defendants' alleged violations are "ongoing" (*see* FAC ¶¶ 218-19; FAC, Ex. A), this conclusory statement alone is insufficient.  *See Pirgim Public Interest Lobby v. Dow Chem. Co.*, 1996 WL 903838, at *3 (E.D. Mich. Feb. 16, 1996) ("Without any other factual allegations, plaintiffs' 'ongoing and continuous' allegation is rendered a mere conclusory statement upon which the Court's jurisdiction cannot rest."); *Tennessee Riverkeeper v. Waste Connections of Tenn., Inc.*, 769 F. Supp. 3d 784, 793 (M.D. Tenn. 2025) (holding that *Gwaltney*'s good faith standard was not satisfied by alleging that "the violations complained of have not ceased and are ongoing"); *Stephens v. Koch Foods, LLC*,

667 F. Supp. 2d 768, 786-87 (E.D. Tenn. 2009) ("Merely alleging [in a notice] that a violation is continuing is not sufficient notice.").

Instead, since Plaintiffs' CWA claims are based on alleged discharges of PFAS, the FAC must allege that these discharges were continuing at the time the action was commenced (April 4, 2025). Plaintiffs effectively concede that they must do this by alleging specific dates and locations of discharges by the Carpet Manufacturing Defendants. FAC ¶¶ 149-50. The most recent of these alleged discharges occurred on July 12, 2016 for Mohawk and July 14, 2016 for Shaw— almost *nine years* before the action was filed.[9] *See id.* On its face, then, the FAC fails to allege a continuing or current violation. *See Pirgim*, 1996 WL 903838, at *3 ("ongoing and continuous" allegation rendered conclusory where sole factual support for a violation was 20 months prior to filing of the action); *Tenn. Riverkeeper*, 769 F. Supp. 3d at 792 (allegations of ongoing PFAS contamination were not sufficiently supported by evidence of contamination 10 months earlier).

In an attempt to cure their pleading and notice deficiency, Plaintiffs allege that PFAS' persistency has led to the continuing presence of PFAS in the environment, including in the Carpet Manufacturers' facilities and wastewater. FAC ¶¶ 149-50;

---

[9] In addition, even though Plaintiffs' "pass through" theory against the Carpet Manufacturing Defendants is dependent on alleged ongoing discharges by Dalton Utilities' LAS, Plaintiffs' data relating to those alleged discharges ends in June 2022. FAC ¶ 152.

15

FAC, Ex. A.  But legacy contamination is not automatically the same thing as actual discharge, which is what Plaintiffs must allege in their notices and plead in their Complaint.  *See, e.g.*, *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985) ("Mere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge[.]"); *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 969, 975 (D. Wyo. 1998) ("[M]igration of residual contamination from previous releases does not constitute an ongoing discharge, and [] to so hold would undermine the CWA's limitations as set forth in the statute's definition of point source and the Supreme Court's holding in *Gwaltney*").[10]  The Notices and FAC fail to supply the factual content needed to support an inference that the Carpet Manufacturing Defendants are continuing to discharge any restricted pollutant.  Moreover, Plaintiffs' conclusory allegations of an ongoing violation are undermined by their admission that the carpet industry ceased buying and using PFOS-based soil resistant

---

[10] The FAC does not supply the types of factual allegations found in *City of Mountain Park v. Lakeside of Ansley, LLC*, 560 F. Supp. 2d 1288 (N.D. Ga. 2008) and *Draper v. H. Roberts Family, LLC*, 2009 WL 10668404 (N.D. Ga. Mar. 30, 2009), where past discharges of fill materials were found to constitute ongoing violations.  In those cases, it was critical to the Court's holding that the fill materials stayed intact over time, did not dissipate or dissolve, and thus continued to have the *same* effect over time.  *See Mountain Park*, 560 F. Supp. 2d at 1296; *Draper*, 2009 WL 10668404, at *11-12.  Here, the FAC alleges that PFAS stay intact at the molecular level, but also alleges that it is mobile and soluble, and concedes that it is present in different concentrations at different times.  FAC ¶¶ 54, 153-57.  Other courts have also rejected the reasoning in *Mountain Park* and *Draper*.  *See, e.g.*, *Warde v. Stucke*, 2021 WL 4033166, at *9 (S.D. Ohio Sept. 3, 2021), *aff'd*, 2022 WL 1467652 (6th Cir. May 10, 2022).

16

chemicals no later than 2002, PFOA-based soil resistant chemicals no later than 2008, and all PFAS-based soil resistant chemicals no later than 2019. FAC ¶¶ 60, 123-24. These admissions, combined with Plaintiffs' failure to allege an alternative theory of liability, mean that Plaintiffs fail *Gwaltney*'s good faith requirement.

Finally, even if Plaintiffs had overcome those hurdles, the Notices and FAC fail to allege a sufficient nexus between the alleged presence of PFAS at the Carpet Manufacturing Defendants' facilities and a violation of the CWA. The lack of a viable legal theory supports dismissal for failure to state a claim, as shown below. For purposes of jurisdiction, the Notices and Amended Complaint are insufficient under *Gwaltney* and *Hallstrom* because they are hopelessly vague and internally inconsistent, and therefore do not fairly apprise the Carpet Manufacturing Defendants of the specific violation alleged:

- The Notices allege that the Carpet Manufacturing Defendants caused Dalton Utilities to violate its LAS Permit, which Plaintiffs allege is a violation of 40 C.F.R. § 305(a)(1). *See* FAC, Ex. A.

- The FAC, on the other hand, omits this allegation and instead alleges that the Carpet Manufacturing Defendants caused Dalton Utilities to violate Part 1.1.4 of its ***NPDES Permit***, an allegation not made in the Notices. FAC ¶ 219.

Plaintiffs cannot rest on a newly asserted theory. A citizen suit complaint under Section 505(a) of the CWA cannot allege violations beyond those identified in the notice letter. *See Historic Green Springs, Inc. v. Louisa Cty. Water Auth.*, 833 F. Supp. 2d 562, 566 (W.D. Va. 2011); *Woods Knoll, LLC v. City of Lincoln*, 2011 WL

17

13228126, at *2-6 (N.D. Ala. Jan. 20, 2011).  Because Plaintiffs did not update their Notices to assert their new theory, their claims are barred.[11]

## B. Plaintiffs' Claims Should Be Dismissed for Lack of Standing.

"The judicial power of the federal courts is limited by Article III of the U.S. Constitution." *South River Watershed Alliance, Inc. v. Dekalb County*, 69 F.4th 809, 819 (11th Cir. 2023).  "Article III restricts federal courts to the resolution of cases and controversies," which "requires that the party invoking federal jurisdiction have standing – the personal interest that must exist at the commencement of the litigation."  *Davis v. Federal Election Comm'n*, 554 U.S. 724, 732 (2008). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  "Each plaintiff's standing must be assessed individually."  *In re SuperValu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017); *see also Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1340 (11th Cir. 2013) ("Each plaintiff must establish standing on the facts of the case[.]").

---

[11]The Notices are also deficient because they identified "40 C.F.R. § 305(a)(1)" as the purported CWA standard, limitation, or order that the Carpet Manufacturing Defendants allegedly violated.  *See* FAC, Ex. A.  But 40 C.F.R. § 305(a)(1) ***does not exist*** (and, even if it did exist, that provision would be part of CERCLA, not the CWA, so that is not a standard or limitation under the CWA).

18

### 1.  CRBI Lacks Associational Standing to Pursue Its Claims.

CRBI alleges that it has "organizational standing" to pursue this action.  *See* FAC ¶ 35.  "It is common ground that . . . organizations can assert the standing of their members." *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009).  There are three requirements for associational standing.  "'An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Georgia Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env. Svcs., Inc.*, 528 U.S. 167, 181 (2000)).  The Court should dismiss CRBI's claims because the FAC fails to plead facts sufficient to meet the first and third requirements for associational standing.

### a.  *CRBI Fails to Plead Facts Showing that any Specific Member Has Standing.*

CRBI fails to meet the first requirement for associational standing—*i.e.*, that one of its members would have standing to sue in their own right—because it has not identified a specific member who has suffered or will suffer harm.  "To establish standing under this theory, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'"  *Georgia Republican Party v. SEC*, 888 F.3d at 1203 (quoting *Summers*, 555 U.S. at

19

498); *see also South River Watershed Alliance*, 69 F.4th at 819 (identifying a specific member by name who suffered a cognizable injury was sufficient to meet first requirement for associational standing).  To establish associational standing, "it is not enough to aver that unidentified members have been injured."  *Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) (citing *Summers*, 129 S. Ct. at 1151-52).  "'[N]aming the affected members' is a requirement for associational standing that has never been dispensed with in light of statistical probabilities." *Prairie Rivers Network v. Dynegy Midwest Generation,* LLC, 2 F.4th 1002, 1009 (7th Cir. 2021) (quoting *Summers*, 555 U.S. at 499).

Here, the FAC fails to identify, even by pseudonym, any individual member of CRBI that it alleges was or will be harmed.  The only allegation regarding CRBI members in the FAC states:

> The CWA violations alleged herein have directly and substantially harmed CRBI members and lessened these members' economic interests, as well as their recreational and aesthetic enjoyment of the Upper Coosa River Basin, and tributaries to these waters, as well as connected groundwater springs that feed these waters.  These members would use and enjoy these waters more if the violations alleged herein ceased.

FAC ¶ 33.  Because the FAC fails to identify any specific harm to any specific CRBI member, CRBI fails to meet the first requirement for associational standing.

       *b.  CRBI Pursues Damages, Which Requires the Participation of Individual Members.*

CRBI also lacks associational standing for an additional reason—it seeks to recover not just declaratory or injunctive relief but also damages.  "Generally, an association seeking damages on behalf of its members cannot claim associational standing."  *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1354 (11th Cir. 2009) (association lacked standing where it sought compensatory and punitive damages in addition to declaratory and injunctive relief); *see also South River Watershed Alliance*, 69 F.4th at 820 (an organization seeking damages does not meet "the third requirement of associational standing – *i.e.,* that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit") (internal quotation marks omitted); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members.") (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).  "While individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members, it is typically required in an action for damages to an association's members."  *Int'l Brotherhood of Teamsters v. Sun Country, Inc.*, 753 F. Supp. 3d 764, 770 (D. Minn. 2024) (internal

quotation marks omitted).[12]    Here, CRBI does not limit the relief it seeks to declaratory or injunctive relief but instead also seeks punitive damages in Count Ten of the FAC.[13]   Accordingly, the participation of individual members is necessary and CRBI fails to satisfy the third requirement for associational standing.  The Court should dismiss CRBI's claims for lack of Article III standing.

### 2.  The Perkins Plaintiffs Lack Standing Under Article III.

The Perkins Plaintiffs, who are suing in their individual capacities, must also satisfy Article III's requirements of (1) an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016).  Where injunctive relief is sought, a plaintiff must also show that there is a sufficient likelihood that he

---

[12] The Supreme Court has held that associational standing does not require individual participation in a suit for damages where Congress has expressly authorized an association to sue for damages on behalf of its members.  *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996).  No such authorization has been provided here.

[13] CRBI does not appear to seek an award of compensatory damages.  To the extent that is the case, CRBI's claim for punitive damages must be dismissed.  *See Martin v. Martin*, 267 Ga. App. 596, 597 (2004) ("[Punitive] damages cannot be awarded in the absence of any finding of compensatory damages.") (*quoting Howell v. Ansley*, 169 Ga. App. 935, 936 (2), 315 S.E.2d 476 (1984)); *Artis v. Crenshaw*, 256 Ga. 488, 488, 350 S.E.2d 247 (1986) ("There can be no recovery of exemplary damages where the sole recovery is in equity.").

22

will be affected by the allegedly wrongful conduct in the future, at the hands of the defendant, and that the relief sought will likely prevent such injury in the future. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013); *Cone Corp. v. Fla. Dep't. of Transp.*, 921 F.2d 1190, 1203-04 (11th Cir. 1991).

The Perkins Plaintiffs allege that their property (Perkins Farms), located downstream of the LAS, is subject to intermittent flooding from the Conasauga River, which results in PFAS contamination of Perkins Farms that increases with every flooding event.  FAC ¶ 37.  They allege unspecified damage to Perkins Farms as well as injury to their use and enjoyment of Perkins Farms. *Id.*  They do not allege any bodily injury, nor do they allege (like the plaintiff in *Johnson*) that they are paying increased fees for drinking water as a result of PFAS cleanup efforts.[14]

Assuming, for purposes of this Motion only, that Plaintiffs have adequately alleged a concrete injury, Plaintiffs nonetheless fail the final requirement of redressability.  "To determine whether an injury is redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024) (internal quotation omitted).  A plaintiff's

---

[14] *See Johnson,* 2024 WL 6956476, at *12.  While the FAC does allude to "costs for remediating the LAS" (*see, e.g.*, FAC ¶ 241), there are no well-pleaded factual allegations establishing that Plaintiff is or may become liable to pay any costs associated with remediating the LAS.  The Perkins Plaintiffs do not allege that they are rate payers to any utility that has imposed any such costs—in fact, they do not allege that they obtain their water from any public water provider at all.

injury must be "likely to be redressed by the requested relief." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) (observing that redressability requires "a likelihood that the requested relief will address the alleged injury").

As this Court explained in denying a similar request for injunctive relief in *Johnson*, "the requested relief must connect to, match, and remedy the cognizable injury in fact." *Johnson*, 2024 WL 6956476, at *7. In *Johnson*, the Court held that an alleged ratepayer injury, which was sufficiently pled to survive a motion to dismiss, failed to support injunctive relief at the summary judgment stage because there was no evidence that the requested injunctive relief (including remediation of the LAS) would remedy the alleged injury:

> [E]ven if Plaintiff were to obtain the $850 million LAS remediation he seeks to address PFAS remediation, the reality remains that PFAS would still exist in the water upstream of Rome because PFAS would still be released from the LAS, PFAS would still enter the water supply via the Etowah River, and preexisting PFAS in the Oostanaula River would still be present.

*Id.* at *12-13 (citations omitted).

While this case stands in a different posture to *Johnson* and the Perkins Plaintiffs claim a different type of injury, dismissal is warranted because the FAC on its face reveals the same problem that doomed the *Johnson* plaintiffs' request for injunctive relief. The FAC acknowledges that PFAS is ubiquitous in regional water systems. FAC ¶¶ 2, 3, 15, 226, 252. Among other things, Plaintiffs specifically

24

allege that waters *upstream* of the LAS (and, for that matter, the Carpet Manufacturing Defendants' facilities) previously contained PFOS and PFOA in concentrations that exceed the recently enacted MCLs for drinking water. *Id.* ¶¶ 153-56. Plaintiffs further admit that PFAS is highly mobile and that it persists in the environment for decades, as the Court found in *Johnson*. Given these concessions, a well-pleaded complaint would need to explain how the injunctive relief they seek would actually prevent PFAS from contaminating Perkins Farms. The FAC does not and cannot supply these allegations. Likewise, Plaintiffs fail to allege how an injunction requiring the Carpet Manufacturing Defendants to remediate Perkins Farms would actually remedy their injury, given their theory that the property continues to be contaminated by flood events (which are well beyond any Defendant's control).

The Perkins Plaintiffs also fail to allege how an injunction could be implemented against the Carpet Manufacturing Defendants given that they are not alleged to have any control over the POTW, a problem the Court identified in *Johnson*. *See Johnson*, 2024 WL 6956476, at *12 n. 17. And the Perkins Plaintiffs do not explain how enjoining only *two* of Dalton Utilities' customers would accomplish anything, a critical failure given their admission that PFAS is present in a wide variety of industrial and commercial applications and in household products. *See* FAC ¶ 53. At bottom, Plaintiffs lack standing to pursue their claims.

25

**II.    The Court Should Dismiss Plaintiffs' Claims for Failure to State a Claim Under Rule 12(b)(6).**

**A. Plaintiffs Fail to State a Claim in Count Five.**

Plaintiffs' vague claim of "Pass Through" in Count Five alleges violations of the CWA and Dalton Utilities' SURR. The claim fails under either theory.

1. <u>Plaintiffs Fail to State a Claim Under the CWA</u>.

A citizen suit under the CWA is only proper against a person "who is alleged to be in violation of . . . an effluent standard or limitation under the Act." *Boring v. Pattillo Indus. Real Est.*, 426 F. Supp. 3d 1341, 1343 (N.D. Ga. 2019) (quotation mark omitted). As a CWA claim, Count Five is premised on the theory that the Carpet Manufacturing Defendants caused Dalton Utilities to violate its permit—specifically, its NPDES Permit, which Plaintiffs allege is a violation of Section 307(d) of the CWA. *See* FAC ¶¶ 218-19. The CWA's implementing regulation at 40 C.F.R. § 403(a)(5) prohibits Pass Through, which the regulations define as:

> [A] Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a ***cause of a violation of any requirement of the POTW's NPDES permit*** (including an increase in the magnitude or duration of a violation).

40 C.F.R. § 403.3(p) (emphasis added). The FAC alleges that the relevant permit violation is of Part 1.1.4 of the NPDES Permit. But this provision does not set forth an effluent limitation or a prohibition. Instead, it defines the scope of coverage under the NPDES Permit. For instance, Part 1.1.4.1 states that "discharges that are mixed

26

with non-stormwater . . . *are not eligible for coverage under this permit.*"  Such a provision cannot be violated—it just means that discharges of this type are not covered by this particular permit.  Plaintiffs recognize this difference in their claims against Dalton Utilities, by asserting counts both for ***unpermitted*** discharges (Count One) and discharges in violation of permits (Counts Two and Three).  Because any discharge mixed with non-stormwater is, by definition, not covered by the NPDES permit rather than a violation of it, it cannot form the basis for a Pass Through theory.

Even if Plaintiffs could establish that discharges mixed with non-stormwater *violate* Part 1.1.4 of Dalton's NPDES Permit, Claim Five should still be dismissed because Plaintiffs fail to allege that the Carpet Manufacturing Defendants caused the discharges mixed with stormwater.  On the face of the NPDES Permit, the discharges complained of appear to be permitted as "[s]tormwater discharges associated with industrial activity."[15]  Plaintiffs allege that the Carpet Manufacturing Defendants are

---

[15] *See* **Ex. B** (NPDES Permit) at Parts 1.1.2.1 and 8.L.2 and Appendices A and D. The Permit covers "[s]tormwater discharges associated with industrial activity for any primary industrial activity and co-located industrial activities, as defined in Appendix A."  *See id.* at Part 1.1.2.1.  Appendix A states that for the categories of industries identified in Appendix D, the term includes but is not limited to "sites used for the application or disposal of process waste waters (as defined at 40 C.F.R. § 401)[.]"  *See id.* at Appendix A.  Appendix D, in turn, identifies "Land Application Sites" as a Sector L covered facility for purposes of the definition of stormwater discharges associated with industrial activity.  *Id.* at Appendix D, Activities Covered Table, Sector L.  Section 8.L.2 of the NPDES Permit reinforces this conclusion, identifying expressly that the NPDES Permit covers "stormwater discharges for Sector L facilities associated with waste disposal at . . . land application sites . . . that receive or have received industrial waste[.]"  *Id.* at Part 8.L.2.

liable "by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries ***along with stormwater***." FAC ¶¶ 218-19 (emphasis added). By definition, however, the runoff at issue is a covered stormwater discharge associated with industrial activity.

The allegation that the discharge contains PFAS changes nothing. Courts consistently hold that it is the stormwater from the industrial activity, not what contaminants may be in that stormwater, which determines the NPDES permit coverage. *See Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1304 (9th Cir. 1992) (holding EPA's distinction for light industry stormwater was arbitrary and capricious and observing "[i]t is not necessary that storm water be contaminated or come into direct contact with pollutants; only association with any type of industrial activity is necessary"); *see also Puget Soundkeeper All. v. Whitley Mfg. Co.,* 145 F. Supp. 3d 1054, 1057 (W.D. Wash. 2015) ("Congress necessarily found that the stormwater itself is a pollutant subject to regulation under the CWA."). This well-settled law makes clear that the presence or absence of a particular pollutant does not transform a stormwater discharge associated with industrial activity, by fact or definition, into something else.

Because the stormwater discharges at issue are covered "stormwater discharges associated with industrial activity," there could be no violation of Part

28

1.1.4 of the NPDES Permit, and therefore any claim asserted against the Carpet Manufacturing Defendants based on "Pass Through" must be dismissed.

Plaintiffs are required to rely on this convoluted (and ultimately unsupportable) theory because there are no permit limitations or restrictions that prevent the Carpet Manufacturing Defendants *or anyone* from discharging PFAS to a POTW. There is no statute or rule imposing any such limitation. The NPDES Permit and LAS Permit are silent as to PFAS. *See* **Exs. B, C** (NPDES and LAS Permits). So too are the Industrial User Permits. *See* **Exs. E, F** (Mohawk and Shaw Permits). And Plaintiffs' alleged violations of Dalton's permits cannot be premised on any provision that merely makes the "permittee responsible for the quality of the water in the body of water into which the permittee discharges pollutants," as the Supreme Court has recently recognized that such permits must instead "spell out what a permittee must do or refrain from doing." *City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025). At the end of the day, Plaintiffs do not and cannot identify an effluent limitation or violation of *any* permit or any federal "pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 404 through 471, including . . . categorical regulations for specific industrial categories," as Plaintiffs concede would be required to state a claim. FAC ¶ 212.

The CWA claim therefore fails. And the Court need not take the Carpet Manufacturing Defendants' word for it, as Plaintiffs' counsel's exact "Pass

29

Through" theory has already been rejected. Plaintiffs' counsel also raised this exact same theory in asserting a CWA claim against an alleged user of PFAS in a different case (to which the Carpet Manufacturing Defendants were not a party), which arose out of alleged PFAS contamination in the area near Trion and Summerville. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1322 (N.D. Ga. 2022) ("The Plaintiff first claims that Mount Vernon's PFAS discharges have caused 'Pass Through' at the Trion WPCP in violation of the CWA and its implementing regulations."). But the Court rejected Plaintiffs' counsel's arguments and "grant[ed] Mount Vernon's Motion to Dismiss as to the Plaintiff's Pass Through [CWA] claim." *Id.* at 1323.

Most relevant here, the *Parris* court agreed with the alleged PFAS user that "the Pass Through rule" focuses "on 'discharge[s] of treated effluent ***directly from the [POTW] into jurisdictional waters***." *Id.* (emphasis added). *Parris* involved the land application of sludge by the POTW, rather than the direct discharge of treated wastewater by the POTW, and the court recognized that the land application of sludge was subject to a different regulatory scheme. *See id.* Likewise, this case involves Dalton's land application of treated wastewater, rather than the direct discharge of treated wastewater by Dalton. And, as Plaintiffs acknowledge, that land application is likewise subject to its own regulatory scheme—the Georgia EPD "administers statutes and regulations implementing the CWA's permitting programs within the State of Georgia," including Dalton's LAS permit, which "should be

30

treated as a state permit issued pursuant to the CWA." FAC ¶¶ 184, 191. Accordingly, this Court should follow *Parris* and dismiss Plaintiffs' Pass Through theory of liability.

### 2. Plaintiffs Fail to State a Claim Under the SURR.

To the extent that Count Five can be read as an attempt to enforce the SURR, the claim fails in that respect as well. The FAC does not plead facts showing that Plaintiffs have a right of action under the SURR. Nothing on the face of the FAC indicates that Plaintiffs may enforce the SURR through a civil suit, and Plaintiffs cite no statute authorizing a private right of action under the SURR. To the contrary, the SURR makes clear that any cause of action belongs to Dalton—not third parties like Plaintiffs. *See* **Ex. D** (SURR) §§ 6.4, 6.5 (stating that "Dalton Utilities, through the Utility's attorney, may petition the State Court of Whitfield County for the issuance of a temporary or permanent injunction" and that "Dalton Utilities may recover . . . the cost of any actual damages incurred by Dalton Utilities"). "[I]t is well settled that violating statutes and regulations does not automatically give rise to a cause of action by an individual claiming to have been injured from a violation thereof." *State Farm Mut. Ins. Co. v. Hernandez Auto Painting & Body Works, Inc.*,

312 Ga. App. 756, 761 (2011). "Rather, the statutory text must expressly provide a private cause of action." *Id.*[16]

Even if a private right of action existed, the FAC fails to show a violation of the SURR for the same reasons explained above—neither SURR nor the Industrial User Permits nor any of Dalton Utilities' permits purports to impose an effluent limitation capable of being violated.

### B. Plaintiffs Do Not Plausibly Allege that the Carpet Manufacturing Defendants Owed a Duty as Required to State a Claim for Negligent Misconduct.[17]

Turning to Plaintiffs' negligent misconduct claim, "the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff. This issue is a question of law." *Sheaffer v. Marriott Int'l, Inc.*, 349 Ga. App. 338, 340 (2019). "In the absence of a legally cognizable duty, there can be no fault or negligence." *Id.* "A legal duty sufficient to support liability in negligence is 'either a duty imposed by a valid statutory enactment of the legislature

---

[16] Likewise, while the heading to Count Five alludes to "Violation of Federal Prohibitions," the FAC does not allege facts showing that these "prohibitions" give rise to a cause of action other than the limited right to a citizen suit under the CWA.

[17] The Carpet Manufacturing Defendants recognize that this Court rejected certain arguments on some of these common-law claims in *Johnson*. The allegations in this Complaint, however, are sufficiently different as to the extent to which the Carpet Manufacturing Defendants were misled by the Chemical Manufacturers, such that the Court can reach a different conclusion in this case. *See infra* note 19.

32

or a duty imposed by a recognized common law principle declared in the reported decisions of [the] appellate courts.'" *Id.*

Plaintiffs fail to plead a duty that the Carpet Manufacturing Defendants owed them under a statute or a recognized common law principle in Georgia. Plaintiffs primarily allege that the Carpet Manufacturing Defendants owed a duty to "exercise reasonable and due care in the use, handling, and disposal of PFAS to prevent it escaping from their premises and discharging into the Conasauga River and contaminating the Perkins Plaintiffs' property." *See* FAC ¶ 229. But the Carpet Manufacturing Defendants had no such duty because there is no statute or common law principle in a reported appellate decision that required the Carpet Manufacturing Defendants to remove any PFAS from their wastewater—and certainly not to prevent Dalton Utilities' failure to treat their wastewater, Dalton Utilities' decision to spray that treated wastewater over the LAS, or the migration of any PFAS into the Conasauga River. To the contrary, the permits that Dalton Utilities issued to the Carpet Manufacturing Defendants, which restricted the discharge of a host of substances, ***did not limit PFAS***, which suggests that the Carpet Manufacturing Defendants did not owe any duty. *See* **Exs. E, F** (Mohawk and Shaw Permits).

The Carpet Manufacturing Defendants are thus differently situated than the Chemical Manufacturers, as to which Plaintiffs separately allege that "[a]s the suppliers of a knowingly hazardous product, [the Chemical Manufacturers] had a

33

duty to protect Plaintiffs and Plaintiffs' property from PFAS contamination."  FAC ¶ 227.  It is well-established that "a manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses."  *Morgan v. Dick's Sporting Goods, Inc.*, 359 F. Supp. 3d 1283, 1289 (N.D. Ga. 2019) (denying manufacturer's motion to dismiss negligence claim); *see also Maynard v. Snapchat, Inc.*, 870 S.E.2d 739, 745 (Ga. 2022) ("[W]hen designing a product, a manufacturer has a duty to exercise reasonable care in 'selecting from among alternative product designs[.]'").  As this Court recognized in an order last year in the *Johnson* case, those "chemical supplier Defendants knew *for decades* about the potential health impacts of PFAS on humans" (*Johnson v. 3M Co.*, Doc. 1616, No. 4:20-cv-00008 (N.D. Ga. Dec. 10, 2024)) (emphasis in original)), and Plaintiffs allege that they breached their duty to exercise reasonable care and to warn about those potential health impacts (*see* FAC ¶¶ 227, 235-38).   But Plaintiffs do not and cannot allege that the Carpet Manufacturing Defendants violated a similar duty here.

On these allegations, the Court should dismiss Plaintiffs' negligence claim as to the Carpet Manufacturing Defendants.  *See, e.g.*, *Browman v. Kendall Patient Recovery U.S., LLC*, 2022 WL 4451339, at *9 (S.D. Ga. Sept. 23, 2022) (granting motion to dismiss in environmental contamination case because "Plaintiff fail[ed] to assert a duty owed by Defendant, and her negligence claim fail[ed] as a matter of

law"); *Dickerson v. Colonial Pipeline Co.*, 2022 WL 18717801, at *5 (N.D. Ga. June 17, 2022) (granting motion to dismiss when "Plaintiffs fail[ed] to allege the existence of any cognizable statutory or common law duty owed by Colonial").

## C. Plaintiffs' Negligence Per Se Claim Fails.

Plaintiffs assert a claim for negligence per se based solely on violations of "the CWA, Georgia law, and the Dalton SURR as set out Count Five of this Complaint." FAC ¶ 244. However, as discussed above, that predicate CWA claim identified in Count Five is deficient as a matter of law, and Plaintiffs fail to articulate any other specific basis for negligence per se. Thus, this claim must be dismissed as well. *See White-Lett v. New Penn. Fin., LLC*, 2018 WL 6839277, at *15 (N.D. Ga. Sept. 4, 2018), *adopted by* 2019 WL 7493539 (N.D. Ga. Apr. 1, 2019) ("Because this Court has concluded that Plaintiff's [predicate claims] fail to state a claim . . . , those claims cannot support Plaintiff's claim for negligence per se.").

## D. The Court Should Dismiss Plaintiffs' Nuisance Claims.

Plaintiffs allege that the Carpet Manufacturing Defendants, as well as the other Defendants, "created and maintained a continuous [private and public] nuisance by causing and contributing to cause the proliferation of PFAS including, but not limited to PFOA, PFOS, and related chemicals, into the Conasauga River and related tributaries and watersheds, which has caused, and continues to cause, contamination of these waters and the Upper Coosa River Basin, and contamination

35

of the properties adjacent to these waters."  FAC ¶¶ 252, 262.  Plaintiffs also seek abatement of the nuisance.  *See id.* ¶¶ 284-89.  These claims fail for two reasons.

First, "the essential element of nuisance is control over the cause of the harm." *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007).  Plaintiffs fail to plausibly allege that the Carpet Manufacturing Defendants controlled or still control the nuisance. On the front end, as Plaintiffs acknowledge, the Chemical Manufacturers were the "manufacturers and suppliers of PFAS" and "exerted control over the application of the PFAS-containing products at Carpet Manufacturing Defendants' facilities." FAC ¶¶ 6, 19.  The Carpet Manufacturing Defendants could not have controlled the nuisance when Plaintiffs admit that the Chemical Manufacturers controlled their conduct in the first place.  On the back end, the Carpet Manufacturing Defendants' permits expressly permitted them to discharge their wastewater and never limited PFAS.  *See* **Exs. E, F** (Mohawk and Shaw Permits).  Not to mention that Plaintiffs expressly allege that Dalton Utilities—not the Carpet Manufacturing Defendants— is the party that operates the land application system which is purportedly the source of PFAS contamination.  FAC ¶¶ 172-75.  Given these allegations, the Carpet Manufacturing Defendants should not be liable for a nuisance that its co-defendants created, controlled, and expressly allowed through the Carpet Manufacturing Defendants' permits.  *See, e.g., Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, 1986 WL 12447, at *6 (M.D. Ga. Mar. 9, 1986) (granting motion to dismiss when the

36

"'nuisance' creating property . . . was in the possession and control of the plaintiff" and thus the defendants "no longer owned or controlled" the property), *rev'd in part on other grounds*, 877 F.2d 35 (11th Cir. 1989).

Second, Plaintiffs' claim for abatement of the nuisance must be dismissed. For one thing, the underlying nuisance claims fail. *See Westpark Walk Owners, LLC v. Stewart Holdings, LLC*, 288 Ga. App. 633, 635-36 (2007) ("[T]he trial court may deny injunctive relief if it appears unlikely that the movant will prevail on the merits of its claim."); *see also, e.g.*, *Baker v. Dwyer*, 2018 WL 11214862, at *9 (N.D. Ga. May 30, 2018) (similar). And even if Plaintiffs had a valid underlying claim, Plaintiffs fail to plausibly allege that there is no adequate remedy at law, as required to obtain an injunction. *See* FAC ¶¶ 284-89. Indeed, "the ability to calculate monetary damages provide[s] Plaintiff[s] an adequate remedy at law." *Pub. Serv. Tel. Co. v. Ga. Pub. Serv. Comm'n*, 755 F. Supp. 2d 1263, 1281 (N.D. Ga. 2010).[18]

---

[18] Separately, under Georgia law, "[t]hat which the law authorizes to be done, if done as the law authorizes, cannot be a nuisance. . . . Thus, where the act is lawful in itself, it becomes a nuisance only when conducted in an illegal manner to the hurt, inconvenience or damage of another." *City of Douglasville v. Queen*, 270 Ga. 770, 773 (1999). Here, as discussed, the Carpet Manufacturing Defendants' conduct was authorized and not done in an illegal manner, as its wastewater discharges were not prohibited by its permits. *See* **Exs. E, F** (Mohawk and Shaw Permits). Because the "law permits Defendant's [wastewater discharges] through a permitting process," "Plaintiff's claim [for nuisance] fails as a matter of law." *Browman*, 2022 WL 4451339, at *9-11 (granting motion to dismiss in environmental contamination case); *see also Kempton v. S. Flavor Real Estate, L.P.*, 362 Ga. App. 137, 138-39 (2021) (affirming judgment in favor of defendant that "obtained all necessary licenses and permits and was authorized by law to operate" the alleged nuisance).

### E. Plaintiffs' Derivative Claims Must Be Dismissed.

Finally, Plaintiffs assert derivative claims for punitive damages and attorneys' fees. *See* FAC ¶¶ 275-83. Because "none of the substantive claims against" the Carpet Manufacturing Defendants survive, Plaintiffs' "derivative claims for litigation expenses and punitive damages [should] also be dismissed." *Hendren v. Patton*, 2026 WL 1662631, at *13 (N.D. Ga. 2026). But, even if there is a valid underlying claim to which Plaintiffs' derivative claims could attach, the derivative claims should still be dismissed for failure to state a claim. Punitive damages are appropriate only when there is "clear and convincing evidence" of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). And attorneys' fees are appropriate only where "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11.

Here, there are insufficient allegations to support an award of punitive damages or attorneys' fees against the Carpet Manufacturing Defendants, as Plaintiffs fail to plausibly allege that the Carpet Manufacturing Defendants had knowledge of the harms of PFAS. Plaintiffs' meager allegations with respect to the Carpet Manufacturing Defendants' knowledge stand in stark contrast to Plaintiffs' precise and inculpatory allegations regarding the Chemical Manufacturers' decades-

38

long scheme to fraudulently conceal the harms of their own PFAS products.  Among many other things, Plaintiffs allege that "a 1978 3M study of the effects of PFAS on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the PFAS" and that DuPont "failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility."  FAC ¶¶ 89, 98.

Notably absent from Plaintiffs' Complaint are any similar allegations that the Carpet Manufacturing Defendants had such knowledge or that the Chemical Manufacturers ever shared this level of knowledge with either carpet company. Instead, as Plaintiffs allege, the Chemical Manufacturers failed to "warn the purchasers and users of their PFAS products, including carpet manufacturers, of the dangers associated with PFAS, including the existence and extent of the risks PFAS pose to human health and the environment and the inability of conventional wastewater treatment to remove these chemicals."  *Id.* ¶ 235.[19]

---

[19] The Court allowed the punitive damages claim to proceed past a motion to dismiss in *Johnson*, but that claim was premised on different allegations than those here.  *See Johnson*, 563 F. Supp. 3d at 1345.  After extensive discovery in *Johnson*, Plaintiffs' counsel has learned that the Chemical Manufacturers misled the Carpet Manufacturing Defendants, and Plaintiffs have acknowledged that crucial fact in the First Amended Complaint.  For example, Plaintiffs acknowledge that "the [Chemical Manufacturers], for years, continued to sell PFAS-containing products to the Carpet Manufacturing Defendants while also failing to provide adequate guidance and instructions to their customers to avoid environmental contamination and human exposure."  FAC ¶ 125.  That allegation was not in *Johnson*.  And Plaintiffs also assert a failure to warn claim against the Chemical Manufacturers (*id.* ¶¶ 234-42),

Separately, the Carpet Manufacturing Defendants' discharges complied with their permits, which did not limit PFAS. *See* **Exs. E, F** (Mohawk and Shaw Permits). Under Georgia law, "punitive damages are typically not appropriate where the manufacturer has complied with regulatory standards." *Mims v. Wright Med. Tech., Inc.*, 2012 WL 1681810, at *5 (N.D. Ga. May 11, 2012) (granting motion to dismiss punitive damages claim) (citing *Stone Man Inc. v. Green*, 263 Ga. 470, 472 (1993) (internal quotations omitted)). Against this backdrop, Plaintiffs cannot seek punitive damages from the Carpet Manufacturing Defendants, and thus the Court should dismiss the claim for punitive damages. *See, e.g.*, *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1356 (M.D. Ga. 2015) (rejecting punitive damages when defendant "complied with . . . the relevant regulations").

## CONCLUSION

Accordingly, for the foregoing reasons, the Carpet Manufacturing Defendants respectfully request that the Court dismiss the claims against them in their entirety.

---

which was likewise not asserted in *Johnson*. Plaintiffs' acknowledgment that the Chemical Manufacturers concealed their knowledge from the Carpet Manufacturing Defendants makes this case different than *Johnson* and shows that punitive damages are appropriate solely against the Chemical Manufacturers—not the Carpet Manufacturing Defendants.

Dated:  June 17, 2026

/s/ Jennifer B. Dempsey
Jennifer B. Dempsey
Georgia Bar No. 217536
Michael P. Carey
Georgia Bar No. 109364
Christian J. Bromley
Georgia Bar No. 206633

**BRYAN CAVE LEIGHTON PAISNER LLP**
1201 W. Peachtree Street, 14th Floor
Atlanta, GA 30309
Phone: (404) 572-6600
Fax: (404) 572-6999
jennifer.dempsey@bclplaw.com
michael.carey@bclplaw.com
christian.bromley@bclplaw.com

A. Elizabeth Blackwell (*pro hac vice* filed)

**BRYAN CAVE LEIGHTON PAISNER LLP**
One Metropolitan Square
211 North Broadway
St. Louis, MO 63102
Phone: (314) 259-2513
Fax: (314) 259-2020
liz.blackwell@bclplaw.com

*Counsel for Defendants*
*Shaw Industries, Inc. and Shaw Industries Group, Inc.*

Respectfully submitted,

/s/ Jason Rottner
Jason Rottner
Georgia Bar No. 678137
William J. Repko III
Georgia Bar No. 301797
Jamie S. George
Georgia Bar No. 911331
Andrew A. Roberts
Georgia Bar No. 425333

**ALSTON & BIRD LLP**
1201 W. Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
jason.rottner@alston.com
jay.repko@alston.com
jamie.george@alston.com
andrew.roberts@alston.com

*Counsel for Defendants*
*Aladdin Manufacturing Corporation, Mohawk Industries, Inc., and Mohawk Carpet LLC*

## <u>CERTIFICATION UNDER LOCAL RULE 7.1(D)</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1(D), I hereby certify that the foregoing filing is a computer document and was prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1(C).

*/s/ Andrew A. Roberts*
Andrew A. Roberts
Georgia Bar No. 425333
ALSTON & BIRD LLP

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2026, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which automatically sends e-mail notification of such filing to counsel of record.

/s/ Andrew A. Roberts
Andrew A. Roberts
Georgia Bar No. 425333
ALSTON & BIRD LLP